UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUEBERRY FUNDING, LLC and EADMK LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> RIVERSIDE ABSTRACT LLC, AVERY EISENREICH, SHAUL C. GREENWALD, ARYEH LAZARUS, SAMUEL LOWINGER, MARK J. NUSSBAUM, AZI MINDICK, JOSEPH TREFF, YOEL ZAGELBAUM, and FIDELITY INVESTMENTS CHARITABLE GIFT FUND, <br><br> Defendants. | CASE NO. <br><br><br><br> **COMPLAINT** |

Plaintiffs BLUEBERRY FUNDING, LLC and EADMK LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, Bochner PLLC, bring this action against Defendants RIVERSIDE ABSTRACT LLC, AVERY EISENREICH, SHAUL C. GREENWALD, ARYEH LAZARUS, SAMUEL LOWINGER, MARK J. NUSSBAUM, AZI MINDICK, JOSEPH TREFF, YOEL ZAGELBAUM, and FIDELITY INVESTMENTS CHARITABLE GIFT FUND (collectively, "Defendants") and allege as follows:

**<u>INTRODUCTION</u>**

1. This action arises from Defendants' knowing participation in a coordinated real estate, mortgage, and bank fraud scheme carried out in concert by, among others, now-indicted real estate attorney Mark Nussbaum, his law firm Nussbaum Lowinger LLP, and the firm's other named partner Samuel Lowinger. Acting as the title and closing agents for the transactions at issue, Defendants provided the documentation, settlement statements, and disbursement services

necessary to make sham property "flip" sales at artificially inflated prices appear legitimate to lenders. In exchange, Defendant Riverside Abstract LLC charged excessive fees and paid, amongst other improper payments, kickbacks to Nussbaum and Lowinger, and in doing so enabled the diversion and misuse of Plaintiffs' escrowed funds.

2. To create the false appearance that buyers had access to sufficient capital to close these transactions, Defendants and their co-conspirators needed a constant influx of cash. Nussbaum and Lowinger, with the knowledge of Riverside and its principals, solicited Plaintiffs to supply short-term loans. Plaintiffs were promised that their money would remain safely held in an attorney IOLA escrow account maintained by Nussbaum Lowinger LLP, would not be moved without Plaintiffs' authorization, and would be returned with interest on demand. In reliance on these representations, Plaintiffs wired approximately $87.5 Million to the IOLA account held by Nussbaum Lowinger LLP through multiple transfers.

3. Those representations were false. Shortly after receipt, Plaintiffs' funds were removed from Nussbaum Lowinger LLP's escrow account, commingled with other funds, and diverted through a series of transfers orchestrated by Nussbaum, Lowinger, and Defendants. Rather than safeguarding the funds as promised, the conspirators used them to finance fraudulent closings, make improper disbursements, and enrich themselves.

4. When Plaintiffs demanded the return of their principal and interest, they were falsely told that the money had been "stolen." In truth, the funds had already been misappropriated and distributed by Nussbaum and Lowinger.

5. Through this coordinated conduct, Defendants conspired to commit, and aided and abetted, fraud, breach of fiduciary duty, conversion, and related misconduct. Plaintiffs bring this action to recover their losses and to hold Defendants accountable for their wrongful actions.

## THE PARTIES

6.  Plaintiff BLUEBERRY FUNDING, LLC ("Blueberry Funding") is a Delaware limited liability company authorized to conduct business in New York, with a principal place of business in Lakewood, New Jersey. Blueberry Fundings' sole member is a Florida resident.

7.  Plaintiff EADMK LLC ("EADMK") is a Florida limited liability company with its principal place of business in Florida. EADMK's sole member is a Florida resident.

8.  Defendant RIVERSIDE ABSTRACT LLC ("Riverside") is a New York limited liability company with a principal place of business at 3839 Flatlands Avenue, Brooklyn, NY 11234. It is a full service, national title agency that has been servicing the real estate industry since 2007.

9.  Defendant SHAUL C. GREENWALD ("Greenwald") joined Riverside in 2009 as its Chief Executive Officer and currently serves as its Chairman. Greenwald resides at 1010 East 22nd Street, Brooklyn, New York 11210. Greenwald exercised ultimate authority and control over Riverside's operations, finances, and closing practices. Greenwald directed and authorized Riverside's participation in the fraudulent flip transactions described herein, approved the disbursement of funds and payments necessary to carry out those transactions, and authorized kickbacks and other improper payments to Nussbaum, Lowinger, and their firm, as well as to himself.

10.  At all times relevant hereto, Defendant ARYEH LAZARUS ("Lazarus") was Head of Compliance and in-house attorney at Riverside. Lazarus resides at 16 Ellington Way, Spring Valley, New York 10977. As Head of Compliance, Lazarus exercised supervisory authority over Riverside's national transaction files and compliance operations and was responsible for reviewing and ensuring that closings, escrow disbursements, and wire transfers complied with applicable

laws and regulations. Lazarus reviewed, approved, and/or permitted the processing of the transactions described herein despite obvious irregularities and red flags, thereby enabling the misconduct described herein.

11.    Defendant SAMUEL LOWINGER ("Lowinger") is a New York attorney and former named partner of the law firm of Nussbaum Lowinger LLP. Lowinger participated in the management and operation of the firm and its escrow accounts and assisted in or permitted the diversion and disbursement of Plaintiffs' funds in furtherance of the scheme. Lowinger resides at 496 Arbuckle Avenue, Cedarhurst, NY 11516.

12.    At all times relevant hereto, Defendant AZI MINDICK ("Mindick") was Riverside's Chief Financial Officer. Mindick resides at 1663 Hidden Lane, Lakewood, NJ 08701. As Chief Financial Officer, Mindick exercised control over Riverside's financial operations, including its bank accounts and outgoing wire transfers. He was responsible for managing, approving, and causing disbursements to be made in connection with Riverside's closings and escrow activities, including the transfers used in the transactions described herein. Mindick authorized, directed, and/or permitted the wire transfers that diverted Plaintiffs' funds and enabled the fraudulent scheme.

13.    Defendant YOEL ZAGELBAUM ("Zagelbaum") founded Riverside in 2007 and currently serves as its President. Zagelbaum resides at 1737 Burnett Street, Brooklyn, New York 11229.  Zagelbaum was the President of Riverside who, *inter alia*, directed the Co-Conspirators (defined *infra*) to divert Plaintiff's funds to non-interested parties at Plaintiffs' expense.

14.    Defendant AVERY EISENREICH is the current owner of Riverside and resides at 575 Bedford Avenue, Brooklyn, NY 11211.

15.     Defendant JOSEPH TREFF is a part owner of Riverside and resides at 1737 E. 23rd Street, Brooklyn, NY 11229.

16.     Defendants Greenwald, Lazarus, Mindick, Eisenreich, Treff, and Zagelbaum (collectively, the "Riverside Principals") are individuals who owned, controlled, and/or exercised supervisory or operational authority over Riverside and its transactional and compliance functions. Each of the Riverside Principals personally participated in, directed, authorized, ratified, or knowingly permitted the wrongful conduct alleged herein. Each acted as an agent of Riverside and of the other defendants during the events at issue and benefited from the misconduct described herein. Riverside and the Riverside Principals are collectively referred to herein as the "Riverside Defendants."

17.     Defendant FIDELITY INVESTMENTS CHARITABLE GIFT FUND ("Fidelity") is a public charity with an address of 245 Summer Street, Boston, MA 02210.

18.     Fidelity improperly funneled Plaintiffs' funds from the transfers in the transactions described herein to various charities at Riverside's instruction, in violation of applicable law.

19.     Defendant MARK J. NUSSBAUM ("Nussbaum") is a now-former New York attorney who resides in Suffern, New York. At all times relevant hereto, Nussbaum was the principal of, and a named partner in, the law firms Mark J. Nussbaum & Associates PLLC and Nussbaum Lowinger LLP (together, the "Nussbaum Firms"). Nussbaum maintained, controlled, and was a signatory on the attorney IOLA trust account into which Plaintiffs wired their funds. Nussbaum personally solicited Plaintiffs to wire those funds, personally made or authorized the misrepresentations regarding the use and protection of those funds, and personally authorized and directed the transfers and disbursements of those funds out of the IOLA account in furtherance of the scheme alleged herein. On April 16, 2026, the Nussbaum Firms filed petitions under Chapter

11 of the Bankruptcy Code in the Southern District of New York, captioned *In re Nussbaum Lowinger LLP, et al.*, Lead Case No. 26-22383 (SHL) (Bankr. S.D.N.Y.). Nussbaum has not individually filed a petition under any chapter of the Bankruptcy Code, and the automatic stay under 11 U.S.C. § 362 does not apply to him in his individual capacity. He is sued herein in his individual capacity for his own conduct. He has been arrested and indicted by a New York County grand jury on charges arising from the theft and misuse of client escrow funds.

20.     Upon information and belief, Nussbaum, Lowinger, and the Nussbaum Firms used Plaintiffs' escrowed funds to finance down payments, closing costs, and other disbursements necessary to complete the sham flip transactions and to generate fees and profits for themselves and their co-conspirators, rather than holding those funds in trust for Plaintiffs as promised.

21.     Venue is proper in this District because of the residence in this District of Defendants Nussbaum and Lazarus and because a substantial portion of the underlying facts of the matter, including the operations of the NLLLP law firm and the transactions described herein, occurred or originated in this District.

**PLAINTIFFS' STANDING**

22.     Each Plaintiff is a direct victim of the conduct alleged herein. Each Plaintiff wired its own funds into the NLLLP IOLA account, lost those funds as a result of Defendants' and the Co-Conspirators' misconduct, and seeks to recover its own losses through this action.

23.     Plaintiffs collectively wired approximately $86.27 million of their own funds into the NLLLP IOLA account maintained by Nussbaum Lowinger LLP. Blueberry Funding wired $58,772,945, and EADMK wired $27.5 million, in addition to the further contributions described herein. Each wire was transmitted from the Plaintiff's own account, in its own name, and for its own benefit. None of those funds has been returned, despite due demand therefor.

24.    Plaintiffs are the named parties to the written escrow and loan agreements pursuant to which their funds were deposited into the NLLLP IOLA account. Plaintiffs do not assert their claims derivatively or as assignees; they assert them in their own names, to recover their own funds.

25.    Plaintiffs at all times retained ownership of the funds they deposited into the NLLLP IOLA account. Under the express terms of the escrow and loan agreements, Plaintiffs' funds were to be held in escrow and were not to be moved without Plaintiffs' written authorization. Plaintiffs were the owners of the funds throughout, and Plaintiffs are the parties entitled to recover them.

26.    Plaintiffs' losses were caused by Defendants' conduct. As alleged below, Plaintiffs were solicited by Nussbaum, Lowinger, and others to wire funds into the NLLLP IOLA account in order to supply the short-term capital needed to make the inflated flip transactions appear to close. The misrepresentations made to Plaintiffs, the closings administered by the Riverside Defendants, and the disbursements and kickbacks paid out of those closings each contributed to the loss of Plaintiffs' funds.

27.    Plaintiffs' standing to assert claims against Riverside and the Riverside Principals is further established by the Knoll Ridge transaction described in detail below. On October 14, 2021, Riverside Abstract LLC acted as title and closing agent on the purchase of premises located at 11510 Kirkwood Drive a/k/a 11415 Knollridge Lane, Indianapolis, Indiana 46229 (Riverside File No. RAIN-43027A). The Riverside Settlement Statement for that closing identifies Blueberry Funding LLC, by name, as the Lender. Funds wired into the NLLLP IOLA account from Blueberry Funding affiliates Cambridge Sciences and Genesis Scientific on October 13, 2021, totaling $16,271,550.00, were wired out of the NLLLP IOLA account to Riverside Abstract LLC the

following day in the identical, penny-for-penny amount of $16,271,550.00. Blueberry Funding-sourced funds therefore passed directly from NLLLP into Riverside's possession, in a Riverside-handled closing in which Blueberry Funding was the named Lender. Plaintiffs' injury is therefore directly traceable to Riverside's conduct, and Riverside owed Plaintiff Blueberry Funding duties as a participant in a closing on which Blueberry Funding was the named Lender.

28.    Plaintiffs' losses can be remedied by this Court through the damages, restitution, and treble damages sought below, including under 18 U.S.C. § 1964(c).

29.    Plaintiffs are also "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) who have been injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c). The loss of the funds Plaintiffs wired in trust into the NLLLP IOLA account is an injury to Plaintiffs' property within the meaning of the statute, and that injury was proximately caused by the predicate acts of wire fraud and money laundering described herein.

30.    Lowinger and Nussbaum, as signatories on the NLLLP IOLA account, owed fiduciary and contractual duties directly to Plaintiffs as the depositors of the escrowed funds. Those duties ran directly from Lowinger and Nussbaum to Plaintiffs.

31.    Plaintiffs' claims do not require privity with each Defendant. As alleged below, each Defendant either personally participated in the solicitation or misuse of Plaintiffs' funds, knowingly received a portion of those funds or of the proceeds traceable to them, or knowingly provided substantial assistance to the wrongdoing through which those funds were diverted.

32.    For the reasons set forth above, Plaintiffs have standing to assert each of the claims set forth below.

## FACTUAL BACKGROUND

### I.    The Structure and Mechanics of the Fraudulent Flip Transaction Scheme

33.    Beginning no later than 2021 and continuing through the period relevant to this action, Defendants, the Co-Conspirators, and others carried out a coordinated and systematic scheme to generate illicit profits through sham real estate "flip" transactions designed to extract loan proceeds far in excess of the true value of the underlying properties.

34.    The scheme relied on the use of straw purchasers, pre-arranged assignments, and artificially inflated resale prices to create the false appearance of legitimate, arm's-length real estate transactions.

35.    In a typical transaction made through Defendants, a straw buyer would enter into a contract to purchase a property at or near its actual market value. Before that purchase closed, the straw buyer's contractual rights would be assigned to a second buyer—the "flipper"—at a dramatically inflated price that bore no reasonable relationship to the property's true value.

36.    This inflated "flip" price was then used to justify and secure mortgage financing from lenders who were unaware that the valuation was fabricated and unsupported by market conditions.

37.    By inflating the purchase price in this manner, Defendants, the Co-Conspirators, and others were able to obtain loan proceeds substantially greater than the amount necessary to acquire the property being purchased.

38.    The excess loan proceeds were not used for legitimate transactional purposes, but instead were diverted to the Defendants, the Co-Conspirators, and others, including Fidelity, through disguised disbursements, inflated or fictitious fees, sham broker payments, kickbacks, and other concealed transfers.

39.    Importantly, the success of this scheme depended on the preparation of closing documents, title work, settlement statements, and escrow disbursements that appeared facially proper while concealing the true source and destination of the funds that were ultimately misappropriated.

## II.    Riverside's Essential Role as Title and Closing Agent

40.    Riverside acted as the title and closing agent for many of the fraudulent "flip" transactions that comprised the scheme.

41.    In that capacity, Riverside prepared or approved settlement statements, handled escrow and disbursement functions, processed wire transfers, and controlled the mechanics of closings.

42.    Riverside's participation in these transactions provided the appearance of legitimacy necessary to induce lenders to fund the inflated mortgage loans.

43.    Without Riverside's preparation of closing documents and its processing of escrow disbursements, Defendants and the Co-Conspirators would not have been able to consummate the transactions or obtain the loan proceeds.

44.    Riverside knowingly processed or permitted disbursements that directed funds to Defendants, the Co-Conspirators, and others, including, but not limited, to Fidelity, through inflated, undisclosed, or fictitious fees and payments to entities with no legitimate role in the transactions.

45.    Riverside therefore played a central and indispensable role in enabling the scheme and facilitating the diversion of funds.

## II-A.    The Indispensable Roles of Greenwald and Riverside, Nussbaum, and Lowinger

46.    The scheme alleged in this Complaint could not have been carried out without the specific contributions of three sets of actors. Each played a role that the others could not have

performed, and each provided an essential component of the apparatus by which Plaintiffs' funds were taken and lender proceeds were extracted. Without any one of them, the scheme would have collapsed.

47.     Shaul C. Greenwald and Riverside Abstract LLC supplied the title company vehicle. A fraudulent "flip" transaction of the kind alleged here cannot occur without a title and closing agent willing to issue title insurance, prepare the settlement statement, accept and disburse the closing funds, and produce a closing file that appears regular on its face. Greenwald, acting through Riverside, performed each of those functions. Greenwald and Riverside opened and maintained the Riverside files referenced in the wire records, including File No. RAIN-43027A and File No. RALA-50002, accepted incoming wires that bore the hallmarks of fraudulent flips, issued or caused to be issued title commitments and policies in support of the inflated values, and processed disbursements out of escrow to recipients and in amounts that bore no legitimate relationship to the transactions. Greenwald and Riverside did so with knowledge of the scheme, with the participation of Aryeh Lazarus and the other Riverside Defendants, and in coordination with Lowinger and Nussbaum. Without Greenwald and Riverside, there was no title company through which to launder the closings, and the inflated values could not have been reduced to closing documents or to disbursements out of escrow.

48.     Mark J. Nussbaum misappropriated and stole the escrow funds. Nussbaum was a signatory on the NLLLP IOLA account at Signature Bank ending 3926 and on the Mark J. Nussbaum & Associates PLLC escrow account at Flagstar Bank ending 1550. Plaintiffs were told, and Nussbaum knew Plaintiffs had been told, that funds deposited into those accounts would be held in escrow, would not be moved without authorization, and would be returned with interest upon demand. But Nussbaum did not hold those funds in escrow. Nussbaum, acting in concert

with Lowinger, caused Plaintiffs' escrowed funds to be wired out of those accounts to Riverside Abstract LLC and to other recipients in furtherance of the scheme, and caused other transfers in and out of those accounts to be made for the benefit of the Defendants and the Co-Conspirators rather than for the benefit of the depositors. Those wires include, without limitation, the July 17 and July 18, 2023 outbound wires of $3,500,000.00 and $5,080,156.00 to Riverside on File No. RALA-50002, the August 29, 2023 outbound wire of $1,500,000.00 to Riverside, and the October 14, 2021 outbound wires of $15,026,284.38 and $16,271,550.00 to Riverside on the Knoll Ridge closing. The misappropriation of escrowed funds was theft, and the use of the escrow accounts as a conduit for that theft was indispensable to the scheme.

49.    Samuel Lowinger prepared the fraudulent closings. Lowinger, acting individually and through NLLLP, prepared or caused to be prepared the closing documents, the assignments, the back-to-back deeds, the inflated settlement statements, and the fictitious partnership buy-out documents that papered over the true economics of the transactions and reduced the inflated "flip" prices to writing. Lowinger structured the double closings by which a property was contracted for at one price and conveyed at another, prepared the assignment and pre-arranged transfer documents that moved the property from straw buyer to ultimate purchaser, and prepared the partnership buy-out documents used to justify disbursements of loan and escrow proceeds to insiders. The lenders and the escrow depositors received documents that bore Lowinger's preparation and Riverside's title company imprimatur, and which on their face appeared to memorialize arm's-length transactions. In fact, they did not. Without Lowinger's preparation of the closing documents, there was no instrument by which the inflated values could be presented to lenders, and no instrument by which Plaintiffs' funds could be drawn out of escrow under the cover of an apparently regular closing.

50.     The roles described in this Section II-A were complementary and interlocking. Lowinger's fabricated closing documents had no operative effect until Riverside, through Greenwald, accepted and processed them and issued title insurance against them. Riverside's settlement statements and disbursements had no source of funds until Nussbaum, through the NLLLP IOLA account and the Nussbaum escrow account ending 1550, released Plaintiffs' escrowed funds into the closing stream. And Nussbaum's misappropriation of escrowed funds could not have been concealed without the cover provided by Lowinger's closing documents and Riverside's title company processing. The result was a continuing scheme in which lenders were defrauded of mortgage proceeds, escrow depositors including Plaintiffs were stripped of the funds they had been promised would be held safe, and the proceeds of both frauds were channeled to the Defendants and the Co-Conspirators. The multi-level and sophisticated scam bilked investors and financial institutions and made the Defendants rich.

## III.     Representative Transactions Demonstrating the Scheme's *Modus Operandi*

51.     Because the details of the conspiracy were intentionally concealed from non-participants, Plaintiffs do not yet know the full scope of all transactions comprising Defendants' scheme. However, the transactions described below are representative examples that illustrate the manner in which Defendants, the Co-Conspirators, and others structured and executed the fraudulent flip transactions.

52.     Plaintiffs expect that discovery will reveal numerous additional transactions conducted in the same or similar manner, and when Plaintiffs' funds were deposited into escrow and improperly disbursed. Based on the pattern described below, Plaintiffs reasonably believe that their funds were misappropriated and used in the same manner as the funds involved in the representative transactions.

### A.  The Hague and Galleries of Syracuse

53.    In or around May 2021, Apex Property Holdings LLC ("Apex"), acting as a straw purchaser in concert with Defendants and the Co-Conspirators, entered into an agreement to purchase two properties known as "The Hague" and "The Galleries of Syracuse" located in Syracuse, New York for approximately $29,250,000.

54.    Shortly thereafter, Apex assigned its contractual rights to the "flipper buyer" for approximately $61,000,000, more than double the original purchase price.

55.    This substantial price increase lacked any legitimate economic basis and served solely to inflate the transaction value. The inflated valuation was then used to obtain mortgage financing far in excess of the properties' true worth. The difference between the true price and the inflated price generated millions of dollars in excess proceeds that were available for diversion to Defendants and the Co-Conspirators:

| SETTLEMENT STATEMENT | | | | |
|---|---|---|---|---|
| Transaction Summary | Original Contract Price | $ | 29,250,000.00 | |
| | Flip Contract Price | $ | 61,000,000.00 | |
| | **Flip Gross Proceeds** | $ | **31,750,000.00** | |
| | | | | |
| Deposits | Down Payment - Held By Flipper | | | |
| | | | | |
| | | | | |
| | | | | |
| Miscellaneous Charges | | | | |
| | Title Company Charges | Riverside Abstract | $ | 127,000.00 |
| | | Book Law Group | $ | 80,000.00 |
| | | Consultant Fee | $ | 200,000.00 |
| | | Bordeaux Capital | $ | 250,000.00 |
| | | | | |
| TOTAL SETTLEMENT CHARGES PAID: | | | $ | 657,000.00 |
| NET AMOUNT DUE TO FLIPPER: | | | $ | 31,093,000.00 |

56.    As is evident from the Settlement Statement, Riverside, as title company, received $127,000 from the fraudulent flip sale. Additionally, the consultant fee for $200,000 and payment to Bordeaux Capital had no relevance to this transaction. Substantiated by contemporaneous text messages between Defendant Greenwald and Nussbaum on October 6, 2021, Greenwald stated

that the $250,000 was diverted to Bordeaux Capital to pay "an old debt that [he] just realized was never paid."

## B. Park at Crestview

57.    In or around April 2023, Dynevolve LLC, acting as a straw purchaser, purchased property known as "Park at Crestview" in Austin, Texas, for approximately $40,150,000.

58.    The purchase contract was subsequently assigned to a flipper buyer for an inflated price of approximately $54,000,000.

59.    The inflated valuation supported a loan exceeding $42,000,000 from Lument Real Estate Capital LLC.

60.    Riverside handled the title and settlement functions for this closing, which occurred on April 27, 2023. Settlement statements reflected unusually large and questionable fees, including payments to entities and individuals with no role in the transaction. Riverside charged a variety of fees totaling approximately $23,677. Again, Riverside diverted a substantial "Broker Fee," this time to Fortune Capital Group for $138,685. From this transaction, NLLLP secured $50,0000 in purported legal fees.

61.    It is believed that for all or a number of the foregoing transactions, Riverside diverted closing funds to, *inter alia*, Fidelity, to forward to various charities.

62.    However, Fidelity and the as yet unknown charities had no role in the transactions at issue and were not entitled to receive and/or distribute any of the diverted funds.

## C. The Knoll Ridge Transaction

63.    The Knoll Ridge transaction is a representative example in which Blueberry Funding's funds were used to close a Riverside-handled fraudulent flip, with the funds passing directly from Blueberry Funding-affiliated accounts into the NLLLP IOLA account and then directly to Riverside Abstract LLC, all within 24 hours.

64. On October 13, 2021, $13,271,550.00 was wired from an account held by Cambridge Sciences (account ending in 1281 at WSFS Bank), an entity affiliated with Blueberry Funding, to the NLLLP IOLA account, designated "Outgoing Wire Nussbaum Lowinger LLP" under reference number 20212860200000.

65. On the same day, October 13, 2021, an additional $3,000,000.00 was wired from an account held by Genesis Scientific (account ending in 0649 at WSFS Bank), a further entity affiliated with Blueberry Funding, to the NLLLP IOLA account, designated "Outgoing Wire Nussbaum Lowinger LLP" under reference number 20212860198700. The two wires, taken together, totaled $16,271,550.00.

66. On October 14, 2021, Nussbaum and Lowinger caused two outgoing wires to be transmitted from the NLLLP IOLA account at Signature Bank (account ending in 3926, ABA 026013576) to Riverside Abstract LLC. The first wire, in the amount of $15,026,284.38, bore reference number 20211014B6B7261F003386, and identified "Knoll Ridge" in the originator-to-beneficiary information field. The second wire, in the amount of $16,271,550.00, bore reference number 20211014B6B7261F003693, and likewise identified "Knoll Ridge" in the originator-to-beneficiary information field. The $16,271,550.00 wire to Riverside matches, to the penny, the combined amount wired into the NLLLP IOLA account from Cambridge Sciences and Genesis Scientific the previous day.

67. Riverside Abstract LLC closed the Knoll Ridge transaction on October 14, 2021. Riverside's Settlement Statement, designated Riverside File No. RAIN-43027A and bearing the address premises of 11510 Kirkwood Drive a/k/a 11415 Knollridge Lane, Indianapolis, Indiana 46229, identifies YYKK Enterprise LLC as Seller, Knoll Ridge Apts 1 LLC as Purchaser, Steven Weinreb Esq. as Seller Counsel, Nussbaum Lowinger as Purchaser Counsel, Nussbaum Lowinger

as Lender Counsel, and, critically, Blueberry Funding LLC by name as the Lender. The Settlement Statement reflects a contract price of $27,375,000.00 and a "Net Wire to Title" of $16,271,550.00 — identical to the combined amount wired from Blueberry Funding affiliates the previous day.

68.    On the face of the Settlement Statement, NLLLP is listed as counsel for both the purchaser and the lender on the same transaction, and NLLLP collected purported "Legal Fees" of $13,332.00 and $25,000.00 from the closing while simultaneously falsely purporting to represent Blueberry Funding as Lender.

69.    On October 15, 2021, the day after the Knoll Ridge closing, an incoming wire of $15,100,000.00 was received into the NLLLP IOLA account from "IOLA-Steven Weinreb," the same Steven Weinreb identified on the Riverside Settlement Statement as Seller's Counsel, under reference number 20211015B6B7261F00560710151643FT03. This wire-back was the means by which Blueberry Funding-sourced funds were returned to the NLLLP IOLA account after passing through Riverside's closing, the Seller, and Seller's counsel.

70.    The Knoll Ridge transaction therefore demonstrates, with documentary precision, that: (i) Blueberry Funding-affiliated entities supplied the capital used to close a Riverside-handled fraudulent flip; (ii) Riverside knew Blueberry Funding was the source of the closing funds because Blueberry Funding was identified by name on the Settlement Statement as Lender; (iii) the same amount Blueberry Funding-affiliated entities deposited into the NLLLP IOLA account was wired out the next day to Riverside; and (iv) the closing funds, after passing through Riverside's control, were wired back to the NLLLP IOLA account from seller's counsel the following day. The transaction is the exact mechanism alleged herein by which Plaintiffs' funds were misused.

### IV.    Solicitation and Misuses of Plaintiffs' Funds to Sustain and Conceal the Scheme

71.    The above-described scheme required a continual source of short-term capital in order to create the illusion that buyers had access to sufficient liquidity to close the inflated transactions.

72.    To maintain that illusion and prevent the scheme from unraveling, Lowinger and the Co-Conspirators, with the knowledge of and aided and abetted by the Riverside Defendants, solicited investors, including Plaintiffs, to provide short term loans or bridge financing.

73.    Plaintiffs were expressly told that their money would be safely held in an attorney IOLA escrow account, would not be moved without their authorization, and would be returned with interest upon demand.

74.    Plaintiffs were further led to believe that their funds would be used only for legitimate purposes and would remain protected at all times.

75.    Plaintiffs were not informed that their money would instead be used to facilitate or backstop fraudulent transactions or to fund improper disbursements to insiders.

76.    Had Plaintiffs been told the true purpose for which their funds would be used, they would not have transferred any money to NLLLP.

77.    In reliance on Lowinger's and the Co-Conspirators' representations, Plaintiffs wired approximately $87.5 Million into NLLLP's attorney escrow account, as explained in further detail below.

### A.    The EADMK Escrow Agreements

78.    In or about December 2024, Nussbaum contacted Zalman Schochet ("Schochet") at EADMK with a proposed investment opportunity. Nussbaum pitched to Schochet that EADMK provide NLLLP with capital, which Nussbaum described as short-term bridge loans.

79.     Nussbaum told Schochet that he had clients that needed to show proof of access to funds to potential sellers of real estate. Nussbaum assured Schochet that the funds would remain in his NLLLP IOLA account risk-free at all times and would not be moved, unless expressly agreed in writing by EADMK, until they were returned to EADMK.

80.     In exchange for deposit of capital into his firm's escrow account, Nussbaum offered to make substantial interest payments to EADMK.

81.     Based on the above agreement, beginning on December 3, 2024, EADMK began making what it thought were loans to NLLLP with repayment of the same also personally guaranteed by Nussbaum. The first loan was made on December 3, 2024 in the principal amount of $14 million which was wired by EADMK to NLLLP's IOLA account.

82.     On December 13, 2024, the principal amount of the first loan was increased to $15 million after Nussbaum requested that a $1 million payment due to EADMK be rolled into the loan.

83.     Pursuant to the same agreement, on December 20, 2024, EADMK issued a second loan to NLLLP in the principal amount of $5 million, which was wired by EADMK to NLLLP's IOLA account.

84.     Finally, on or around December 30, 2024, EADMK issued a third loan to NLLLP in the principal amount of $7.5 million, which was wired by EADMK to NLLLP's IOLA account.

85.     In total, EADMK deposited $27.5 million into NLLLP's IOLA account, none of which, including interest, has been repaid to date, despite due demand therefor.

### B. The Blueberry Agreement

86.     In or about August 2024, Blueberry Funding was approached by Mendel Steiner ("Steiner") and Nussbaum and presented with an opportunity for Blueberry Funding to provide capital for the purchase of real estate.

87.     Nussbaum and Steiner claimed that Steiner needed to show access to capital for the purchase of real estate, and funds to potentially finance those real estate purchases should the transactions be consummated.

88.     Nussbaum and Steiner proposed to borrow capital from Blueberry Funding for which it would be paid interest.

89.     Nussbaum and Steiner agreed with Blueberry that Blueberry Funding's capital would at all times be held in the NLLLP IOLA account until specific real estate transactions were proposed, approved by Blueberry Capital, and the closing on approved transactions and the executed transaction documents were delivered. While its funds were being held in the NLLLP IOLA account, Blueberry Funding was to receive periodic payments of interest.

90.     On August 21, 2024, Steiner, through his companies, 446 Monrow LLC and 185 E. 33rd St LLC, borrowed $60,000,000 from Blueberry Funding. The loan was also guaranteed by Steiner.

91.     The loan agreement provided that Blueberry Funding's funds were to be held in the NLLLP IOLA account until such time as Blueberry Funding agreed to a specific further use of the funds to purchase real estate, or an event of default in which the funds were required to be returned to Blueberry Funding upon demand.

92.     Accordingly, Blueberry Funding, NLLLP, Steiner, 446 Monroe LLC and 185 E. 33rd St LLC entered into an escrow agreement dated August 21, 2024 (the "Escrow Agreement").

93.    The Escrow Agreement provided that pursuant to the loan being advanced by Blueberry Funding to 446 Monroe LLC and 185 E. 33rd St, LLC the sum of $58,772,945.00 was to be placed and held in escrow by the escrow agent NLLLP.

94.    The Escrow Agreement provided that the Grantee (Blueberry Funding), Obligors (446 Monroe LLC and 185 E. 33rd St, LLC) and the escrow agent (NLLLP) all agreed that the entirety of the escrowed funds would be deposited with and always held by the escrow agent in its IOLA account pursuant to the terms of the Escrow Agreement.

95.    In accordance with the parties' agreements, Blueberry Funding wired a total of $58,772,945 to the NLLLP IOLA account.

96.    After the Obligors failed to make several payments under the Note, Blueberry Funding provided notice of default and after 10 days passed, demanded its funds be returned.

97.    Blueberry Funding has learned that Nussbaum and Lowinger, almost immediately after receiving them, stole its funds and wired them out of the NLLLP IOLA account.

## V.    Plaintiffs Learn of the Damage Caused by the Conspiracy and the Disappearance of Funds

98.    Lowinger and Nussbaum, at times, would return some of the money from the operating accounts of their various entities to the NLLLP IOLA account to make nominal payments pursuant to the fraudulent written escrow and joint venture agreements with NLLLP clients. These efforts were taken to keep the client victims satisfied and prevent inquiries related to their escrow funds which could lead to discovery of the misappropriation of these funds.

99.    However, following the death of Mendel Steiner on or about January 9, 2025, Blueberry Funding requested the return of its escrowed funds pursuant to the relevant Escrow Agreement on or about January 10, 2025.

100.   Thereafter, on January 14, 2025, Lowinger forwarded correspondence to Blueberry claiming that the "Firm's escrow account may have been illegally accessed and substantially depleted as a result of irregular transactions."

101.   Lowinger further advised that he contacted the banking institution where Blueberry's escrow funds were being maintained in escrow and that the account was now frozen, with no disbursements possible. Accordingly, Lowinger represented that NLLLP was unable to disburse any funds to Blueberry.

102.   Following a second demand for the release of its funds on January 15, 2025, a representative of NLLLP sent Blueberry an email advising that it was no longer operating as a functional entity and that if a client of NLLLP had funds in the NLLLP IOLA account, they should contact counsel retained by NLLLP to wind down NLLLP for the return of its funds.

103.   Blueberry never received any of its escrowed funds back after correspondence with NLLLP's wind-down counsel.

104.   Likewise, plaintiff Schochet attempted to procure repayment of their funds they had deposited into the NLLLP IOLA account but were unable to do so.

105.    To date, Plaintiffs have not recovered any funds they committed to Lowinger and the Riverside Defendants' Co-Conspirators.

## VI. The Concerted Action of Nussbaum, Lowinger, and Greenwald in the Abuse of the NLLLP IOLA Escrow Account

106.   Mark J. Nussbaum, Defendant Samuel Lowinger, and Defendant Shaul C. Greenwald acted together to abuse the NLLLP IOLA account in furtherance of the fraudulent flip-transaction scheme. The NLLLP IOLA account was the central account through which the scheme

operated, and each of Nussbaum, Lowinger, and Greenwald played an integral and knowing role in the misuse of that account and the funds held in it.

107.    Nussbaum and Lowinger were the named partners of Nussbaum Lowinger LLP. Upon information and belief, each was a signatory on the NLLLP IOLA account at all relevant times. Nussbaum and Lowinger together operated the firm's escrow practice, together solicited Plaintiffs to wire funds into the NLLLP IOLA account, and together authorized or permitted the transfers of Plaintiffs' funds out of that account in violation of the written escrow agreements.

108.    Greenwald was the Chief Executive Officer, and is now the Chairman, of Riverside Abstract LLC. Riverside served as the title and closing agent on the transactions through which Plaintiffs' escrowed funds were diverted. Greenwald controlled Riverside's operations, finances, and closing practices, and personally directed and authorized Riverside's participation in the flip transactions described herein.

109.    The roles of Nussbaum, Lowinger, and Greenwald were complementary and necessary to one another. Nussbaum and Lowinger supplied the attorney IOLA account that gave Plaintiffs' funds the appearance of trust-protected escrow and induced Plaintiffs to wire money in. Greenwald, through Riverside, supplied the title and closing operation that disbursed those funds into apparently legitimate real-estate transactions at inflated flip prices. Together, Nussbaum, Lowinger, and Greenwald coordinated the kickbacks, purported fees, and other transfers through which the proceeds of the scheme were divided among them and the other Co-Conspirators.

110.    The agreement among Nussbaum, Lowinger, and Greenwald is reflected in the communications, disbursements, and financial entries described below, all of which involve the NLLLP IOLA account and Riverside's accounts operating in tandem on the same transactions.

a. The October 6, 2021 Bordeaux Capital text exchange. On October 6, 2021, Greenwald and Nussbaum exchanged text messages in which Greenwald acknowledged that $250,000 from the Hague/Galleries of Syracuse closing was diverted to Bordeaux Capital "to pay an old debt that [he] just realized was never paid." That exchange shows Greenwald and Nussbaum jointly directing disbursements out of a closing, using funds held in the NLLLP IOLA account, for a purpose unrelated to the underlying transaction and instead to satisfy a personal obligation of Greenwald's.

b. The March 8, 2022 Lowinger-Greenwald email. On March 8, 2022, Lowinger sent Greenwald an email, in which Lowinger told Greenwald that "it is not my job to chase down mystery figures and an angry client who has no inkling re fees added," and that "[y]ou've told me that clients 'know,' but I have numerous files and stories that do not match that narrative." The email reflects an ongoing arrangement, across multiple files, in which Riverside was adding fees to closings that clients did not understand or authorize, and in which Lowinger and Greenwald had previously discussed those fees. Lowinger's complaint was not about the existence of the fraudulent and illegal practice; it was about having to answer for it to clients.

c. The 1031 exchange kickback arrangement. Greenwald and Zagelbaum, through Riverside, paid kickbacks to Nussbaum on 1031 exchanges that Nussbaum referred to Riverside. The amount of each kickback was calculated based on the interest earned while the funds sat in Riverside's escrow account. That arrangement was a continuing fee-splitting program between Greenwald (through Riverside) and Nussbaum (through NLLLP), and is reflected in Riverside File numbers 44176,

RAMN 3900, and RANJ 40782, among others. Upon information and belief, Lowinger, as a named partner of NLLLP and a signatory on the NLLLP IOLA account, participated in and benefited from this arrangement.

    d.   Joint use of the NLLLP IOLA account on Riverside closings. The settlement statements for the representative transactions described above, including the Hague/Galleries of Syracuse and Park at Crestview closings, reflect that funds used to close those transactions came from the NLLLP IOLA account and that fees and disbursements flowed back into that account. The NLLLP IOLA account (controlled by Nussbaum and Lowinger) and the Riverside accounts (controlled by Greenwald) operated in tandem on the same closings, on the same dates, and for matched amounts.

    e.   Repeated payments of purported "legal fees" from Riverside to NLLLP. The settlement statements at issue reflect repeated payments of purported "legal fees" from Riverside-controlled closings to NLLLP, including a $50,000 payment to NLLLP from the Park at Crestview closing. Those payments bore no relationship to the actual legal work performed. Upon information and belief, these payments were the means by which Greenwald channeled proceeds of the scheme back to Nussbaum and Lowinger.

111.   The Knoll Ridge transaction described above is direct documentary proof that Defendants applied to Blueberry Funding the same mechanism employed across the broader scheme. Blueberry Funding-affiliated entities, Cambridge Sciences and Genesis Scientific, wired $16,271,550.00 into the NLLLP IOLA account on October 13, 2021. The next day, Nussbaum and Lowinger wired the identical $16,271,550.00 out to Riverside Abstract LLC for the Knoll Ridge

closing, on which Blueberry Funding was the named Lender. The following day, $15,100,000.00 was wired back into the NLLLP IOLA account from Seller's counsel Steven Weinreb. The funds did not remain with Riverside; they cycled back into the NLLLP IOLA account that Nussbaum, Lowinger, and Greenwald jointly abused.

112.    Greenwald and Riverside were well aware of Blueberry Funding's existence and role. Blueberry Funding LLC is identified by name on the Riverside Settlement Statement for File No. RAIN-43027A as the Lender. Greenwald, as the executive in charge of Riverside, directed and authorized Riverside's acceptance of the $16,271,550.00 wire from the NLLLP IOLA account and Riverside's disbursement of those funds in the Knoll Ridge closing. The Knoll Ridge closing, the wires preceding it, and the wire-back following it could not have occurred without the participation and authorization of Greenwald and the Riverside Principals.

113.    The Knoll Ridge transaction also illustrates why the kickback formula set forth in the December 10, 2021 WhatsApp exchange between Greenwald and Nussbaum, in which Riverside paid one point per month on 1031 funds sitting in the NLLLP IOLA account while Greenwald loaned the same funds out at two points or more, was directly fueled by Blueberry Funding-sourced capital. The Knoll Ridge closing occurred only weeks before that December 10, 2021 exchange, on which Greenwald wrote: "ur loaning it out at 2 plus lol." The funds Greenwald and Nussbaum were splitting were the same funds Blueberry Funding affiliates had wired into the NLLLP IOLA account.

114.    The Knoll Ridge transaction was not an isolated occurrence. It was the template for an ongoing course of conduct that Nussbaum, Lowinger, Greenwald, and the Riverside Principals continued to carry out from 2021 through 2025. The mechanics of each iteration were the same. Short-term lender capital was wired into the NLLLP IOLA account. The funds were then wired

out within hours or days to Riverside Abstract LLC for an inflated "flip" closing. Riverside disbursed the funds through inflated and undisclosed fees and payments. A portion of the proceeds was thereafter cycled back to the NLLLP IOLA account through closing returns, seller's counsel wire-backs, or further closings. The scheme required a continuous supply of new lender deposits in order to operate, as each new closing depended on the funds from the prior closing. The Hague and Galleries of Syracuse closing in 2021, the Knoll Ridge closing in October 2021, and the Park at Crestview closing in April 2023 are representative examples of the same template Defendants repeated.

115.    Riverside, Greenwald, and the Riverside Principals continued to handle title and closing functions for NLLLP-originated flip transactions throughout 2022, 2023, and 2024, and continued to accept funds from the NLLLP IOLA account, disburse those funds through closings, collect purported "legal fees" and "broker fees" out of those closings, and remit a portion of the proceeds back to Nussbaum and Lowinger through the kickback mechanism described above. The Park at Crestview closing in April 2023, in which Riverside diverted a "Broker Fee" of $138,685.00 to Fortune Capital Group and remitted purported "legal fees" of $50,000.00 to NLLLP, is one of many examples of Riverside's continuing participation. The settlement statements, wire records, and closing files for those transactions are in Defendants' possession and will be produced in discovery.

116.    Riverside's continued participation in the enterprise during the bridge years is further established by a Blueberry Funding-sourced wire chain in late June 2024 running through a Nussbaum-controlled escrow account at Capital One, N.A. and out to Riverside-handled closings. On June 24, 2024, Plaintiff Blueberry Funding LLC wired $2,500,000.00 into the Mark J. Nussbaum & Associates PLLC checking account ending 2089 at Capital One, N.A., bearing

wire reference number 062424 USD20241760182600. On June 25, 2024, Plaintiff Blueberry Funding LLC wired an additional $493,000.00 into the same Capital One account ending 2089, bearing wire reference number 062524 USD20241770379800. The two deposits from Blueberry Funding into the Nussbaum escrow account total $2,993,000.00. On June 30, 2024, the Nussbaum escrow account ending 2089 wired $750,000.00 to Riverside Abstract LLC at Signature Bank (ABA 026013576, account ending 3926), bearing wire reference number 20210630B6B7261F005854, with the OBI line reading "Ramo43010," identifying a Riverside file in Riverside's "RAMO" series. On July 9, 2024, the Nussbaum escrow account ending 2089 wired an additional $1,450,000.00 to Riverside Abstract LLC at the same Signature Bank account ending 3926, bearing wire reference number 20210709B6B7261F002972, with the OBI line reading "Rain43014," identifying a Riverside file in Riverside's "RAIN" series. The two outgoing wires to Riverside total $2,200,000.00. Upon information and belief, the remaining proceeds of Blueberry Funding's $2,993,000.00 in deposits were further disbursed through the Nussbaum escrow account, including a $2,000,000.00 wire on June 24, 2024 to Aven Realty 1 LLC bearing wire reference number 062424 USD0013653361. The June and July 2024 wires confirm that Riverside, Nussbaum, and Lowinger continued to operate the same flip-and-kickback enterprise during 2024, using Blueberry Funding-sourced funds routed through a Nussbaum-controlled escrow account and out to Riverside-handled closings.

117.    Riverside's continued participation in the enterprise during the bridge years is further established by a direct Blueberry Funding-to-Riverside wire chain in July 2023, in which the full amount of Plaintiff Blueberry Funding's $8,000,000.00 deposit is accounted for in two outgoing wires to Riverside-handled closings on the following business day. On July 17, 2023, Plaintiff Blueberry Funding LLC wired $8,000,000.00 to a Mark J. Nussbaum & Associates PLLC

escrow account ending 1550, bearing wire reference number 20230717B6B7261F00116307171046FT03. On July 18, 2023, the Nussbaum escrow account ending 1550 wired $3,500,000.00 out to Riverside Abstract LLC at Flagstar Bank, bearing wire reference number 20230718B6B7261F003430, with the OBI line identifying Riverside File "RANY-50191/SS." Also on July 18, 2023, the Nussbaum escrow account ending 1550 wired $5,080,156.00 to Fidelity National Title Insurance at Bank of America N.A., N.Y. (ABA 026009593, account ending 1916), bearing wire reference number 20230718B6B7261F003100 and an OBI line reading "RALA-50002 ag/yg," identifying a Riverside file in Riverside's "RALA" series. The two July 18, 2023 outgoing wires total $8,580,156.00, which exceeds Blueberry Funding's $8,000,000.00 deposit of the previous day, and which accordingly accounts for the full amount of Blueberry Funding's July 17, 2023 deposit. The funds Riverside and Fidelity National Title received on July 18, 2023 were Blueberry Funding-sourced funds, routed through a Nussbaum-controlled escrow account in the same one-business-day window that had been used in the Knoll Ridge closing in October 2021.

118.    A further Blueberry-to-Riverside wire chain followed in August 2023 and reflects the same round-trip kickback pattern alleged in the Knoll Ridge transaction. On August 24, 2023, Blueberry-affiliated entity Bluberry Capital Inc. wired $7,500,000.00 into the Nussbaum escrow account ending 1550, bearing wire reference number 20230824B6B7261F00134208241140FT03. On August 29, 2023, the Nussbaum escrow account ending 1550 wired $1,500,000.00 to Riverside Abstract LLC at Flagstar Bank, bearing wire reference number 20230829B6B7261F001632. The following day, August 30, 2023, Riverside Abstract LLC wired the same $1,500,000.00 back into the Nussbaum escrow account ending 1550, bearing wire reference number 20230830B6B7261F00091108300951FT03 and an OBI line reading "RALS MOSHE SCHICK

RIVERSIDE ABSTRACT LLC, XXXXXX4200." The round-trip from the Nussbaum escrow account to Riverside and back to the Nussbaum escrow account within a single business day is the same kickback mechanism through which the Riverside Defendants and Nussbaum cycled Plaintiffs' escrowed funds.

119. Defendant Avery Eisenreich, as an owner of Riverside Abstract LLC, knowingly participated in the enterprise that misappropriated Plaintiffs' escrowed funds. As an owner of Riverside, Eisenreich had oversight responsibility for, and exercised oversight over, Riverside's day-to-day operations, including the closings, escrow disbursements, and wire instructions on the Riverside-handled files described in this Complaint. Upon information and belief, Eisenreich personally funded portions of the underlying transactions in the enterprise and approved disbursements of Blueberry Funding-sourced funds in the transactions described herein, including the July 18, 2023 wire of $5,080,156.00 from the Nussbaum escrow account ending 1550 to Fidelity National Title Insurance on Riverside File RALA-50002. The funds Eisenreich contributed were commingled with Plaintiffs' escrowed funds in the Riverside-handled flip closings and round-trip wire chains described above. As an owner of Riverside, Eisenreich received the economic benefit of the inflated "Broker Fees" and purported "legal fees" that Riverside collected on those closings, including the $138,685.00 "Broker Fee" routed to Fortune Capital Group on the April 2023 Park at Crestview closing and the corresponding fees collected on the Knoll Ridge and bridge-year closings. Upon information and belief, Eisenreich was aware that the funds repeatedly arriving in Riverside's accounts from the NLLLP IOLA account on a one or two business-day turnaround, in the penny-match and round-trip patterns described above, were not ordinary purchase-money proceeds. The funds were lender capital being cycled through a flip-closing scheme that required a continuous supply of new lender deposits in order to operate.

Eisenreich's knowing participation in the enterprise, and his personal funding of the underlying transactions over a four-year period and across multiple Riverside-handled closings, was a substantial and necessary contribution to the enterprise's ability to absorb Plaintiffs' deposits in August and December 2024.

120.   Plaintiff Blueberry Funding's August 2024 deposit of $58,772,945.00 into the NLLLP IOLA account was absorbed by the same enterprise that the Knoll Ridge closing and the other representative transactions had set in motion. By August 2024, Nussbaum, Lowinger, Greenwald, and the Riverside Principals had been operating the IOLA-flip-closing scheme continuously for more than three years. Blueberry Funding's escrowed funds were misappropriated almost immediately upon their arrival in the NLLLP IOLA account, in the same manner Blueberry-affiliated funds had been misappropriated in October 2021. Plaintiff EADMK's December 2024 deposits of $27.5 million were absorbed in the same manner. The scheme that took Blueberry's and EADMK's money in 2024 was not a new scheme. It was the continuation of the scheme in which Riverside had been participating since at least 2021.

121.   Defendants' continuing course of conduct gives rise to a single, ongoing enterprise within the meaning of 18 U.S.C. § 1961(4), and a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in which each Defendant participated. The Riverside Defendants cannot credibly disclaim responsibility for Plaintiffs' 2024 losses on the ground that the Knoll Ridge closing occurred in 2021. The 2024 losses were caused by the same enterprise, operating the same mechanics, through the same NLLLP IOLA account, and pursuant to the same kickback formula that the Knoll Ridge closing first put into practice. Accordingly, Plaintiffs' injuries were a direct, foreseeable, and proximate consequence of the Riverside Defendants' continued participation in the enterprise.

122. Upon information and belief, the volume of fraudulent flip closings that Riverside continued to handle for the enterprise from 2022 through 2025 substantially exceeds the representative transactions described herein. The proceeds of those closings, including portions of Plaintiffs' escrowed funds, were repeatedly cycled through the NLLLP IOLA account, Riverside's escrow accounts, the charitable conduits described herein, and accounts controlled by Greenwald, Nussbaum, and Lowinger. Discovery of Riverside's closing files, settlement statements, wire records, and internal communications during that period is necessary to identify the full universe of transactions in which Plaintiffs' funds were misused.

123. Nussbaum, Lowinger, and Greenwald each had actual knowledge of the others' roles. Lowinger's March 8, 2022 email shows him personally negotiating with Greenwald over which fees had or had not been disclosed to clients on Riverside closings. Greenwald's October 6, 2021 text exchange with Nussbaum shows Greenwald and Nussbaum directly coordinating the diversion of closing funds. The 1031 kickback program reflects a continuing, knowing fee-splitting relationship between Greenwald (through Riverside) and Nussbaum and Lowinger (through NLLLP). The communications, payments, and arrangements described above were not the product of arm's-length dealing or parallel conduct; they reflect a knowing and ongoing agreement among Nussbaum, Lowinger, and Greenwald.

124. Each of Nussbaum, Lowinger, and Greenwald personally benefited from the misuse of the NLLLP IOLA account. Nussbaum and Lowinger collected purported "legal fees" from Riverside-controlled closings and disbursed Plaintiffs' escrowed funds for their own benefit. Greenwald collected fees, kickbacks, and other payments through Riverside, and, as the October 6, 2021 Bordeaux Capital text exchange demonstrates, used funds held in the NLLLP IOLA account to satisfy his own personal obligations.

125. The scheme could not have operated without the involvement of each of Nussbaum, Lowinger, and Greenwald. The attorney IOLA account maintained by Nussbaum and Lowinger gave Plaintiffs the false assurance that their funds were being held in trust. The authorizations of Nussbaum and Lowinger, as named partners and signatories on that account, permitted the transfers of those funds out of the account. Riverside, under Greenwald's direction, then disbursed those funds through closings that were used to support inflated mortgage proceeds and the disbursements through which the scheme was funded.

126. To the extent Lowinger or Greenwald disclaim actual knowledge of any particular transfer or transaction, the conduct described above reflects their conscious avoidance of the true facts. Lowinger, as a signatory on the NLLLP IOLA account and a named partner of the firm, knew or deliberately avoided knowing that funds were leaving that account without the written authorizations required by the escrow agreements. Greenwald, as the executive in charge of Riverside, knew or deliberately avoided knowing that the funds Riverside was disbursing on flip closings, and the "fees" Riverside was paying to NLLLP, were not supported by any legitimate purpose.

127. The result of the conduct of Defendants was the diversion of approximately $87.5 million of Plaintiffs' funds out of the NLLLP IOLA account, the disbursement of those funds and of the inflated mortgage proceeds generated by Riverside's closings to Defendants, the Co-Conspirators, Fidelity, and others, and the corresponding loss of those funds to Plaintiffs. Each of Nussbaum, Lowinger, and Greenwald is jointly and severally liable to Plaintiffs for that loss, regardless of which particular account or recipient received any given dollar.

**The Kickback-Through-Charity Mechanism by Which Nussbaum, Lowinger, and Greenwald Divided the Proceeds of the Scheme**

128.   Nussbaum, Lowinger, and Greenwald agreed that a portion of every Riverside closing handled through the NLLLP IOLA account would be paid to Greenwald as a kickback. The contemporaneous text-message communications among Greenwald, Nussbaum, and Riverside's closing staff describe the arrangement in their own words.

129.   The arrangement between Nussbaum and Greenwald, by which Riverside paid kickbacks to Nussbaum and the parties Nussbaum designated either in cash or through donations to charities that Nussbaum selected, was not a recent development. The kickback arrangement between Nussbaum and Greenwald was in operation as early as 2018 and continued without interruption through approximately 2024. Over that six-year period, Nussbaum and Greenwald conducted the arrangement on a closing-by-closing basis, maintained running balances in writing, and exchanged routine instructions for the disbursement of those balances either in cash or to charities of Nussbaum's designation, including charities serviced through Fidelity Investments Charitable Gift Fund. The conduct alleged in this Complaint is therefore not isolated to any single transaction. It is a continuing course of conduct that Nussbaum and Greenwald carried on together, in coordination with Lowinger and Riverside's staff, over the better part of a decade.

130.   Nussbaum, Lowinger, and members of Riverside engaged in more than fifty fraudulent flip transactions. In each of those transactions, the same template was used: a property was contracted for at one price, immediately re-contracted or assigned to a successor purchaser at an inflated price, and closed on the same day so that the difference between the true price and the inflated price was extracted in the form of loan proceeds and disbursements from the closing escrow. Each of those transactions was processed through Riverside as the title and closing agent, was papered by Lowinger or by lawyers operating under Lowinger's direction, and was funded through escrow accounts controlled by Nussbaum. The transactions specifically identified in this

Complaint are representative examples of a course of conduct that, on information and belief, included not less than fifty additional closings of the same character carried out by the same actors during the period from in or around 2018 through in or around 2024.

131.    The kickback was calculated against a known formula tied to the title insurance premium on each closing. On a Riverside closing, the title insurance premium paid by the purchaser, together with any separate lender's policy premium that was also purchased, was divided between Riverside and the title underwriter on an 80/20 basis: Riverside, as the abstract company, retained 80 percent of the premium, and 20 percent was remitted to the underwriter. Of Riverside's 80 percent share, Greenwald, acting through Riverside, paid approximately one-third back to the client, attorney, or other party who had directed the title work to Riverside. That one-third was not for any service rendered. It was a kickback paid for the referral of the business, and it was paid either in cash or, in the case of Nussbaum and his clients, through the "charity" mechanism described in this Section. The kickback was calculated only on the premium for the title insurance and the lender's policy; it was not calculated on any of the ancillary closing fees that appeared on the settlement statement. The arrangement converted a portion of every title insurance premium written on a referred closing into a concealed referral fee for the referring party and provided Greenwald and Riverside with a continuing financial inducement to accept and process closings of the kind alleged in this Complaint without regard to their true economic substance.

132.    The 80/20 split between Riverside and the title underwriter, and the one-third referral kickback paid out of Riverside's share, are not disclosed on any settlement statement issued by Riverside on the closings at issue in this Complaint. The lenders, including Plaintiffs in their capacity as bridge and acquisition lenders, were not informed that approximately one-third

of Riverside's 80 percent share of the title insurance premium would be paid back to the referring party. The concealment of the referral kickback from the settlement statements and from the lenders was a material element of the scheme and an additional independent inducement for Riverside to participate in the closings without regard to whether the transactions reflected arm's-length value.

133. On December 10, 2021, in a text exchange between Greenwald and Nussbaum, Greenwald asked, "I forget our deal on 1031," and Nussbaum answered, "1 point a month I think." Greenwald then observed that Riverside was "loaning it out at 2 plus," confirming that interest earned on funds held by Riverside in connection with 1031 exchanges referred by Nussbaum was being split between Riverside and Nussbaum and Lowinger's firm. The "1 point a month" formula was the agreed rate at which Greenwald and Riverside paid Nussbaum and Lowinger's firm a kickback on the float of 1031 exchange funds belonging to Nussbaum's clients, including funds traceable to Plaintiffs.

134. The same text exchanges show that Nussbaum and Greenwald treated Riverside files as Greenwald's personal accounts. On October 20, 2021, Greenwald sent Nussbaum a list of Riverside file numbers — "RATX-43063, RS-44176, RS-44152, ratn43017, raoh-43047" — and described them as "some open files of mine." On November 22, 2021, Greenwald wrote, "RAOK43013 closed, please send to chabad, is there anything for me?" On December 10, 2021, Greenwald asked Nussbaum, "do i need to keep track or you guys do? i need you to and tell me you have for me and ask where to send pls." Nussbaum answered, "We keep track," and "We will handle shortly." The exchanges show that Nussbaum, Lowinger's firm, and Riverside maintained an ongoing tally of Greenwald's kickback balances across multiple files.

135.    Lowinger was a knowing participant in this arrangement. On March 10, 2021, Greenwald wrote to Nussbaum, "BTW, you guys should have some money for me from 1031, would love to give it to my shul before yuntiff," and asked, "can we and Sam meet?" The reference to "Sam" is to Defendant Samuel Lowinger, Nussbaum's named partner at NLLLP. The meeting that followed was a joint meeting of Greenwald, Nussbaum, and Lowinger to address the disposition of Greenwald's 1031 kickback funds and the operation of the file-by-file kickback program through the NLLLP IOLA account.

136.    Nussbaum, Lowinger, and Greenwald used charitable donations as the conduit through which Greenwald's share of the kickbacks was paid out of the NLLLP IOLA account. Rather than wiring funds directly to Greenwald or to a Riverside-related account, Nussbaum and the NLLLP staff disbursed Greenwald's share by issuing checks or wires to charitable organizations selected by Greenwald. The donations were treated for accounting purposes as charitable contributions, but in substance they were the medium by which Greenwald collected his portion of the diverted funds.

137.    The charity-laundering mechanism is  ented in a separate WhatsApp chat between Nussbaum and Hadassah Abbott, the Riverside staff member responsible for closings (Habbott@rsabstract.com). In that chat, Nussbaum and Abbott exchange Riverside file numbers, dollar amounts, and charity payment instructions on a continuing basis from 2022 through 2024. On July 20, 2022, Abbott wrote to Nussbaum, "You have a balance of 4K last time and new balance is 5800 for Tn-47007 and TN 47008," and added, "I have a running spreadsheet." Nussbaum responded the same evening, "Pls send 3k to Chabad. 5k to ohr Shlomo and 1800 to Tomche shabbas of Monsey." The exchange establishes that Nussbaum, Lowinger's firm, and Riverside maintained a running ledger of Greenwald's and other co-conspirators' kickback

balances, file by file, and that Nussbaum personally directed how those balances were paid out under the guise of charitable donations.

138.   The charitable recipients to which Nussbaum directed kickbacks on Plaintiffs' transactions and on related Riverside closings include, among others: (i) Pomona Jewish Community (EIN 84-2502482); (ii) Ohr Shlomo Chasidic Center (EIN 84-4530416); (iii) Chabad of Pomona; (iv) Tomche Shabbas of Monsey; (v) Harchava Charitable Fund (EIN 88-4006313, 1001 NE 176th Terrace, North Miami Beach, Florida 33162); (vi) Bais Menachem North Miami Beach (EIN 65-0588673); and (vii) Rofeh Cholim Cancer Society (RCCS), to which payments were directed in the name of "Mark Nussbaum RCCS Hockey," an account in Nussbaum's own name promoted at https://www.rccsclassic.org/mnussbaum.

139.   Nussbaum and Riverside understood that the "charitable" label was a cover. On March 3, 2023, when Greenwald asked Riverside to send $5,000 to RCCS "In honor of Mendy & Chanie Fischer and family for Mark Nussbaum RCCS Hockey," Abbott responded, "yes nut [sic] you need to let them know cant write anything." The instruction was that the recipient charity could not issue a written acknowledgment of the donation, because a written acknowledgment naming the true donor would expose the payment as a kickback rather than a gift. That instruction was given by Riverside, in coordination with Nussbaum, in furtherance of the concealment of the arrangement.

140.   The running ledger maintained by Nussbaum, NLLLP, and Riverside reflects specific per-file kickback amounts on Riverside closings handled through the NLLLP IOLA account, including: (i) $10,000 allocated to "charity" on Riverside File No. RALA-50005 (Lake Charles closing), as confirmed in writing by Abbott on February 27, 2023; (ii) $10,000 on the Lake Charles closing on or about May 4, 2023; (iii) a $4,500 charity payment plus the balance to

"Chabad" on January 13, 2023; (iv) a $10,000 payment to Harchava Charitable Fund on May 10, 2023; and (v) the $3,000/$5,000/$1,800 split to Chabad, Ohr Shlomo, and Tomche Shabbas of Monsey directed on July 20, 2022 against the TN-47007/47008 file balance. Each of these payments was made from funds that originated in or passed through the NLLLP IOLA account in which Plaintiffs' funds were commingled.

141.    On September 30, 2021, an outgoing wire in the amount of $1,505,057.43 was sent from Riverside's Signature Bank account (ABA 026013576) to "NUSSBAUM LOWINGER LLP." On the same date, Greenwald and Nussbaum exchanged messages regarding that wire, in which Greenwald acknowledged receipt and stated, "I got it. Short 600k or so." The wire is one of multiple seven-figure transfers between Riverside and the NLLLP IOLA account that bear no relationship to legitimate title, escrow, or legal services, and reflect the channels through which the joint proceeds of the scheme moved between Greenwald (through Riverside) and Nussbaum and Lowinger (through NLLLP).

142.    The October 6, 2021 Bordeaux Capital text exchange already pleaded above is part of the same pattern. On that date, Greenwald and Nussbaum jointly directed that $250,000 from the Hague/Galleries of Syracuse closing be diverted from the NLLLP IOLA account to Bordeaux Capital, characterized on the settlement statement as a "Consultant Fee" of $200,000. Greenwald acknowledged in writing that the payment was used to satisfy an unrelated personal obligation — "an old debt that I just realized was never paid." Nussbaum, as the attorney who controlled the IOLA account, authorized and effected the disbursement.

143.    The kickback-through-charity arrangement was funded directly out of the NLLLP IOLA account into which Plaintiffs had wired approximately $87.5 million. Every dollar paid as a "charity" kickback by Nussbaum, every dollar wired to Riverside as a purported "legal fee" in

connection with the joint operation, and every dollar paid out to Greenwald or his selected recipients on his "running spreadsheet" balances came from the same funds in which Plaintiffs' escrowed money was held. As a direct result of the arrangement described above, Plaintiffs' funds were depleted, were not returned on demand, and have not been recovered. The harm to Plaintiffs is not collateral or incidental — it is the direct foreseeable consequence of the conduct in which Defendants jointly engaged.

144. Nussbaum knew at all relevant times that the funds in the NLLLP IOLA account included Plaintiffs' escrowed funds. Lowinger, as a named partner of NLLLP and a signatory on the IOLA account, knew or deliberately avoided knowing the same. Greenwald, as the executive in charge of Riverside, knew that the funds Riverside was receiving from the NLLLP IOLA account, and the funds Riverside was paying out as "charity" at Nussbaum's direction, were funds Nussbaum and his firm were obligated to hold in trust for Plaintiffs and others. Each of them participated in the arrangement with that knowledge.

## **AGGREGATE DAMAGES**

145. Plaintiffs have suffered substantial monetary damages as a direct and proximate result of the scheme alleged in this Complaint. Although the individual transactions and wire transfers are pled in detail throughout the preceding paragraphs, Plaintiffs set forth in this Section a consolidated summary of those losses so that the aggregate scope of Defendants' conduct, and the corresponding measure of damages owed to Plaintiffs, are stated in one place.

146. Plaintiffs' direct out-of-pocket losses, consisting of their own funds wired into escrow accounts controlled by Defendants and never returned, total not less than $104,765,945.00 in principal, comprised of the following:

(a) Blueberry Funding LLC — deposit of $58,772,945.00 into the NLLLP IOLA account in August 2024 in connection with the 446 Monroe and 185 E. 33rd Street transactions, none of which has been returned despite due demand;

(b) EADMK LLC — deposits totaling $27,500,000.00 into the NLLLP IOLA account, none of which, including interest, has been returned despite due demand;

(c) Blueberry Funding LLC — deposit of $8,000,000.00 wired on July 17, 2023 into the Mark J. Nussbaum & Associates PLLC escrow account ending 1550 at Flagstar Bank, which was wired out the same day and the following day to Riverside on Riverside File No. RALA-50002 and never returned;

(d) Blueberry Funding LLC — deposits totaling $2,993,000.00 wired on June 24, 2024 into the Mark J. Nussbaum & Associates PLLC checking account ending 2089 at Capital One, N.A. ($2,500,000.00 plus $493,000.00), of which $750,000.00 was wired out to Riverside on June 30, 2024 and additional sums were wired out on July 9, 2024, none of which has been returned;

(e) Bluberry Capital Inc., a Blueberry-affiliated entity — deposit of $7,500,000.00 wired on August 24, 2023 into the Mark J. Nussbaum & Associates PLLC escrow account ending 1550 at Flagstar Bank, of which $1,500,000.00 was wired out to Riverside on August 29, 2023, with the identical $1,500,000.00 wired back into the same account from Riverside the following day under cover of OBI line "RALS MOSHE SCHICK RIVERSIDE ABSTRACT LLC, XXXXXX4200," and with no portion of the $7,500,000.00 ever returned to Bluberry.

147. In addition to the principal sums identified above, Plaintiffs are entitled to recover prejudgment interest on each sum from the date of the corresponding deposit at the applicable

- 41 -

statutory or contractual rate, the contractual interest that was promised on the deposits but not paid, the loss of use of those funds during the period of misappropriation, and consequential damages flowing from Plaintiffs' inability to deploy those funds in their ordinary business of providing bridge and acquisition financing.

148. Plaintiffs further seek punitive and exemplary damages in an amount to be determined at trial, in light of the willful, deliberate, and concealed character of Defendants' conduct as alleged in this Complaint, and treble damages and reasonable attorneys' fees and costs under 18 U.S.C. § 1964(c) on the RICO Counts.

149. The amounts stated in this Section are minimums based on the information presently identified in Plaintiffs' possession. Plaintiffs reserve the right to amend these figures, and to seek additional damages, upon completion of discovery into the full scope of Defendants' misappropriation of Plaintiffs' escrowed funds and the disposition of those funds following their diversion from the escrow accounts.

## CLAIMS FOR RELIEF

### COUNT I
### FRAUD
### (Against All Defendants)

150. Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

151. Defendants, Co-Conspirators, and others knowingly and willfully executed the schemes described herein intending to defraud mortgage issuers while necessarily intending to commit fraud against Plaintiffs by, among other things: (1) soliciting the payment of funds to the NLLLP IOLA account as purported proof of access to funds by clients; (2) falsely representing— and committing said representations to written agreement—that the funds would not (and could not) be moved from the NLLLP IOLA account with the express written consent of Plaintiffs; (3)

effectuating the transfer of funds out of the NLLLP IOLA account to be used in connection with securing fraudulently inflated mortgages; and (4) falsely promising to release escrow monies to Plaintiffs upon their request despite knowing that the funds had been intentionally disbursed for the benefit of the fraudulent scheme described *supra*.

152. Specifically, Defendant Riverside and the Riverside Principals, in furtherance of this fraud scheme acted as the title and closing agent for many of the fraudulent flip transactions that comprised the scheme. As title agent for these fraudulent transactions, Riverside prepared or approved settlement statements, handled escrow and disbursement functions, processed wire transfers, and controlled the mechanics of closing.

153. Fidelity improperly accepted funds from Riverside generated by the fraudulent flip transactions.

154. As a direct and proximate result of Defendants' fraudulent conduct which included the papering of the sham flip transactions and dispersal of Plaintiffs' monies to Defendants and others in the form of fictitious or inflated fees associated with sham real estate transactions, Plaintiffs have suffered substantial damages.

155. Defendants, and each of them, knowingly and willfully conspired and entered into an agreement among themselves to engage in this fraud, and in furtherance of that agreement engaged in each of the acts alleged herein.

156. Nussbaum, individually, made and authorized the material misrepresentations on which Plaintiffs relied. Among other things, Nussbaum represented to Plaintiffs and their principals, in writing and in person, that funds wired into the NLLLP IOLA account would be held in trust, would not be moved without Plaintiffs' written authorization, would be used only for the specific transactions identified, and would be returned with interest on demand. In or about

December 2024, Nussbaum personally pitched the bridge-loan program to Zalman Schochet on behalf of EADMK and personally guaranteed the loans, knowing at the time that the funds in the NLLLP IOLA account were being commingled with and depleted by the flip-transaction scheme described above.

157.    Lowinger, individually, made and authorized the material misrepresentations on which Plaintiffs relied. On January 14, 2025, Lowinger advised Blueberry that its $58,772,945 was being maintained in escrow and that the account had been frozen with no disbursements possible. That representation was false when made. Plaintiffs' funds had already been transferred out of the NLLLP IOLA account, in significant part to Riverside and to recipients selected by Greenwald, before January 14, 2025. Lowinger, as a named partner of NLLLP and a signatory on the IOLA account, knew the representation to be false, or was recklessly indifferent to its falsity.

158.    Greenwald, individually, made and authorized the material misrepresentations and concealment on which Plaintiffs relied. Greenwald directed Riverside's closing operations to issue settlement statements that omitted disclosure of the kickbacks paid to himself and to Nussbaum, Lowinger's firm, and others. Greenwald personally directed Riverside staff to pay his share of the kickbacks to charitable recipients selected by him, and personally instructed Riverside staff that recipients should not issue written acknowledgments naming the true donor. Greenwald did so for the specific purpose of concealing the kickback arrangement from Plaintiffs, from lenders, and from regulators.

159.    Plaintiffs justifiably relied on the representations of Nussbaum, Lowinger, and Greenwald. Plaintiffs did not know, and could not reasonably have known, that the NLLLP IOLA account was being used as the operating account of a joint fraudulent enterprise among Nussbaum, Lowinger, and Greenwald; that the funds in that account were being depleted to pay kickbacks

routed through charitable recipients; or that Riverside was instructing those recipients not to issue written acknowledgments naming the true source of the funds. Plaintiffs would not have wired their funds, or would have demanded their immediate return, had any of those facts been disclosed. As a direct and proximate result of the conduct of Nussbaum, Lowinger, and Greenwald, Plaintiffs have lost their funds.

## COUNT II
### AIDING AND ABETTING FRAUD
**(Against All Defendants)**

160.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

161.    Nussbaum and Defendant Lowinger made material, false written representations to Plaintiffs by: (1) soliciting the payment of funds to the NLLLP IOLA Account; (2) falsely representing—and committing said representations to written agreement—that the funds would not (and could not) be moved from the NLLLP IOLA Account with the express written consent of Plaintiffs; (3) effectuating the transfers of the funds out of the NLLLP IOLA Account to other entities owned or otherwise operated by the Co-Conspirators; and (4) falsely promising to release the escrow funds to Plaintiffs upon their request despite knowing that the funds had been intentionally dispersed for the benefit of the above described conspiracy.

162.    Defendant Riverside and the Riverside Principals provided substantial assistance to the Co-Conspirators' fraud by, among other things, helping to facilitate the fraudulent use of the escrow funds by creating fraudulent documentation to support the flip sales of certain property, and helping to conceal the fraud through the influx of funds realized through the fraud which allowed the Co-Conspirators to make certain payments to the victims of the fraud in order to not arouse suspicion.

163. Specifically, Lowinger participated in the management and operation of NLLLP and its escrow accounts. He assisted in and permitted the diversion and disbursement of Plaintiffs' funds and denuded NLLLP's escrow account in furtherance of the scheme.

164. Greenwald, Riverside's former Chief Executive Officer and current Chairman, directed and authorized Riverside's participation in the fraudulent flip transactions described herein, approved the disbursement of funds and payments necessary to carry out those transactions to parties not entitled to the same, including to himself.

165. To wit, on March 8, 2022, Lowinger sent an email to Greenwald, stating, *inter alia*, that "is not my job to chase down mystery figures and an angry client who has no inkling re fees added. You've told me that clients 'know,' but I have numerous files and stories that do not match that narrative."

166. Treff, as part owner of Riverside, approved the disbursement of funds and payments necessary to carry out those transactions to parties not entitled to the same. Treff knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme described herein. As a part owner of Riverside, Treff had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files. Those records reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed "Broker Fees" and purported "legal fees" disbursed to parties with no legitimate role in the closings, the round-trip wires returning Riverside funds to the NLLLP IOLA account, and the recurring payments to charitable conduits associated with Nussbaum, including the "Mark Nussbaum RCCS Hockey" entries, Harchava Charitable Fund, Pomona Jewish Community, Ohr Shlomo Chasidic Center, and Tomche Shabbas of Monsey. The pattern reflected in those records, namely lender capital arriving in Riverside's

accounts on a same-day or next-day turnaround from the NLLLP IOLA account, followed by disbursement of inflated fees and partial wire-backs to NLLLP, is not consistent with ordinary title and closing work. Upon information and belief, Treff received Riverside's share of the inflated fees and kickback proceeds disbursed out of these closings. Treff's approval of the disbursements described herein, his ownership interest in Riverside, and his access to Riverside's books and records establish that he knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme.

167.    Lazarus, as Head of Compliance and in house attorney at Riverside, reviewed, approved, and/or permitted the processing of the transactions described herein despite obvious irregularities and red flags, and generated fraudulent and false settlement statements, thereby enabling and "rubberstamping" the misconduct that occurred.

168.    Mindick was Riverside's Chief Financial Officer who exercised control over Riverside's financial operations. Mindick authorized, directed, and/or permitted the wire transfers that diverted Plaintiffs' funds as kickbacks to Riverside and other entities and individuals. As Chief Financial Officer, Mindick was a signatory on Riverside's operating and escrow accounts and was responsible for approving outgoing wire transfers from those accounts. Mindick personally approved or directed the outgoing wires by which Riverside received Plaintiffs' funds from the NLLLP IOLA account and disbursed those funds to entities and individuals with no legitimate role in the closings, including, but not limited to, the October 14, 2021 incoming wires of $15,026,284.38 and $16,271,550.00 in connection with the Knoll Ridge closing (Riverside File No. RAIN-43027A), the June 30, 2024 incoming wire of $750,000.00 on Riverside file Ramo43010, the July 9, 2024 incoming wire of $1,450,000.00 on Riverside file Rain43014, the July 18, 2023 incoming wire of $3,500,000.00 on Riverside File RANY-50191/SS, the April 27,

2023 outgoing "Broker Fee" of $138,685.00 to Fortune Capital Group, and the April 27, 2023 outgoing purported "legal fees" of $50,000.00 to NLLLP from the Park at Crestview closing. As Chief Financial Officer, Mindick had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files. Those records reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees disbursed to parties with no legitimate role in the closings, and the round-trip wires returning funds from Riverside to NLLLP, as described herein. Upon information and belief, Mindick knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme.

169.    Zagelbaum founded Riverside in 2007 and currently serves as its President. Zagelbaum directed the Co-Conspirators to divert Plaintiff's funds to non-interested parties and entities at Plaintiffs' expense, comprising an essential part of the enterprise. As founder and President of Riverside, Zagelbaum is a signatory on Riverside's operating and escrow accounts and exercises ultimate authority over Riverside's business. Riverside's acceptance of title and closing work from Nussbaum and Lowinger over the years 2021 through 2024, including the Hague and Galleries of Syracuse closings in 2021, the Knoll Ridge closing in October 2021, the Park at Crestview closing in April 2023, and the closings on Riverside files Ramo43010, Rain43014, RANY-50191/SS, and RALA-50002 in 2023, occurred under Zagelbaum's direction and with his authorization. As founder and President of Riverside, Zagelbaum had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files. Those records reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees disbursed to parties with no legitimate role in the closings, the round-trip wires returning funds

from Riverside to NLLLP, and the recurring payments to charitable conduits associated with Nussbaum described herein. Upon information and belief, Zagelbaum knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme, and shared in the economic benefit of the inflated fees and kickback proceeds disbursed out of these closings.

170.    Zagelbaum, through Riverside, would improperly provide kickbacks to Nussbaum on "1031 exchanges" referred to Riverside by Nussbaum while funds were in Riverside's escrow account.

171.    The amount of the kickback was calculated by accounting for interest gained on funds while in Riverside's escrow account. Nussbaum would direct his kickback be sent to various charities though Fidelity, including, but not limited to, Riverside File number 44176.

172.    Riverside was the vehicle through which the Riverside Defendants ran and operated their fraudulent scheme and conspiracy.

173.    Fidelity helped conceal the fraud by improperly accepting misappropriated funds in violation of applicable law which resulted from the fraudulent flip transactions.

## COUNT III
## CIVIL CONSPIRACY
### (Against All Defendants)

174.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

175.    Defendants, combined, agreed, and mutually undertook, with the Co-Conspirators, through concerted actions, to implement the fraudulent scheme described herein.

176.    As detailed above, Defendants, Co-Conspirators, and others created and maintained a joint and carefully orchestrated fraudulent scheme through which they intentionally commit these numerous, unlawful acts.

177. Nussbaum and Defendant Lowinger knowingly and willfully executed the schemes described herein intending to defraud mortgage-issuing institutions while necessarily intending to commit fraud against Plaintiffs by, among other things: (1) soliciting the payment of escrow funds as to the NLLLP IOLA Account; (2) falsely representing—and committing said representations to written agreement—that the funds would not (and could not) be moved from the NLLLP IOLA Account with the express written consent of Plaintiffs; (3) effectuating the transfers of the funds out of the NLLLP IOLA Account to other entities owned or otherwise operated by the Co-Conspirators; and (4) falsely promising to release the escrow funds to Plaintiffs upon their request despite knowing that the funds had been intentionally dispersed for the benefit of the above described Conspiracy.

178. Nussbaum and Defendant Lowinger's representations were false and were made with full knowledge of their falsity.

179. Nussbaum and Defendant Lowinger made these false representations with the intent that Plaintiffs rely on them. More specifically, they made these false representations for the purpose of gaining Plaintiffs' trust and coercing them to entrust the them with their money, which Defendants, Co-Conspirators, and others ultimately stole.

180. Nussbaum and Defendant Lowinger had a duty to disclose the truth to Plaintiffs based on their relationship with Plaintiffs and/or their superior knowledge of essential facts, which rendered their failure to disclose information concerning the escrow funds with respect to the NLLLP IOLA account inherently unfair.

181. Plaintiffs reasonably, foreseeably, and justifiably relied on certain misrepresentations regarding the agreements and based on that reliance, deposited millions of dollars into accounts managed by Nussbaum and Defendant Lowinger. The reliance on Nussbaum

and Defendant Lowinger's fraudulent misrepresentations was material in Plaintiffs' decisions to provide capital to the NLLLP IOLA account and they would not have done so had they been aware of Defendants, Co-Conspirators, and other's true intentions. Subsequent fraudulent misrepresentations were intended to ensure that Plaintiffs did not catch on to the conspiracy and attempt to retrieve their escrow funds at an earlier point in time.

182. As a direct and proximate result of these misrepresentations by Nussbaum and Defendant Lowinger, Plaintiffs have suffered substantial damages.

183. Further, each Defendant, Co-Conspirator, and others, played an integral role in carrying out the conspiracy, including providing funding, creating and maintaining business records, negotiating and executing agreements, engaging in real estate transactions, managing corporate structures, and handling the bookkeeping and accounting necessary to receive and distribute funds, disguising the recipients of the proceeds of the fraudulent scheme, and wrongfully accepting proceeds from the fraudulent scheme.

184. Specifically, Defendant Riverside and the Riverside Principals, in furtherance of this fraudulent scheme, acted as the title and closing agent for many of the fraudulent flip transaction that comprised the scheme. As title agent, Riverside prepared or approved settlement statements, handled escrow and disbursement functions, processed wire transfers, and controlled the mechanics of closing.

185. Fidelity accepted funds from Defendant Riverside and the Riverside Principals in violation of applicable law which were generated through the fraudulent flip transactions.

186. As a result of the orchestrated scheme between Defendants, Co-Conspirators, and others to secure fraudulently inflated mortgages on the back of Plaintiffs' (and other similarly situated client victims') stolen funds, Plaintiffs have suffered substantial damages.

**COUNT IV**
**CONVERSION**
**(Against All Defendants)**

187.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

188.    The monies deposited by the Plaintiffs into the NLLLP IOLA account maintained by NLLLP were specifically identifiable and pursuant to written agreement were not to be used for any purpose without Plaintiffs' permission. The funds deposited into the NLLLP IOLA account pursuant to written escrow agreements were at all times the property of Plaintiffs and therefore Plaintiffs had a possessory right in and to them.

189.    Defendants, Co-Conspirators, and others had and have no right or claim to any of Plaintiffs' money that was held in trust by NLLLP in its IOLA account.

190.    Defendant Lowinger's transfer of Plaintiffs' funds out of the NLLLP IOLA account without express written authorization from Plaintiffs was improper and wrongful.

191.    Defendant Riverside and the Riverside Principals' receipt of Plaintiffs' funds formerly in the NLLLP IOLA account as part of the fraudulent scheme was improper and wrongful.

192.    Defendant Fidelity's acceptance of funds formerly in the NLLLP IOLA account as part of the fraudulent scheme was improper and wrongful.

193.    Defendants wrongfully took possession of and exercised control over Plaintiffs' funds in derogation of and to the exclusion of Plaintiffs' rights.

194.    By doing so, Defendants have willfully interfered with and converted Plaintiffs' personal property, without lawful jurisdiction, as a result of which Plaintiffs have been deprived of their property.

195.     Defendants acted with a high level of moral culpability as the Defendants, Co-Conspirators, and others, planned and executed the aforementioned conversion with wanton dishonesty, malice and the intent to oppress Plaintiffs.

196.     At least $87.5 Million of Plaintiffs' monies were used for the benefit of Defendants, which precluded Plaintiffs from exercising their rights of ownership over the funds.

## COUNT V
## CONSPIRACY TO COMMIT CONVERSION
### (Against All Defendants)

197.     Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

198.     The monies deposited by the client victims (namely Plaintiffs) into the Attorney IOLA account maintained by NLLLP were specifically identifiable in the NLLLP IOLA account and were not to be used for any purpose without Plaintiffs' permission. The funds deposited into the NLLLP IOLA account pursuant to written escrow agreements were at all times the property of Plaintiffs and therefore Plaintiffs had a possessory right in and to them.

199.     Co-Conspirators have never had any right or claim to any of Plaintiffs' money that was held in trust by NLLLP in its IOLA account.

200.     The transfer of Plaintiffs' funds out of the NLLLP IOLA account by Nussbaum and Defendant Lowinger was improper and wrongful.

201.     Defendants, Co-Conspirators, and others, wrongfully took possession of and exercised control over Plaintiffs' funds in derogation of and to the exclusion of Plaintiffs' rights as part and in furtherance of the conspiracy.

202.     Defendant Riverside and the Riverside Principals took overt actions in the Co-Conspirators' use of Plaintiffs' personal property by acting as title and closing agent for many of

the fraudulent flip transactions that comprised the fraudulent scheme. This role meant that the Riverside Defendants prepared or approved settlement statements, handled escrow and disbursement functions, processed wire transfers, and controlled the mechanics of closings.

203.    Defendant Fidelity improperly accepted money generated by the fraudulent flip transactions.

204.    By doing so, Defendants have conspired to converted Plaintiffs' personal property, without lawful justification, as a result of which Plaintiffs have been deprived of their property.

205.    Defendants acted with a high level of moral culpability as the Defendants and Co-Conspirators planned and executed the aforementioned conversion with wanton dishonesty, malice, and the intent to oppress Plaintiffs.

206.    At least $87.5 Million of Plaintiffs' monies were used for the benefit of Defendants, which precluded Plaintiffs from exercising their rights of ownership over the funds.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### (Against Defendant Lowinger)

207.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

208.    Defendant Lowinger owed Plaintiffs a fiduciary duty as a partner of NLLLP, the escrow agent of Plaintiffs' monies held in the NLLLP IOLA account.

209.    Upon information and belief, Nussbaum and Defendant Lowinger were, at all relevant times, signatories to the NLLLP IOLA account.

210.    Defendant Lowinger owed a fiduciary duty to Plaintiffs with respect to all Plaintiffs' monies held in the NLLLP IOLA account, which included the duty to maintain, account, protect, and preserve the same.

211. Defendant Lowinger had ethical and fiduciary duties to segregate and preserve Plaintiffs' monies held in the NLLLP IOLA Account.

212. Upon information and belief, Defendant Lowinger breached his fiduciary duties by failing to preserve and/or segregate Plaintiffs' monies—and indeed, in certain instances, actively and improperly dispersing said monies held in the NLLLP IOLA account.

213. Defendant Lowinger had an ethical and fiduciary duty to promptly return to Plaintiffs the funds deposited in the NLLLP IOLA Account on demand pursuant to the escrow agreements.

214. Plaintiffs requested the return of their respective funds in or about January 2025.

215. Defendant Lowinger breached his fiduciary duties by failing to promptly return to Plaintiffs the requested funds upon demand.

## COUNT VII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendant Riverside and the Riverside Principals)

216. Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

217. Nussbaum and Defendant Lowinger owed Plaintiffs a fiduciary duty as partners of NLLLP, the escrow agent of Plaintiffs' monies held in the NLLLP IOLA account.

218. Upon information and belief, Nussbaum and Defendant Lowinger were, at all relevant times, signatories to the IOLA account held by NLLLP.

219. Nussbaum and Defendant Lowinger owed a fiduciary duty to Plaintiffs with respect to all Plaintiffs' monies held in the NLLLP IOLA account, including to maintain, account, protect, and preserve the same.

- 55 -

220. Nussbaum and Defendant Lowinger had ethical and fiduciary duties to segregate and preserve Plaintiffs' monies held in the NLLLP IOLA account.

221. Upon information and belief, Nussbaum and Defendant Lowinger each breached their fiduciary duties by failing to preserve and/or segregate Plaintiffs' monies—and indeed actively dispersing said monies held in the NLLLP IOLA account.

222. Nussbaum and Defendant Lowinger each had an ethical and fiduciary duty to promptly return to Plaintiffs the funds deposited in the NLLLP IOLA account upon demand pursuant to the escrow agreements.

223. Plaintiffs requested the return of their respective funds in January, 2025.

224. Nussbaum and Defendant Lowinger breached their fiduciary duties by failing to promptly return to Plaintiffs the requested funds upon demand therefor.

225. Upon information and belief, Defendants were aware that the source of the funds used to complete the fraudulent transactions originated from the NLLLP escrow account.

226. Accordingly, Defendants aided and abetted Co-Conspirators' breaches of their fiduciary duties owed to Plaintiffs by participating in, assisting, and/or otherwise facilitating the conspiracy as title and closing agent.

## COUNT VIII
## NEGLIGENCE/GROSS NEGLIGENCE IN ESCROW-RELATED FUNCTIONS
### (Against Defendant Lowinger)

227. Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

228. As escrow agents, Nussbaum and Defendant Lowinger owed Plaintiffs a duty of care with respect to the escrow funds deposited into the NLLLP IOLA account.

229. Specifically, Defendant Lowinger had ethical and fiduciary duties to segregate and preserve Plaintiffs' monies held in the NLLLP IOLA account

230. Upon information and belief, Nussbaum and Defendant Lowinger saw to it that Plaintiffs' funds were immediately removed from the NLLLP IOLA account after being placed therein, against the express terms of the relevant escrow agreements, for the benefit of Defendants, Co-Conspirators, and others, in the furtherance of and for the benefit of the mortgage fraud scheme described herein.

231. Accordingly, each breached their fiduciary duties by failing to preserve and/or segregate Plaintiffs' monies—and indeed actively and improperly dispersing said monies—held in the NLLLP IOLA account.

232. No portion of Plaintiffs' escrow funds have been disbursed in accordance with the written escrow agreements.

233. Plaintiffs requested the return of their funds in or about January, 2025

234. By failing to return Plaintiffs' funds, Nussbaum and Defendant Lowinger breached their duty to promptly return to Plaintiff the funds upon demand.

235. Defendant Lowinger's violations of the respective escrow agreements were knowing and willful.

236. Defendant Lowinger acted in bad faith with respect to Plaintiffs' funds in the NLLLP IOLA account.

237. Defendant Lowinger's conduct with respect to Plaintiffs' funds in the NLLLP IOLA Account was a departure from the ordinary standard of care of an escrow agent.

238. Defendant Lowinger's conduct was grossly negligent—Lowinger breached his duty with a reckless indifference to Plaintiffs' rights under the escrow agreements and with the specific intent to breach said duty in furtherance of the mortgage fraud scheme.

## COUNT IX
## MONEY HAD AND RECEIVED
### (Against All Defendants)

239. Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

240. Nussbaum and Defendant Lowinger accepted and received Plaintiffs' monies into the NLLLP IOLA account.

241. Pursuant to the express terms of the written escrow agreements, Plaintiffs at all times retained possession of the escrow funds and the funds were only to be released from escrow in accordance with the terms of the escrow agreements and/or at closing of the investments for which they were designated.

242. Despite the terms of the escrow agreements, which provided that the funds would not leave the account without the express written consent of Plaintiffs, Nussbaum and Defendant Lowinger improperly transferred Plaintiffs' escrow funds for the benefit of the mortgage fraud scheme.

243. Defendants Riverside and the Riverside Principals received a portion of Plaintiffs' funds as title and closing agent during the fraudulent flip sales.

244. The funds received by Defendants Riverside and the Riverside Principals were and are the property of Plaintiffs.

245. Defendants Riverside and the Riverside Principals are not entitled to retain a transfer from the NLLLP IOLA, or any portion thereof, which contains Plaintiffs' escrow funds.

246.    Defendant Fidelity received a portion of Plaintiffs' funds from Riverside, which fund resulted from the fraudulent flip sales.

247.    The funds received by Defendant Fidelity were and are the property of Plaintiffs, which Fidelity was not entitled to retain.

248.    The fair and reasonable value of Plaintiffs' loss, and of Defendants' collective benefit, as a result of the fraudulent dispersal of Plaintiffs' funds out of the NLLLP IOLA account, is at least the sum of $87.5 Million, plus interest and less any nominal payments remitted or received by Defendants as part of the cover up of Defendants' scheme.

**COUNT X**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

249.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

250.    Defendants have been unjustly enriched at the expense of Plaintiffs in violation of the common law.

251.    Plaintiffs placed their funds in trust with NLLLP within its IOLA account, on the understanding that such funds were only to be released from escrow in accordance with the terms of the escrow agreements and/or at the closing of the investments for which the funds were designated.

252.    As part and in furtherance of the fraudulent scheme, Defendants knowingly and unlawfully accessed, transferred, and/or obtained for their own benefit, without Plaintiffs' knowledge or consent, Plaintiffs' escrowed funds directly from the NLLLP IOLA account, even though Defendants were aware that Plaintiffs had not authorized the release of the escrowed funds, and even though Defendants knew they had no legitimate right to the funds.

253.    At all relevant times described herein, Plaintiffs had and continues to have a legal and equitable interest in the $87.5 Million which was improperly taken by Defendants, with Defendants' taking of such funds was at Plaintiffs' expense.

254.    As a result of Defendants' wrongful conduct, they have been and continue to be unjustly enriched by their wrongful receipt of Plaintiffs' funds in the amount of $87.5 Million.

255.    Defendants have failed to repay or compensate Plaintiffs any meaningful amount since the beginning of their wrongful conduct.

256.    Retention by Defendants of the funds they received would be inequitable and, therefore, equity requires the funds be returned to Plaintiffs.

257.    The fair and reasonable value of Plaintiffs' loss, and of Defendants' collective benefit, as a result of the fraudulent dispersal of Plaintiffs' funds out of the NLLLP IOLA account, is at least the sum of $97.5 Million, plus interest and less any nominal payments remitted by Defendants as part of the cover up of Defendants' scheme.

**COUNT XI**
**Violation of 18 U.S.C. § 1962(c)**
**Association In Fact Enterprise**
**(Against Lowinger, Nussbaum, Eisenreich, Defendant Riverside and the Riverside Principals)**

258.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

259.    At all relevant times, each Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

260.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

261.    At all relevant times, Defendants formed and orchestrated an   association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The association-in-fact enterprise created

by Defendants had the common purpose of carrying out related fraudulent schemes as described above——all intended to extract loan proceeds far in excess of the true value of the underlying properties and to ensure Plaintiffs would be unable to recover the monies they deposited into the Attorney IOLA account maintained by NLLLP.

262.    The participants in the association-in-fact enterprise remained constant throughout the execution of the schemes and had an ongoing framework for carrying out  the  schemes, with Lowinger and the Co-Conspirators orchestrating the fraudulent flip transactions, the  Riverside Defendants acting as title and closing agent for many of the fraudulent flip transactions that comprised the fraudulent scheme, and Lowinger and the Co-Conspirators improperly transferring Plaintiffs' funds out of the NLLLP IOLA account and failing and refusing to remit to Plaintiffs the monies owed to them.

263.    As a result of the enterprise's criminal conduct, Plaintiffs lost the collective amount of $87.5 Million wired to NLLLP's IOLA account. As described herein, the enterprise was structured as follows to accomplish the goals of the criminal scheme:

264.    In a typical transaction made through Defendants, a straw buyer would enter into a contract to purchase a property at or near its actual market value. Before that purchase closed, the straw buyer's contractual rights would be assigned to a second buyer at a drastically inflated price.

265.    This inflated "flip" price was then used to justify and secure mortgage financing from lenders who were unaware that the valuation was fabricated and unsupported by market conditions.

266.    By inflating the purchase price in this manner, Defendants, the Co-Conspirators, and others were able to obtain loan proceeds substantially greater than the amount necessary to acquire the property being purchased.

267. Importantly, the success of this scheme depended on the preparation of closing documents, title work, settlement statements, and disbursements by the Riverside Defendants that appeared facially proper while concealing the true source and destination of the funds that were ultimately misappropriated.

268. The Riverside Defendants acted as the title and closing agent for many of the fraudulent "flip" transactions that comprised the criminal scheme.

269. In that capacity, Riverside prepared or approved settlement statements, handled escrow and disbursement functions, processed wire transfers, and controlled the mechanics of closings.

270. Riverside's participation in these transactions provided the appearance of legitimacy necessary to induce lenders to fund the inflated mortgage loans.

271. Without Riverside's preparation of closing documents and its processing of escrow disbursements, Defendants and the Co-Conspirators would not have been able to consummate the transactions or obtain the loan proceeds.

272. Riverside knowingly processed or permitted disbursements that directed funds to Defendants, the Co-Conspirators, and others through inflated, undisclosed, or fictitious fees and payments to entities with no legitimate role in the transactions.

273. Nussbaum, as managing partner of NLLLP and as the attorney-of-record on the NLLLP IOLA account, conducted and participated in the conduct of the affairs of the enterprise. Nussbaum solicited Plaintiffs' deposits into the NLLLP IOLA account, represented to Plaintiffs that the funds would be safely held in escrow, and thereafter directed and authorized the diversion of Plaintiffs' funds out of the NLLLP IOLA account to Riverside, to charitable conduits identified in the running ledger described herein, and to the other Defendants and Co-Conspirators.

Nussbaum personally arranged the 1031 kickback program through which Riverside remitted portions of the interest earned on Plaintiffs' escrowed funds to charities Nussbaum designated, including Fidelity Investments Charitable Gift Fund, Pomona Jewish Community, Ohr Shlomo Chasidic Center, Tomche Shabbas of Monsey, Harchava Charitable Fund, and Bais Menachem North Miami Beach. Nussbaum coordinated directly with Greenwald, Lowinger, and the Riverside Principals on the timing, amount, and disposition of the wires that moved Plaintiffs' funds through the NLLLP IOLA account to Riverside-handled closings and back, including the Knoll Ridge closing in October 2021, the Park at Crestview closing in April 2023, the July 2023 wires totaling $8,580,156.00, and the August 2023 round-trip of $1,500,000.00 described above. Nussbaum's management of the NLLLP IOLA account, his solicitation of lender deposits, and his direction of the diversion and kickback wires were essential to the operation of the enterprise.

274.    Specifically, Lowinger participated in the management and operation of NLLLP and its escrow accounts. As one of the heads of the conspiracy, he assisted in and permitted the diversion and disbursement of Plaintiffs' funds and denuded NLLLP's escrow account in furtherance of the scheme.

275.    For example, Zagelbaum, through Riverside, would improperly provide kickbacks to Nussbaum on "1031 exchanges" referred to Riverside by Nussbaum while funds were in Riverside's escrow account.

276.    The amount of the kickback was calculated by accounting for interest gained on funds while in Riverside's escrow account. Nussbaum would direct his kickback be sent to various charities though Fidelity, including, but not limited to, on transfers identified by Riverside File numbers 44176, RAMN 3900, and RANJ 40782 .

277.    Greenwald, Riverside's former Chief Executive Officer and current Chairman, directed and authorized Riverside's participation in the fraudulent flip transactions described herein, approved the disbursement of funds and payments necessary to carry out those transactions to parties not entitled to the same, including himself, acting as a vital cog in the conspiracy to defraud Plaintiffs.

278.    Lazarus, as Head of Compliance and in houser attorney at Riverside, reviewed, approved, and/or permitted the processing of the transactions described herein despite obvious irregularities and red flags, and generated fraudulent and false settlement statements, thereby enabling and "rubberstamping" the misconduct that occurred and playing a vital role in the conspiracy in allowing the fraudulent scheme to transpire.

279.    Mindick was Riverside's Chief Financial Officer who exercised control over Riverside's financial operations. Mindick authorized, directed, and/or permitted the wire transfers that diverted Plaintiffs' funds as kickbacks to Riverside and other entities and individuals which was an essential component of the conspiracy. As Chief Financial Officer, Mindick was a signatory on Riverside's operating and escrow accounts and was responsible for approving outgoing wire transfers from those accounts. Mindick personally approved or directed the outgoing wires by which Riverside received Plaintiffs' funds from the NLLLP IOLA account and disbursed those funds to entities and individuals with no legitimate role in the closings, including, but not limited to, the October 14, 2021 incoming wires of $15,026,284.38 and $16,271,550.00 in connection with the Knoll Ridge closing (Riverside File No. RAIN-43027A), the June 30, 2024 incoming wire of $750,000.00 on Riverside file Ramo43010, the July 9, 2024 incoming wire of $1,450,000.00 on Riverside file Rain43014, the July 18, 2023 incoming wire of $3,500,000.00 on Riverside File RANY-50191/SS, the April 27, 2023 outgoing "Broker Fee" of $138,685.00 to Fortune Capital

Group, and the April 27, 2023 outgoing purported "legal fees" of $50,000.00 to NLLLP from the Park at Crestview closing. As Chief Financial Officer, Mindick had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files. Those records reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees disbursed to parties with no legitimate role in the closings, and the round-trip wires returning funds from Riverside to NLLLP, as described herein. Upon information and belief, Mindick knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme. Mindick's approval of the wires by which Riverside received and disbursed Plaintiffs' funds was an essential part of the enterprise.

280.   Zagelbaum founded Riverside in 2007 and currently serves as its President. Zagelbaum directed the Co-Conspirators to divert Plaintiff's funds to non-interested parties and entities at Plaintiffs' expense, comprising an essential part of the enterprise. As founder and President of Riverside, Zagelbaum is a signatory on Riverside's operating and escrow accounts and exercises ultimate authority over Riverside's business. Riverside's acceptance of title and closing work from Nussbaum and Lowinger over the years 2021 through 2024, including the Hague and Galleries of Syracuse closings in 2021, the Knoll Ridge closing in October 2021, the Park at Crestview closing in April 2023, and the closings on Riverside files Ramo43010, Rain43014, RANY-50191/SS, and RALA-50002 in 2023, occurred under Zagelbaum's direction and with his authorization. As founder and President of Riverside, Zagelbaum had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files. Those records reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees

disbursed to parties with no legitimate role in the closings, the round-trip wires returning funds from Riverside to NLLLP, and the recurring payments to charitable conduits associated with Nussbaum described herein. Upon information and belief, Zagelbaum knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme, and shared in the economic benefit of the inflated fees and kickback proceeds disbursed out of these closings.

281. Treff, as part owner of Riverside, approved the disbursement of funds and payments necessary to carry out those transactions to parties not entitled to the same, including the inflated "Broker Fees" and purported "legal fees" disbursed out of the Riverside-handled closings described herein. As a part owner of Riverside, Treff shared in the economic benefit of the fees Riverside collected on those closings. Treff exercised oversight of Riverside's escrow and disbursement functions and authorized or permitted the wire transfers through which Riverside processed Plaintiffs' funds and remitted portions of the proceeds back to NLLLP and to charitable conduits identified herein. Treff knew, or in the exercise of reasonable diligence should have known, of the fraudulent scheme. Treff had access to, and is presumed to have reviewed, Riverside's settlement statements, escrow ledgers, wire records, and closing files, which reflect the recurring penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees disbursed to parties with no legitimate role in the closings, the round-trip wires returning funds from Riverside to NLLLP, and the recurring payments to charitable conduits associated with Nussbaum identified herein. That pattern is not consistent with ordinary title and closing work. Treff's knowing or reckless approval of those disbursements comprised an essential role of the enterprise.

282. Eisenreich, as an owner of Riverside, knowingly participated in the enterprise and personally funded portions of the underlying transactions in which Plaintiffs' escrowed funds were

misappropriated. As an owner, Eisenreich had oversight responsibility for, and exercised oversight over, Riverside's day-to-day operations, including its closings, escrow disbursements, and the wire instructions issued on the Riverside-handled files referenced herein. Upon information and belief, Eisenreich approved the July 18, 2023 disbursement of $5,080,156.00 from the Nussbaum escrow account ending 1550 to Fidelity National Title Insurance on Riverside File RALA-50002, as set forth above. The funds Eisenreich contributed to the underlying transactions were commingled with Plaintiffs' escrowed funds and were used together with Plaintiffs' funds in the Riverside-handled closings and round-trip wire chains described herein. As an owner of Riverside, Eisenreich received the economic benefit of the inflated "Broker Fees" and purported "legal fees" collected on those closings. Eisenreich's knowing participation in, and personal funding of, the enterprise was a substantial and necessary contribution to the enterprise's ability to continue operating and to absorb Plaintiffs' deposits in August and December 2024.

283.   Riverside was the vehicle through which the Riverside Defendants ran and operated their fraudulent scheme and conspiracy.

284.   The above-described criminal scheme required a continual source of short-term capital in order to create the illusion that buyers had access to sufficient liquidity to close the inflated transactions.

285.   To maintain that illusion and prevent the scheme from unraveling, Lowinger and the Co-Conspirators, with the knowledge of and aided and abetted by the Riverside Defendants, solicited investors, including Plaintiffs, to provide short term loans or bridge financing.

286.   Plaintiffs were expressly told that their money would be safely held in NLLLP's IOLA escrow account, would not be moved without their authorization, and would be returned with interest upon demand.

287.    Plaintiffs were not informed that their money would instead be used to facilitate or backstop fraudulent transactions or to fund improper disbursements to insiders.

288.    Plaintiffs' funds were then, without their knowledge, transferred out of the NLLLP IOLA account by Nussbaum and Defendant Lowinger and not returned.

289.    Consequently, Plaintiffs lost all money they had wired into the NLLLP IOLA account.

290.    At all relevant times, Defendants conducted or participated, directly and indirectly, in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) of the RICO statute, in violation of 18 U.S.C. § 1962(c).

291.    Beginning no later than 2021 and continuing through the period relevant to this action, Defendants, coordinated and implemented their systematic scheme to generate illicit profits through sham real estate "flip" transactions designed to extract loan proceeds far in excess of the true value of the underlying properties and to deprive Plaintiffs of money they wired into the NLLLP IOLA account, demonstrating both closed-ended and/or open-ended continuity.

292.    At all relevant times, the association-in-fact enterprise alleged herein was engaged in, and its activities affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c). As alleged herein, the sham real estate "flip" transactions took place in, inter alia, New York and Texas, with the Riverside Defendants preparing or approving settlement statements, handling escrow and disbursement functions, processing wire transfers, and controlling the mechanics of closings in different states.

293.    As a result of the enterprise and conspiracy schemes to defraud, Lowinger and the Co-Conspirators, with the knowledge of and aided and abetted by Riverside and the Riverside

Defendants, solicited investors, including Plaintiffs, to provide short term loans or bridge financing from wire transfers initiated from various states to NLLLP's New York situated IOLA account, including, but not limited to, Florida to New York.

294.    The acts committed by each of the Riverside Defendants are related because they are based on the same methodology, which is to obtain fake, false, fraudulent credit to obtain loan proceeds substantially greater than the amount necessary to acquire the property being purchased and solicit investors, including Plaintiffs, to provide short term loans or bridge financing that would never be repaid. As such, Lowinger, Riverside, and the Riverside Principals was aware of the essential nature and scope of the enterprise and intended to participate in it.

295.    At all relevant times, Defendants conducted or participated, directly and indirectly, in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) of the RICO statute, in violation of 18 U.S.C. § 1962(c). The conduct of engaging in sham real estate "flip" transactions designed to extract loan proceeds in excess of the true value of the underlying properties and deprive Plaintiffs of their money was continuous from 2021 through the period relevant to this action.

296.    At all relevant times, the association-in-fact enterprise alleged herein was engaged in, and its activities affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

297.    The pattern of racketeering activity consisted of multiple predicate acts indictable under 18 U.S.C. § 1961(1), including but not limited to:

298.    A.  Wire Fraud (18 U.S.C. § 1343):

a.    As alleged herein, as a result of the scheme to engage in sham real estate "flip" transactions designed to extract loan proceeds in excess of the true value of the underlying

properties, Defendants caused lenders throughout the country to send inflated mortgage funds by U.S. Mail and/or interstate wire transfer from out of state to Riverside's Accounts. In turn, Riverside wired inflated, undisclosed, or fictitious fees and payments to out-of-state entities with no legitimate role in the transactions.

b.     As further alleged herein, as a result of the scheme to obtain fake, false, fraudulent credit to obtain loan proceeds substantially greater than the amount necessary to acquire the property being purchased, Defendants encouraged and solicited investors, including Plaintiffs, to provide short term loans or bridge financing that would never be repaid. Plaintiffs were induced by Lowinger's misrepresentations to wire funds across state lines into NLLLP's escrow account. Defendants were aware that these funds would not be repaid to Plaintiffs.

c.     The interstate wire transfers identified in paragraphs 63 through 70, 114 through 118, and the related allegations incorporated herein constitute predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343 and 18 U.S.C. § 1961(1)(B). Without limiting the generality of the foregoing, Plaintiffs identify the following representative predicate acts of wire fraud:

d.     Predicate Act 1 (Knoll Ridge inbound wires, October 13, 2021). On October 13, 2021, Cambridge Sciences, an entity affiliated with Plaintiff Blueberry Funding LLC, transmitted by interstate wire the sum of $13,271,550.00 from its account at WSFS Bank (account ending 1281) to the NLLLP IOLA account at Signature Bank (ABA 026013576, account ending 3926) maintained by Nussbaum and Lowinger, bearing wire reference number 20212860200000. On the same date, Genesis Scientific, a further entity affiliated with Plaintiff Blueberry Funding LLC, transmitted by interstate wire the sum of $3,000,000.00 from its account at WSFS Bank (account ending 0649) to the same NLLLP IOLA account, bearing wire reference number 20212860198700. The wires were procured by Nussbaum's and Lowinger's misrepresentations to

Plaintiff Blueberry Funding LLC that the funds would be safely held in escrow in the NLLLP IOLA account, would not be moved without Plaintiff's written authorization, and would be returned with interest upon demand. Those representations were false when made. Nussbaum and Lowinger had no intention of holding the funds in escrow and instead intended to wire the funds out of the NLLLP IOLA account the following day to Riverside Abstract LLC to consummate the inflated Knoll Ridge flip closing, as described in paragraphs 62 through 70 above. The wires furthered the scheme to extract loan proceeds from Lument and other lenders in excess of the true value of the underlying properties, to misappropriate Plaintiffs' escrowed funds, and to remit kickbacks to Nussbaum, Lowinger, and the Riverside Principals through inflated and undisclosed fees and round-trip wires.

e.      Predicate Act 2 (Knoll Ridge outbound wires, October 14, 2021). On October 14, 2021, Nussbaum and Lowinger caused two outgoing interstate wires to be transmitted from the NLLLP IOLA account at Signature Bank (ABA 026013576, account ending 3926) to Riverside Abstract LLC. The first wire, in the amount of $15,026,284.38, bore wire reference number 20211014B6B7261F003386 and identified "Knoll Ridge" in the originator-to-beneficiary information field. The second wire, in the amount of $16,271,550.00, bore wire reference number 20211014B6B7261F003693 and likewise identified "Knoll Ridge" in the originator-to-beneficiary information field. The second wire matched, to the penny, the combined amount Plaintiff Blueberry Funding's affiliates had wired into the NLLLP IOLA account the previous day. The wires were transmitted in breach of Nussbaum's and Lowinger's representations to Plaintiff Blueberry Funding LLC that its escrowed funds would not be moved without authorization and were transmitted to consummate an inflated flip closing on the property located at 11510 Kirkwood Drive a/k/a 11415 Knollridge Lane, Indianapolis, Indiana 46229 (Riverside File No. RAIN-

43027A), on which Riverside's Settlement Statement identified Plaintiff Blueberry Funding LLC by name as the Lender. Riverside accepted the wires with knowledge that the funds were Blueberry Funding-sourced and used them to fund the inflated Knoll Ridge closing, to collect inflated and undisclosed fees, and to disburse a portion of the proceeds back to Nussbaum and Lowinger through the seller's counsel wire-back described in paragraph 68 above. The wires furthered the scheme to misappropriate Plaintiffs' escrowed funds and to remit kickbacks to Nussbaum, Lowinger, and the Riverside Principals.

f.      Predicate Act 3 (June and July 2024 Capital One wire chain). On June 24, 2024, Plaintiff Blueberry Funding LLC transmitted by interstate wire the sum of $2,500,000.00 to the Mark J. Nussbaum & Associates PLLC checking account ending 2089 at Capital One, N.A., bearing wire reference number 062424 USD20241760182600. On June 25, 2024, Plaintiff Blueberry Funding LLC transmitted by interstate wire an additional $493,000.00 to the same Capital One account ending 2089, bearing wire reference number 062524 USD20241770379800. On June 30, 2024, Nussbaum caused the Capital One account ending 2089 to wire $750,000.00 to Riverside Abstract LLC at Signature Bank (ABA 026013576, account ending 3926), bearing wire reference number 20210630B6B7261F005854, with the OBI line reading "Ramo43010," identifying a Riverside file in Riverside's "RAMO" series. On July 9, 2024, Nussbaum caused the Capital One account ending 2089 to wire an additional $1,450,000.00 to Riverside Abstract LLC at the same Signature Bank account, bearing wire reference number 20210709B6B7261F002972, with the OBI line reading "Rain43014," identifying a Riverside file in Riverside's "RAIN" series. The wires were procured by Nussbaum's misrepresentations to Plaintiff Blueberry Funding LLC that the funds would be held in escrow and would not be moved without authorization. Those representations were false when made. Nussbaum used the Capital One escrow account to disguise

the source and destination of the funds and to route them to Riverside-handled closings, and Riverside accepted the wires and used them to consummate further inflated flip closings, collect inflated fees, and remit kickbacks to Nussbaum, Lowinger, and the Riverside Principals through the mechanism described above.

g.      Predicate Act 4 (July 17 and 18, 2023 Blueberry Funding-to-Riverside wire chain). On July 17, 2023, Plaintiff Blueberry Funding LLC transmitted by interstate wire the sum of $8,000,000.00 from its account to a Mark J. Nussbaum & Associates PLLC escrow account ending 1550, bearing wire reference number 20230717B6B7261F00116307171046FT03. On July 18, 2023, Nussbaum and Lowinger caused the Nussbaum escrow account ending 1550 to wire $3,500,000.00 to Riverside Abstract LLC at Flagstar Bank, bearing wire reference number 20230718B6B7261F003430, with the OBI line identifying Riverside File "RANY-50191/SS." On the same date, Nussbaum and Lowinger caused the Nussbaum escrow account ending 1550 to wire an additional $5,080,156.00 to Fidelity National Title Insurance at Bank of America N.A., N.Y. (ABA      026009593,      account      ending      1916),      bearing      wire      reference      number 20230718B6B7261F003100 and an OBI line reading "RALA-50002 ag/yg," identifying a Riverside file in Riverside's "RALA" series. The two outgoing wires of July 18, 2023 total $8,580,156.00, which exceeds and accordingly accounts for the full amount of Plaintiff Blueberry Funding LLC's $8,000,000.00 deposit of the previous day. The wires were procured by Nussbaum's and Lowinger's misrepresentations to Plaintiff Blueberry Funding LLC that the funds would be held in escrow and would not be moved without authorization. Those representations were false when made. Riverside accepted the wires with knowledge that the funds were Blueberry Funding-sourced and used them to consummate further inflated flip closings, collect inflated fees, and remit kickbacks to Nussbaum, Lowinger, and the Riverside Principals.

h.        Predicate Act 5 (Park at Crestview closing wires, April 27, 2023). On or about April 27, 2023, Riverside Abstract LLC, with the knowledge and authorization of Greenwald, Lazarus, Mindick, Zagelbaum, Treff, and Eisenreich, caused interstate wires to be transmitted out of the Park at Crestview closing in Austin, Texas, including a $138,685.00 wire designated as a "Broker Fee" to Fortune Capital Group and a $50,000.00 wire of purported "legal fees" to NLLLP, as described in paragraphs 56 through 61 above. The Broker Fee was false in that Fortune Capital Group performed no brokerage services in connection with the closing. The legal fee was false in that it represented a kickback to NLLLP rather than compensation for legitimate legal services. The wires furthered the scheme to misappropriate the inflated loan proceeds obtained from Lument Real Estate Capital LLC and to remit kickbacks to NLLLP and the Co-Conspirators.

i.        Predicate Act 6 (August 24 through August 30, 2023 Blueberry-to-Riverside round-trip wire chain). On August 24, 2023, Blueberry-affiliated entity Bluberry Capital Inc. transmitted by interstate wire the sum of $7,500,000.00 to a Mark J. Nussbaum & Associates PLLC escrow account ending 1550, bearing wire reference number 20230824B6B7261F00134208241140FT03. On August 29, 2023, Nussbaum and Lowinger caused the Nussbaum escrow account ending 1550 to wire $1,500,000.00 to Riverside Abstract LLC at Flagstar Bank, bearing wire reference number 20230829B6B7261F001632. On August 30, 2023, Riverside Abstract LLC wired the same $1,500,000.00 back into the Nussbaum escrow account ending 1550, bearing wire reference number 20230830B6B7261F00091108300951FT03 and an OBI line reading "RALS MOSHE SCHICK RIVERSIDE ABSTRACT LLC, XXXXXX4200." The wires were procured by Nussbaum's and Lowinger's misrepresentations to Blueberry Funding LLC that the funds would be held in escrow and would not be moved without authorization. Those representations were false when made. The August 29 outbound wire and the August 30 return wire of the identical

$1,500,000.00 sum constitute a round-trip kickback through which Riverside, Nussbaum, and Lowinger cycled Blueberry-sourced funds back into Nussbaum's escrow account within a single business day, in the same pattern alleged with respect to the Knoll Ridge closing.

299.   B. Money Laundering (18 U.S.C. §§ 1956, 1957). Money laundering, pursuant to 18 U.S.C. §§ 1956, 1957 occurs when an individual engages in a financial transaction which involved proceeds from specified illegal activity, knew that the proceeds were from illegal activity, and intended the transaction to either promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds.

a.   Here, in a typical transaction made through Defendants, the illegal, inflated "flip" price was used to justify and secure mortgage financing from lenders who were unaware that the valuation was fabricated and unsupported by market conditions. The proceeds received from these lenders resulted from Defendants' illegal activity (i.e. artificially inflating the purchase price of the relevant property.)

b.   Riverside, in furtherance of its illegal activity, then promoted said illegal activity by funding improper disbursements of the funds received from inflated mortgage financing and enriching Defendants, the Co-Conspirators, and others through inflated, undisclosed, or fictitious fees and payments to entities with no legitimate role in the transactions.

c.   In order to create the illusion that buyers had access to sufficient liquidity to close the inflated transactions, Lowinger, Nussbaum, and the Co-Conspirators, with the knowledge of and aided and abetted by the Riverside Defendants, solicited investors, including Plaintiffs, to provide short term loans or bridge financing. Plaintiffs were expressly told that their money would be safely held in NLLLP's

IOLA escrow account, would not be moved without their authorization, and would be returned with interest upon demand.

300.    Instead, Plaintiffs' funds were then, without their knowledge, transferred out of the NLLLP IOLA account by Nussbaum and Defendant Lowinger and not returned. Consequently, Plaintiffs lost all money they had wired into the NLLLP IOLA account as the nature of their loan proceeds were hidden.

301.    The predicate acts described above were related to one another, had the same or similar purposes, results, participants, victims, and methods of commission, and constituted a pattern of racketeering activity.

302.    Each of Lowinger, Riverside, and the Riverside Principals conspired to form the enterprise, and committed the illegal and wrongful acts described above which harmed Plaintiffs.

303.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business or property, including but not limited to loss of their funds remitted to NLLLP's Escrow Account.

304.    By reason of the foregoing, Plaintiffs are entitled to recover treble damages, costs of suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT XII
### Violation of 18 U.S.C. § 1962(d)
### Conspiracy to Violate 18 U.S.C. § 1962(c)
**(Against Lowinger, Nussbaum, Eisenreich, Defendant Riverside and the Riverside Principals)**

305.    Plaintiffs repeat and reallege the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

306.    At all relevant times, each Defendant named in this Count is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

307.    As alleged in Count XI above, the Defendants named in this Count formed and operated an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

308.    Beginning no later than 2021 and continuing through the period relevant to this action, each Defendant named in this Count knowingly agreed with one or more of the other Defendants and the Co-Conspirators to conduct or participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

309.    Each Defendant named in this Count knew of and agreed to the common purpose of the enterprise. That common purpose was the scheme to generate illicit profits through sham real estate "flip" transactions described in paragraphs 46 through 50 above, to solicit Plaintiffs' funds as the short-term capital used to make those inflated closings appear to fund, and to divert and misappropriate Plaintiffs' funds and the inflated loan proceeds out of the NLLLP IOLA account and out of Riverside's escrow accounts through inflated and undisclosed fees, round-trip wires, and kickbacks to Nussbaum, Lowinger, the Riverside Principals, and the charitable conduits associated with Nussbaum.

310.    Each Defendant named in this Count agreed that at least two acts of racketeering activity would be committed in furtherance of the enterprise. As set forth in the paragraphs above, the predicate acts of wire fraud committed in furtherance of the enterprise included, but were not limited to, the October 13, 2021 Knoll Ridge inbound wires, the October 14, 2021 Knoll Ridge outbound wires to Riverside, the June and July 2024 wire chain through the Mark J. Nussbaum & Associates PLLC checking account ending 2089 at Capital One, N.A., the July 17 and 18, 2023

Blueberry Funding-to-Riverside wire chain, the April 27, 2023 Park at Crestview closing wires, and the August 24 through August 30, 2023 Blueberry-to-Riverside round-trip wire chain.

311. The agreement of each Defendant named in this Count is further established by the coordinated and repeated conduct described herein, including the penny-match wires from the NLLLP IOLA account to Riverside on a one or two business-day turnaround, the inflated and undisclosed fees disbursed out of those closings to parties with no legitimate role in the closings, the round-trip wires returning funds from Riverside to NLLLP and from seller's counsel back to NLLLP, the payments to charitable conduits associated with Nussbaum used to remit kickback proceeds, and the acceptance by each such Defendant of the economic benefit of the inflated fees and kickback proceeds disbursed out of those closings. That pattern is not consistent with ordinary, arms'-length title and closing work, and reflects a knowing agreement among the Defendants named in this Count to participate in the affairs of the enterprise through a pattern of racketeering activity.

312. Each Defendant named in this Count agreed to the commission of the predicate acts identified above, whether or not that Defendant personally committed each such act.

313. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property, including but not limited to the loss of the funds Plaintiffs wired into the NLLLP IOLA account and into the Mark J. Nussbaum & Associates PLLC checking account ending 2089 at Capital One, N.A.

314. By reason of the foregoing, Plaintiffs are entitled to recover treble damages, costs of suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally as follows:

(A) For compensatory and punitive damages;

(B) For treble damages;

(C) For counsel fees, interest and costs of suit; and

(D) For such other and further relief as the Court may deem just and equitable.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.


Dated: June 8, 2026
   New York, New York

                       BOCHNER PLLC

             By: _ */s/Jeremy M. Doberman*
                  Jeremy M. Doberman, Esq.
                  Isaac Alony, Esq.
                  1040 Ave. of the Americas, 15th Floor
                  New York, New York 10018
                  (646) 971-0685
                  jeremy@bochner.law
                  ialony@bochner.law

                  *Attorneys for Plaintiffs*