**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLUEBERRY FUNDING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>RIVERSIDE ABSTRACT LLC, BR TITLE AGENCY LLC, SHAUL C. GREENWALD, ARYEH LAZARUS, AZI MINDICK, YOEL ZAGELBAUM, HADASSAH ABBOTT, KARLA MILLER, BORDEAUX CAPITAL LLC, AVERY EISENREICH, JOSEPH TREFF, SAMUEL LOWINGER, MARK J. NUSSBAUM & ASSOCIATES PLLC, NUSSBAUM LOWINGER LLP, 446 MONROE LLC, and 185 E. 33RD ST LLC,<br><br>Defendants. | Case No.: 7:26-cv-04843<br><br>JURY TRIAL DEMANDED<br><br>**VERIFIED AMENDED COMPLAINT** |

Plaintiff, BLUEBERRY FUNDING, LLC ("**Plaintiff**" or "**Blueberry**"), by and through its undersigned counsel, Bochner PLLC, as and for its Verified Amended Complaint against the above-named Defendants, brings this action against and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action to recover $58,772,945.00 that an attorney escrow agent, Nussbaum Lowinger LLP ("**NLLLP**"), was supposed to have been holding in escrow but that it did not hold and has now admitted it misappropriated. Although the now-dissolved NLLLP and its principal appear now to be taking the criminal fall for the enterprise in which NLLLP functioned, this Complaint also tackles a large portion of it that is not currently under indictment.

2. Blueberry is a commercial lender. Between 2022 and 2024, it loaned money, in a series of consolidated tranches, to two companies owned by a borrower named Mendel Steiner. The loan documents required the loan proceeds to remain in the attorney trust account of NLLLP

and provided that moving any of that money out of escrow without Blueberry's written consent was an event of default. On August 27, 2024, NLLLP, by its managing partner Mark J. Nussbaum, signed an Escrow Agreement stating that $58,772,945.00 "is being held in escrow" for Blueberry's benefit. That statement proved to be false. The account in which the money was supposed to sit never held more than $16,537,183.95 at any point that month. By December 31, 2024, it held $0.00. When Blueberry demanded the return of the funds in January 2025, none of it came back.

3. Nussbaum has since sworn to what happened. From mid-2022 through mid-2025, he took approximately $336,731,000 of escrowed funds and wired them to Real Green Management Corp. ("**Real Green**") and Aven Realty 1, LLC ("**Aven Realty**"), companies he understood Steiner controlled, and approximately $24,025,000 more to Steiner and Steiner's family, for no consideration and no legitimate business reason, using new depositors' money to repay earlier ones. The bank records confirm that admission against Blueberry's own deposits. On December 8, 2022, Blueberry wired $1,600,000.00 into NLLLP's trust account; $1,600,000.00 went out to Real Green the same day. On July 17, 2023, Blueberry wired $8,000,000.00 in; the next day $3,000,000.00 went to Real Green and $3,500,000.00 to Defendant Riverside Abstract LLC ("**Riverside**"). On August 24, 2023, a Blueberry affiliate wired $7,500,000.00 in; $2,500,000.00 went to Real Green the next day. On June 24, 2024, Blueberry wired $2,500,000.00 into a second Nussbaum firm account; $2,000,000.00 went to Aven Realty the same day. Unbeknownst to Blueberry, NLLLP's trust account had become, in the words of Nussbaum, a lending desk for Steiner, extending "one day money" at "a point a week," tallied on a spreadsheet Nussbaum called "MS loans." As Nussbaum told Steiner, Blueberry's money was "escrow money" and "Don't tell blueberry I have money for you when I don't!!"

4. Steiner's death on January 9, 2025 is one of a series of events that started the unraveling of the subject criminal enterprise. The Defendants named herein are people and companies that made large portions of that mechanism work and that profited from it.

5. The first group is the Nussbaum side: NLLLP and its affiliate, Mark J. Nussbaum & Associates PLLC, whose trust accounts took in and misappropriated Blueberry's money; and Samuel Lowinger, NLLLP's other partner and a designated signatory on the same trust account. Lowinger papered the two-price "flip" closings that ran through that account, including on Blueberry's own loans. On Blueberry's Knoll Ridge loan, with his firm acting as Blueberry's own lender's counsel, Lowinger stated the property's price at $15,705,000.00 three days before Riverside closed it against Blueberry-affiliated money at the price of $27,375,000.00, and never told his client. And when Blueberry demanded the return of its money, Lowinger told it NLLLP's trust account "may have been illegally accessed" — six days after he had texted Nussbaum, "What the frick is going on," "you are hanging me out to dry here," and "Dont bullshit me."

6. The second group is Riverside, the title and closing settlement company through which the funds were routed, and the officers who ran it. Riverside prepared two settlement statements for the same closing — one at the true price for the seller, another at an inflated price for the lender — and paid Nussbaum an undisclosed cut of its fees and of interest on escrowed funds. In describing the arrangement themselves, Riverside's Chief Financial Officer, Azi Mindick, asked whether Nussbaum kept "separate accounts" for his clients' money and was told "nope," scripted a fabricated $3,000,000.00 proof-of-funds letter for Steiner, and told Nussbaum, "We send flippers proceeds not amount you sent in." Its Chairman, Shaul Greenwald, said in a recorded voice note, "I play the games along with you guys." Its President, Yoel Zagelbaum, set Nussbaum's cut at "a half a point for as long as it sits." Its Controller, Hadassah Abbott, kept the

running ledger of what Riverside owed Nussbaum. On Blueberry's own loans — Gary, Knoll Ridge, Macon, and Baton Rouge, described in detail *infra* — that machine ran against Blueberry itself: Blueberry was shown the inflated price, funded it, and on the Baton Rouge file the $2,792,500.00 spread went straight back into Nussbaum's trust account.

7. The remaining Defendants are: BR Title Agency LLC ("**BR Title**"), the vehicle through which Riverside continued its business after Fannie Mae barred it from federally backed closings; Bordeaux Capital LLC ("**Bordeaux**"), a private lender for which Mindick signed even while he controlled Riverside's disbursements; Karla Miller, Riverside's Chief Counsel, whose confirmation was the precondition to funding on Riverside closings paid from the same escrow; Avery Eisenreich and Joseph Treff, private lenders, with Treff's law firm's trust account having received $5,000,000.00 from Real Green's own account and a net $1,529,033.35 from NLLLP's escrow; and 446 Monroe LLC and 185 E. 33rd St LLC (collectively the "**Obligors**"), the borrowers whose loan proceeds were escrowed and who have not repaid the same to Blueberry.

8. The money trail is documented, with Blueberry's deposits identified by Fed. Ref. No.. The wires that took them out — to Real Green, Aven Realty, and to Steiner personally, as well as for Riverside closings on which Blueberry was not the lender — are identified the same way, and most wires left within a day of the deposit they consumed. The dual-price, fraudulent settlement statements are documents created by Riverside. The arrangement under which Riverside paid the escrow attorney is in the communications, including emails, text messages, and recorded voice of Riverside's Chairman, President, Chief Financial Officer, National Counsel, and Controller. Bank statements from the account that was supposed to hold at least $58,772,945.00 show it closed 2024 at zero.

## PARTIES

9. Plaintiff is a Delaware limited liability company authorized to conduct business in New York, with its principal place of business at 957 Route 33, Hamilton Square, New Jersey 08690. Blueberry's affiliates (the "**Blueberry Funding Affiliates**"), which made some of the deposits described in this Complaint, have assigned to Blueberry all of their rights and claims arising from those deposits, and Blueberry sues on those assignments as well as in its own right.

10. Defendant NLLLP is a New York limited liability partnership that practiced law from 225 Broadway, 36th Floor, New York, New York. NLLLP was the escrow agent under the Escrow Agreement described below and maintained the IOLA account, ending 1550, at Signature Bank and later Flagstar Bank, into which Blueberry's loan proceeds were deposited. Defendant Mark J. Nussbaum & Associates, PLLC ("**MJN & Associates**"; together with NLLLP, collectively referred to as the "**Nussbaum Firms**")[1] is a New York professional limited liability company through which Nussbaum practiced before and alongside NLLLP; it maintained the Capital One, N.A. account ending 2089 into which Blueberry's 2024 advances were deposited.

11. Defendant Samuel Lowinger ("**Lowinger**") is a New York attorney who resides at 496 Arbuckle Avenue, Cedarhurst, New York 11516. Lowinger was NLLLP's other named partner. Lowinger was designated on NLLLP's escrow-agent disclosure letters as an attorney authorized to sign on NLLLPs IOLA account. Upon information and belief, based on those letters and on Lowinger's position as a named partner, Lowinger was a fifty percent partner of NLLLP with authority over the firm's escrow practice. Lowinger's conduct — preparing and directing the paired settlement statements on the flip closings described below, acting as Blueberry's (lender's)

---

[1] The Nussbaum Firms filed for Chapter 11 bankruptcy protection In re Nussbaum Lowinger LLP, *et al.*, Case No. 26-22383 (SHL). The Southern District of New York Bankruptcy Court dismissed those cases in part on the ground that the filings were intended to hinder and delay creditors rather than a good-faith effort to reorganize. The bankruptcy does not remain pending, and to the best of Plaintiff's knowledge no automatic stay protects any Defendant in this action.

counsel on closings where the price shown to Blueberry had been inflated, and giving Blueberry a false explanation for the loss of its money after demand — is set forth *infra*.

12. Defendant Riverside is a New York limited liability company with its principal place of business at 3839 Flatlands Avenue, Brooklyn, New York 11234. As closing agent, Riverside prepared the settlement statements, controlled the escrow releases and wire authorizations, and issued the title insurance policies. Between March 2021 and January 2025, the NLLLP trust account sent 163 wires to Riverside-named beneficiaries, totaling approximately $467,300,000.00. Riverside operates through affiliates[2] that share its principals and staff and that operate in tandem with Riverside to accomplish closings and other transactions: Riverside 1031 LLC, which New York Department of State records place at Riverside's address with Greenwald named for service of process, and Riverside Title LLC, a Houston title agency that, upon information and belief based on its closing files, uses Riverside's own staff and rsabstract.com email domain on out-of-state closings, including the RATX-47052 closing described *infra*, on which Riverside's National Counsel confirmed receipt of the purchaser's funds.

13. Defendant Shaul C. Greenwald ("**Greenwald**"), a licensed attorney, joined Riverside in 2009 as its Chief Executive Officer and is now its Chairman. He resides at 1010 East 22nd Street, Brooklyn, New York 11210. Greenwald negotiated and operated Riverside's referral-payment arrangement with Nussbaum in his own texts. and recorded voice, arranged for Riverside to front and vouch for deposits that did not exist, and personally received $550,000.00 from the NLLLP trust account on May 2, 2022, as set forth in Section E *infra*.

14. Defendant Yoel Zagelbaum ("**Zagelbaum**"), a licensed attorney, founded Riverside in 2007 and is its President. He resides at 1737 Burnett Street, Brooklyn, New York

---

[2] Neither affiliate is named as a defendant herein, and Blueberry reserves all rights as to each.

11229. Zagelbaum set the rate at which Riverside paid Nussbaum for referred business and for money parked in escrow, going back to at least 2016, and routed those payments through a donor-advised fund so they would appear as gifts, as set forth in Section E *infra*.

15. Defendant Azi Mindick ("**Mindick**") is Riverside's Chief Financial Officer. He resides at 1663 Hidden Lane, Lakewood, New Jersey 08701, and administered Riverside's closings and its Signature Bank account ending 3926. Mindick decided when Riverside would break escrow and fund transactions, administered the closings that took Blueberry's money, knew that Nussbaum did not keep segregated client accounts, fabricated a proof-of-funds letter for Steiner, and served as the authorized signatory of Bordeaux, as set forth *infra*.

16. Defendant Aryeh Lazarus ("**Lazarus**"), a licensed attorney, was at all relevant times Riverside's National Counsel. He resides at 16 Ellington Way, Spring Valley, New York 10977. Lazarus personally confirmed receipt of funds, authorized funding, and directed the routing of "excess" closing proceeds on Riverside files funded from the NLLLP account, including files funded the same day Blueberry's deposits arrived. Lazarus was briefed by Lowinger on the deed structure of a file that carried a $13,000,000.00 spread between its two settlement statements, as set forth in Section E *infra*.

17. Defendant Hadassah Abbott ("**Abbott**") was at all relevant times Riverside's Controller, using the email address habbott@rsabstract.com. Abbott transmitted the wiring instructions on the Baton Rouge file through which $3,007,715.20 of Blueberry's loan proceeds moved to Riverside under an instruction bearing Blueberry's name, and maintained the running ledger of payments Riverside owed Nussbaum, as set forth in Section E *infra*.

18. Defendant BR Title is a New Jersey limited liability company with a registered address at 212 Second Street, Suite 502, Lakewood, New Jersey 08701, and, per its own New

Jersey corporate registration, a business address at 3839 Flatlands Avenue, Suite 207, Brooklyn, New York 11234 — the same building as Riverside. Its registered agent and sole principal of record with the New Jersey Division of Revenue (file number 0450252270) is Greenwald. BR Title is a mere continuation and/or alter ego of Riverside, through which Riverside's business continued since the Federal National Mortgage Association barred Riverside from federally backed mortgage closings in February 2024, as set forth in Section G below.

19. Defendant Bordeaux is a New York limited liability company that operated as a private lender with an address at 1936 51st Street, Brooklyn, New York. Bordeaux's account at Signature Bank, ending 5956, sat at the same bank as Riverside's and NLLLP's own accounts. Mindick signed as Bordeaux's "Authorized Signatory" on a January 31, 2022 payoff statement reciting a $9,000,000.00 loan, a $516,000.00 fee, and a $9,516,000.00 payoff, while he controlled Riverside's trust disbursements. Upon information and belief, Bordeaux is owned by Greenwald. Bordeaux's receipts from the Nussbaum Firms' trust accounts and the alternative alter-ego theory pleaded against it are set forth in Section H below.

20. Defendant Karla Miller ("**Miller**"), a licensed attorney, has worked at Riverside for approximately thirteen years and signs as Riverside's "Chief Counsel." On Riverside closings funded out of the NLLLP trust account, Riverside's own closing staff treated Miller's personal confirmation as the precondition to funding. On a $38,000,000.00 closing on July 21, 2022, Riverside's closer wrote to the closing group, "Adding Karla. We can't fund until she confirms that we're clear on the seller's end," and the file funded, with $15,092,187.56 wired from the NLLLP trust account, minutes after Miller wrote, "We are clear to close." Miller has dealt directly with Nussbaum on Riverside files since at least 2014. Her role is set forth in Section I below.

21. Defendant Avery Eisenreich ("**Eisenreich**") resides at 575 Bedford Avenue, Brooklyn, New York 11211. Defendant Joseph Treff ("**Treff**") resides at 1737 E. 23rd Street, Brooklyn, New York 11229, and is a principal of the law firm Treff & Lowy PLLC, 342 Bedford Avenue, Brooklyn, New York. Eisenreich and Treff operate a private lending business together; a broker who has done "multiple deals" with them described it to Nussbaum in December 2024 as the business "Joe Treff does," and it was Treff who decided whether a proposed loan would be made. Upon information and belief, each holds a direct or indirect ownership interest in Riverside and has funded closings Riverside processed. Treff & Lowy PLLC's attorney trust account transacted directly with the NLLLP trust account and received a $5,000,000.00 wire from the account of Real Green, as set forth in Section I below.

22. Defendants Obligors are New Jersey limited liability companies, each having an office at 365 12th Avenue, Paterson, New Jersey 07514, of which Mendel Steiner was the sole member. They are the borrowers on the loan described in Section A below. They are the makers of the Amended, Restated, and Consolidated Commercial Promissory Note in the principal amount of $60,000,000.00 executed in August 2024, and of the notes it consolidated; their obligations were guaranteed by Steiner personally under a Guaranty executed August 27, 2024 that Nussbaum notarized. They are parties, with Blueberry and NLLLP, to the Escrow Agreement executed August 27, 2024, which designates NLLLP's attorney trust account as the account in which the loan proceeds were to be held and provides that transfer of any amount from that account without Blueberry's prior written consent is an Event of Default. The Obligors have not repaid the loan.

23. Riverside, Greenwald, Zagelbaum, Mindick, Lazarus, and Abbott are referred to together as the "Riverside Defendants." Lowinger, NLLLP, and MJN & Associates are referred to together as the "Firm Defendants." BR Title is treated as coextensive with Riverside wherever the

mere-continuation or alter-ego theory pleaded below is invoked, and Bordeaux is so treated wherever the alternative alter-ego theory pleaded below is invoked.

24. Mark J. Nussbaum ("Nussbaum") is not a Defendant in this action. He is a former New York attorney residing in Suffern, New York, who was the principal of MJN & Associates and a named partner of NLLLP, held himself out as an escrow agent qualified to hold client funds in trust, and personally solicited, administered, and diverted Blueberry's deposits. He is under indictment in New York County for grand larceny in the first degree, and he has admitted the diversion under oath.

25. Mendel Steiner ("Steiner") is not a Defendant. He was the sole member of the two borrowers on Blueberry's loan and the personal guarantor of that loan, and the person to whose companies Nussbaum has admitted sending approximately $336,731,000.00 of client funds. He died on or about January 9, 2025. Blueberry reserves all rights against his estate and any companies with which he may have been affiliated.

26. Shaya Prager, also known as Avrohom Prager ("Prager"), of 7 Olive Court, Lakewood, New Jersey, who operated through Opal Holdings LLC and related entities, is not a Defendant. He was the Riverside client whose flip closings consumed the largest share of the commingled escrow: not less than $111,411,383.00 in Prager-designated wires left the NLLLP trust account during the period Blueberry's deposits were deposited into it, against roughly $51,311,551.00 returning. Blueberry reserves all rights against him and against every other non-party named in this Complaint.

**JURISDICTION AND VENUE**

27. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), because Plaintiff's federal claims arise under 18 U.S.C. § 1962, and supplemental

jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a), because they form part of the same case or controversy.

28. This Court has personal jurisdiction over each Defendant. Riverside is a New York limited liability company headquartered at 3839 Flatlands Avenue, Brooklyn, New York, and is subject to general jurisdiction here, in addition to the specific jurisdiction that follows from the New York conduct alleged against it throughout this Complaint. Bordeaux is a New York limited liability company, organized in Kings County and subject to general jurisdiction here. Lowinger, Greenwald, Zagelbaum, Lazarus, Eisenreich, and Treff are New York residents domiciled in this State. NLLLP and MJN & Associates are New York professional entities that practiced from 225 Broadway, 36th Floor, New York, New York, and maintained the trust accounts at issue at New York banks. The Obligors transacted the business at issue within New York: each negotiated and executed the Note, the Escrow Agreement, and the related loan documents with a New York law firm as escrow agent, each directed that the loan proceeds be disbursed to and held in that firm's New York attorney trust account, each executed instruments notarized in New York by a New York attorney, and the loan documents were prepared and delivered in this State.

29. Mindick, a New Jersey resident, transacted the business at issue in this action within New York within the meaning of C.P.L.R. § 302(a)(1): as Riverside's Chief Financial Officer, he directed disbursements from Riverside's Signature Bank trust account in New York, administered from Riverside's Brooklyn office the closings described below, and executed the Bordeaux payoff statement for a Brooklyn lender. Abbott likewise transacted that business within New York: she transmitted wiring instructions for Riverside's New York trust account and administered Riverside's payments to Nussbaum on behalf of a Brooklyn company, and, upon information and belief based on her Riverside email address and role, worked from Riverside's Brooklyn office.

Miller transacted the business at issue within New York from Riverside's Brooklyn office, where she confirmed Riverside's closings clear to fund. BR Title, a New Jersey limited liability company, gives 3839 Flatlands Avenue, Brooklyn, New York as its business address on its own corporate registration and letterhead and transacts title business from there. Treff & Lowy PLLC maintains its office at 342 Bedford Avenue, Brooklyn, New York. Each of these Defendants is also subject to this Court's jurisdiction as a Defendant on the RICO Counts under 18 U.S.C. § 1965(b), and the state-law claims against each arise from the same nucleus of operative fact.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a). A substantial part of the events giving rise to Plaintiff's claims occurred here: the Nussbaum Firms practiced from 225 Broadway in Manhattan; the NLLLP and MJN & Associates trust accounts into and out of which Plaintiff's funds were wired were maintained at Signature Bank and Flagstar Bank in New York, New York; Lazarus resides and worked in this District; and the Escrow Agreement at the center of this action selects New York County as its venue.

## FACTUAL ALLEGATIONS

### A. Blueberry's Loan to the Obligors and the Escrow

31. Blueberry had a multi-year attorney-client relationship with the Nussbaum Firms before the loss at issue in this action. More than half a dozen loans on which NLLLP acted closed and were repaid. Those completed loans are part of why Blueberry trusted NLLLP to hold the funds described below.

32. Some of Blueberry's advances to the Nussbaum Firms' clients were short-term accommodations made on compressed notice and priced at a premium to Blueberry's ordinary rate. Before Blueberry agreed to lend on those terms, Nussbaum told Blueberry why they were needed: the borrowers were purchasers who had come up short of cash immediately before a scheduled

closing, either because they lacked the full amount required or because a partner who had committed to fund a share had failed to produce it. Asked whether that was unusual, Nussbaum said it happened all the time and that the short notice was what justified the premium rate.

33. The loan at issue was to Obligors, two New Jersey limited liability companies owned by Mendel Steiner. It was advanced in tranches and consolidated twice. A promissory note dated January 1, 2024 in the amount of $48,000,000.00 recites that the "Existing Notes" — $1,100,000.00 dated December 28, 2022; $7,500,000.00 dated August 24, 2023; $11,000,000.00 and $6,900,000.00 dated September 1, 2023; $7,000,000.00 dated October 31, 2023; and $4,500,000.00 dated November 1, 2023 — then carried an aggregate outstanding principal of $38,000,000.00 and $8,845,000.00 in outstanding interest and fees, and that they were consolidated with a further $10,000,000.00 note dated January 1, 2024 from both Obligors into a single $48,000,000.00 loan. In August 2024, that loan was amended, restated, and consolidated into a single "Amended, Restated, and Consolidated Commercial Promissory Note" in the amount of $60,000,000.00 (the "Note"), maturing August 31, 2027, guaranteed by Steiner personally, and secured by confessions of judgment. Contemporaneously with the Note, three Affirmations of Confession of Judgment were executed and delivered to Blueberry, each captioned "BLUEBERRY FUNDING LLC, Plaintiff, -against- MENDEL STEINER, 185 E. 33RD ST LLC, and 446 MONROE LLC, Defendants" and each confessing judgment in "Sixty Million and 00/100 Dollars ($60,000,000.00) plus interest, costs, and disbursements." The Guaranty recites that it was "a material inducement to Lender to make the Loan." Nussbaum notarized Steiner's signature on the Guaranty, on the Note, and on each of the three Affirmations of Confession of Judgment.

34. NLLLP's own client file for the Steiner loans — a folder captioned "Trust account Loans" within the firm's Blueberry records — held the notes that preceded consolidation. Each of

these notes was drafted on, and kept in, the escrow agent's own system. NLLLP was not a stranger to the terms on which it held Blueberry's money; it drafted them.

35. The notes required the loan proceeds to remain in NLLLP's attorney trust account and forbade their release without Blueberry's consent. Blueberry never consented, in writing or otherwise, to the transfer of any of those funds out of escrow.

36. Blueberry funded the loan with wires into the Nussbaum Firms' accounts. The NLLLP trust account's statements record the following deposits from Blueberry and its affiliate, each by Fed. Ref. No.: $10,000,000.00 on December 5, 2022 (20221205B6B7261F00513312051356FT01); $1,600,000.00 on December 8, 2022 (20221208B6B7261F00179412080849FT01); $8,500,000.00 on July 5, 2023 (20230705B6B7261F00124407050851FT03); $8,000,000.00 on July 17, 2023 (20230717B6B7261F00116307171046FT03); $7,500,000.00 on August 24, 2023 (20230824B6B7261F00134208241140FT03); and $900,000.00 on September 11, 2023 (20230911B6B7261F00205809111400FT03). The 2024 advances were wired into the account ending 2089 at Capital One, N.A. that Nussbaum opened in February 2024 for the loan — the Note names the "Nussbaum Lowinger LLP Attorney Trust account IOLA at Capital One Bank" as the Trust account, but the account Nussbaum opened there and used for Blueberry's advances was in the name of MJN & Associates — as follows: $2,500,000.00 on June 24, 2024 (reference 20241760182600); $493,000.00 on June 25, 2024 (20241770379800); $4,960,000.00 on July 8, 2024 (20241900225400); $2,000,000.00 and $1,000,000.00 on July 17, 2024 (20241990206900 and 20240717B6B7261F001731); $240,000.00 on July 18, 2024 (20240718B6B7261F001142); and $1,000,000.00 on October 9, 2024 (20241009B6B7261F002159) — $12,193,000.00 in all. Those deposits were among the more than $108 million Blueberry wired into the NLLLP trust

account between February 2022 and November 2023; the balance funded earlier loans and was returned in the ordinary course when those loans were repaid. What happened to each of the deposits listed above within days of its arrival is set forth in Section C below.

37. Throughout this period, Nussbaum reported directly to Blueberry on its money. On April 14, 2023, a Blueberry representative created a WhatsApp group chat titled "Blueberry Nussbaum Escrow," whose members included Nussbaum, Blueberry's principal, and other Blueberry representatives, and which ran through August 2024. Nussbaum used it to report escrow balances and confirm receipts. In May 2023, the group was used to administer a $65,000.00 extension fee and a $2,500.00 underwriting charge owed to Blueberry on the Steiner loan, together with a $2,500.00 legal fee. On June 2, 2023, Nussbaum confirmed receipt of a $568,500.00 wire on the Macon loan described in Section D below, together with Blueberry's instructions for its return. On November 13, 2023, a Blueberry representative wrote to Nussbaum that Blueberry had "38 million sitting by you in escrow for Steiner" and proposed moving the funds into a dedicated account at Flagstar Bank. Nussbaum did not deny the balance and responded that he was exploring alternatives, including a program at Capital One — the bank at which he opened the MJN & Associates account into which Blueberry's 2024 advances were later wired. On January 31, 2024, Blueberry's controller again confirmed the outstanding balance. At no time did Nussbaum, Lowinger, or anyone at NLLLP tell Blueberry that its money was not in the account.

38. On August 27, 2024, NLLLP, by Nussbaum, executed an Escrow Agreement with Blueberry, Steiner, and the Obligors. The Escrow Agreement recites that "the sum of $58,772,945 is being held in escrow by Escrow Agent ('Escrow Amount')" and that "at Borrowers' direction, the Escrow Amount is being disbursed to Escrow Agent to be held by it in escrow." It requires that "the entirety of the Escrow Amount shall be deposited with and held by Escrow Agent until, at the

latest, 12 PM Eastern Standard Time on August 31, 2027," to be released only (a) to Blueberry in satisfaction of the Note if the Obligors timely pay, (b) to Blueberry "immediately and without notice" if the Obligors miss a payment and ten days pass after email notice, or (c) as Blueberry and the Obligors agree in a writing signed by all of them. It provides that if any amount is released "without the prior written consent of Grantee," the Escrow Agent shall release to Blueberry as much as it is able and the remainder accrues default interest. It makes the Escrow Agent "answerable or accountable" for "its bad faith or willful misconduct," entitles the Escrow Agent to "a reasonable fee for its services," and provides that in any conflict among the loan documents "the terms of this Escrow Agreement shall control." Nussbaum signed for NLLLP on August 27, 2024; Steiner signed for himself and for each Obligor as sole member. The Escrow Agreement recites the loan amount on deposit in escrow as $60,000,000.00.

39. That representation was false when NLLLP made it. The NLLLP trust account opened the month at $5,581,748.40, fell to a balance of $4,467,187.17 on August 5, never rose above $16,537,183.95, and closed the month at $14,237,241.26. It did not hold $58,772,945.00, or half of it, on the day Nussbaum signed the Escrow Agreement or on any day afterward. In September 2024 the account took in $172,086,920.72 and paid out $173,630,295.31, falling as low as $3,980,397.45 on September 13. It fell to $0.00 on December 24, 2024, was overdrawn by $250,000.00 on December 26, and closed the year at $0.00. Likewise, the Capital One account held $4,736.00 on December 9, 2024 and $0.00 by February 10, 2025.

40. The Obligors failed to make payments due under the Note. Blueberry gave notice of default and, after the ten-day period passed, demanded release of the Escrow Amount. Steiner died on or about January 9, 2025, and on or about January 10, 2025, Blueberry demanded return of the entirety of its escrowed funds. NLLLP failed and refused to release and remit to Blueberry

any funds. On January 14, 2025, Lowinger told Blueberry that NLLLP's trust account "may have been illegally accessed and substantially depleted as a result of irregular transactions," that he had contacted the bank, that the account was frozen, and that NLLLP was therefore unable to return any funds. A second NLLLP communication days later advised Blueberry that NLLLP was no longer a functional entity and that Blueberry should seek its money from wind-down counsel. To date, no part of the $58,772,945.00 has been returned.

**B. The Engine: How Nussbaum Turned the Trust Account into Steiner's Lending Desk**

41. The money Blueberry placed with NLLLP did not disappear through a single theft. It was consumed by a standing arrangement between it and Steiner in which the NLLLP trust account functioned as Steiner's short-term lender, funded with whatever entrusted funds happened to be on deposit. That arrangement is documented in WhatsApp and text-message threads between Nussbaum and Steiner from September 2021 through the morning of Steiner's death on January 9, 2025 — and in the bank statements that match those messages wire for wire. This Section of the Complaint sets out that arrangement in the participants' own words.

42. By the spring of 2022 Nussbaum was, without authorization, lending Steiner money out of the escrow on a days'-long basis and charging him for it. In a WhatsApp message to Steiner on May 12, 2022, Nussbaum described their dealings as "The bridge where I loan you money," and continued: "You borrowed one day money in March. I'm still waiting. You haven't paid fees on 2 more recent loans." The next morning, May 13, 2022, Steiner asked Nussbaum to "Send 1.150" for "30 days"; Nussbaum answered, "we agree on wire today is mine, plus a watch and then we move on?"; Steiner replied, "Yes"; and Nussbaum set the price: "loan is for free, if knubby pulls it, you pay back asap OR will be a point a week." Steiner then forwarded the wiring

instructions for the account that would receive the money: "Name on Account: Real Green Management Corp. Address: 4403 15th Ave Suite 192 Brooklyn NY 11219," at JPMorgan Chase. On August 19, 2022, asked "What reg this days," Nussbaum answered, "1/week," and added, "u have the funds, amazing how that works!"

43. That rate was Nussbaum's standing price for escrow money. On February 22, 2024, Nussbaum wrote to Steiner, "Another 4 at two points until Monday. The other money is killing me," and, asked for an accounting, "I can't cheshbon now. I need to see how long out and how many bridges I had to do. Figure it's 1.5-2 points every 2-3 days"; Steiner answered, "Ok deal send the 4 Monday sharp 10 plus 2.7." On March 13, 2024, Nussbaum offered "5mm?" for the weekend at "2 points over the weekend," and Steiner replied, "Ok done deal." On March 21, 2024, Nussbaum summarized: "right now you owe ~14.7, another 3.2 is 18mm," and "u paying 2 points every 3 days (more or less) not my fault." Nussbaum kept a running tally of these loans on a spreadsheet he called "MS loans 2-1-24.xlsx," which he referred Steiner to on November 22, 2024 with the note, "see sheet 3, i know where i am wrong, but not wrong where we are good after 75mm." He also reserved a share of the lenders' money for himself. On December 29, 2023, Nussbaum wrote to Steiner, "If I get this done, when the funds come in I'm taking 20mm for up to two years with no iska," and Steiner answered, "Ok" and "Deal"; on February 21, 2024, Nussbaum reminded him, "20mm for 2 years. That was the deal." On March 14, 2024: "we need to do LLC and as discussed, i am taking 10% so lmk who owning 90%." The price of the arrangement fell on the escrow's depositors. On January 8, 2024, Nussbaum wrote that Steiner had sent "back 3.75mm of my own money (the $4.5MM) and nothing comes from title, NOTHING," then calculated what the money out was costing — "4.5MM x 4 points?" / "11MM x 4 points" / "16,120,000.00" — and wrote of the returns Steiner promised, "these funds, when and if they hit do NOT count for SHIT."

On January 17, 2024: "i have to pay back 2mm plus iska i sent you on 12/29 by friday, no wiggle room"; on January 19: "2mm and 4mm is same guy, he pissed, wants .5 a day until funds back"; on February 1: "im showing you that the 2mm from 12/29 is costing ME 138k"; on February 21: "I am not getting you a dollar until I have my 5 and my 2.75 plus iska. Then we can discuss more money but you still owe me 3 and change"; on March 5: "You took money from me and had no control to insure that I get paid back"; on March 7: "i put out 600k in iska for you, in the past week!!!!!!!!!!!!"; and on March 13, after agreeing to another $5,000,000.00 over a weekend, "we need to sit down and discuss cleaning up, cause i need to live and i cant like this and this wasnt our deal." On March 20, 2024, describing a third-party lender's offer, Nussbaum wrote, "My 14 guy can increase to 17. He wants first month iska paid in advance. We taking this loan? I committed to him as you said yes. Clock started yesterday." Those messages describe escrow money lent out, interest running against the escrow agent personally, and new lenders recruited to fill the hole.

44. In the same message threads, Nussbaum repeatedly distinguished the money exchanged with Steiner from "loose money" that was his to use. On December 29, 2023, he wrote to Steiner: "i went through hell to get you all the money i gave you the past week and did you come through? NO, you sent escrow funds, not loose money, i am up a wazoo, you know it, and i am still trying to help you!" — and, minutes later, "you owe me 10.5mm just on escrow right now." On January 8, 2024, he wrote, "ur relying on escrow funds," then "AGAIN," then "they sending me escrow money, now what?" On January 9, 2024: "This is your money. Escrow. You can show," and, that afternoon, "Note, all closings the proceeds come to me. No exceptions." On March 11, 2024, describing a prospective lender's proposal, Nussbaum told Steiner: "so basically more escrow money," and "he saying money not going to be released, but will really be new loan," and "and they want a segregated account / u know what thay means."

45. Shockingly, Nussbaum clearly described, in the same message threads, how he covered the resulting holes: with other clients' money. On January 8, 2024, he wrote, "I need to wire out 11,220,000 this am to try and salvage a relationship that you have continuously shit on. So when can I wire?" On January 29, 2024: "I need 8.5mm urgent." / "My ppl. I need to pay back. Out of time." On February 1, 2024: "ppl owe me 4mm actually, but they were crying so i pay back 500k, so now i owe them 3.5mm plus iska, and im owed 4mm plus iska." On February 28, 2024, after Steiner's $10,500,000.00 came back: "I need to send zaidy 12mm plus iska in the am. The 10 wasn't enough obviously so I sent out to the other lenders for the prior funds," and, that afternoon, "23.592 is total balance right now with me being nice, i need to get this out and really need it all, i am out of funds," and "1 - no $12mm / 2 - no $11.5mm / 3 - nothing done to get $19mm (I NEED THIS MONDAY!!!) ... 5 - i go out of my way for you day in and day out / 6 - this is the thanks i get!!!!" On March 8, 2024: "I swear on my life i am not sending you money today, sorry, but i cant do it. i havent worked properly all week, havent slept, i am a fucking mess BC OF YOU, cant go deeper in." On March 20, 2024, of a loan a third-party lender proposed to fund through the escrow: "This is supposed to take at Murray. I can't have that on my books. Not our deal. You know that," and, in a voice note the next morning, "I'm just telling you, I'm not letting you take this loan unless we're paying off Murray. I can't. I hope you understand what's going on here." That is the mechanism Nussbaum later admitted under oath — new creditors' money used to repay earlier ones — described by him as it was ongoing.

46. Nussbaum and Steiner also coordinated what excuses and false narratives third parties would be told. On February 27, 2024, Steiner wrote, "Mark that now we agreed to say," "Bec that not true," "Tell Sam not say shit anymore," and "Tell him it was a group with a few ppl." On February 28, 2024, discussing a list of wire recipients to be disclosed to a third party, Steiner

wrote, "Take off real green"; Nussbaum asked, "can i leave the treff?," said he "will take out names," and wrote, "I don't want to drag my lenders into this. I want to protect their indentity. I will say I was returning a loan. Etc"; Steiner answered, "Yes." On January 2, 2024, Nussbaum had written, "sam knows nothing about 150mm deal, ttys," and on January 8, 2024, "these are the lies i know about" / "we both know there are more." Though Nussbaum and Steiner may have kept from Lowinger the Steiner lending, the dual-price, fraudulent closings that ran through the same account were Lowinger's own work, as set forth in Sections D and F below.

47. What Nussbaum was describing was the structure of Blueberry's loan. Term sheets Steiner forwarded to Nussbaum on March 8 and March 20, 2024, for loans of $10,000,000.00, $14,000,000.00, and $17,000,000.00 from other lenders, describe the arrangement in these words: "Funds to be held by nussbaum and lowiger iola Funds can be 1- released to Steiner for approved acquisitions 2- or automatically return to the lender on day 61," and, as to the lenders' security, "MN will be PG on ALL of the above (since I don't know the guy)." A lender was told its money would sit in NLLLP's IOLA account and be released only for approved acquisitions or returned; Nussbaum's own description of that same money, to Steiner, was that it "will really be new loan."

48. The bank statements show what "new loan" meant. The NLLLP trust account's statements record the following wires from that account, ending in 1550, to Real Green's JPMorgan Chase account ending 1819, each with the beneficiary notation "steiner," and each of which Nussbaum pasted into his Steiner chat as a bank confirmation on the day it was sent: $2,500,000.00 on February 14, 2024 (Fed. Ref. No. 20240214B6B7261F002744), which Nussbaum captioned "2.5mm in your account, ur welcome"; $5,000,000.00 on February 16, 2024 (20240216B6B7261F002382); $2,300,000.00 on March 11, 2024 (20240311B6B7261F003234), together with $500,000.00 the same day to Manna Capital Solutions LLC

(20240311B6B7261F003385); $5,000,000.00 on March 13, 2024 (20240313B6B7261F002396); $450,000.00 on March 21, 2024 (20240321B6B7261F003828); and $2,500,000.00 on March 22, 2024 (20240322B6B7261F002337). On February 1, 2024, the account wired $4,905,000.00 to 1 Dynamic Holdings LLC under the notation "Steiner" (20240201B6B7261F002765). In 2024 alone, the NLLLP trust account wired approximately $52,300,000.00 to Real Green, more than $95,000,000.00 to Aven Realty in more than forty wires between May 14 and December 19, 2024, $18,000,000.00 to Steiner personally at Metropolitan Commercial Bank, account ending 0908 — $12,000,000.00 on February 27 (20240227B6B7261F001004), $4,000,000.00 on July 11 (20240711B6B7261F003621), $1,000,000.00 on July 18 (20240718B6B7261F001756), $650,000.00 on July 30 (20240730B6B7261F003343), and $350,000.00 on September 30 (20240930B6B7261F004121) — and, on a single day, February 5, 2024, $8,000,000.00 in six wires each marked "OBI: Mendel Steiner." The Steiner side sent money back the same way: Steiner wired $10,500,000.00 into the escrow on February 28, 2024, the day after the $12,000,000.00 wire to him, marked "PURPOSE: LOAN," and $2,950,000.00 on July 12, 2024.

49. Several of those “round-trips” occurred for the sole purpose of demonstrating to a third party money under the false premise that it belonged to Steiner. On February 27, 2024, Steiner asked for "12 million"; Nussbaum wrote, "I'm selling this as same day," asked "100% back today?," received "Yes," and wired it. When it had not come back by March 5, he wrote, "I can't push a 2 day loan for 8 days." On January 16, 2024, Steiner wrote, "Get me 10.1 / Get it today / Bro get it by today will wire it back before end of the Tom." The paperwork was made to order. On June 29, 2023, Steiner texted, "A min need a letter that I took a loan form u for chase pls," and Nussbaum answered, "Email officemanager@nlllp.Com." On February 1, 2024, Steiner dictated the wording of a receipt letter for the firm to issue — "I am in receipt of the ($type here amount)

for the partnership buyout from XXX LLC to XXX LLc… Something like that. Tell attorney to write. Will come out better" — and Nussbaum sent it that afternoon, captioned for a company named Knot Dutch 1 LLC, noting, "i told him to make it to whom it may concern." Riverside performed similarly: a $3,000,000.00 overnight deposit that its Chief Financial Officer scripted so Steiner could show a lender a letter "that he has $3 million," set forth in Section E below.

50. Blueberry's money was discussed between Nussbaum and Steiner by name. On May 12, 2022, Nussbaum wrote: "Don't tell blueberry I have money for you when I don't!!," and, "And even if you did. Until and unless he allocates money to you, you don't have shit." On January 3, 2024: "BB asking if they getting funds tomorrow! :)" On January 5, 2024, Nussbaum forwarded to Steiner an instruction, written in the words of a lender to its escrow agent, reading: "When the money does come in, don't allocate anything to Steiner until we confirm with you; waiting for the signed loan docs from him. Also, we're going to have around 48 million for Mendy in your trust account, but please don't let any of it leave the account." On January 8, 2024, Nussbaum wrote, "Don't say bb," then "That's escrow," then "thats escrow money and doesnt do me or you SHIT," and that evening, "and even when BB money comes in, its not released, so wtf is your plan?" On January 9, 2024, $4,923,870.97 arrived in the NLLLP trust account under the memo "INTEREST PAYMENT FOR BLUEBERRY FUNDING," together with $76,074.03 marked "INTEREST PAYMENT TO BLUEBERRY"; the same day the account wired $3,250,000.00 (20240109B6B7261F003742) and $1,400,000.00 (20240109B6B7261F003855) to Real Green. On February 22, 2024, Steiner told Nussbaum, "it 60 Million they want," and Nussbaum answered, "No chance." On January 9, 2024, when Blueberry's money arrived: "Their wire hit. It's short of 4mm" / "Sorry 5mm," and, later that day, "We need to get rid of bb." On February 1, 2024: "2/19 i need 9mm btw, after that and paying BB, we can make money," and "i will give that back to you

after i clear up my debt with them, in other words, i need to apply some to what i owe them, then give it to you and when my guys pay me back the money i paid BB, i will again reimburse you." On February 22, 2024, Nussbaum asked, "At what rate to bb?" and answered himself, "If 2 points. Yes." On March 1, 2024: "monday 10am, i am calling sheldon and BB, Fuck this, blow it all up." On March 4, 2024: "and BB up my ass so expedite that 19mm PLS!!! high or hell, as told you before i must have it by 3/18," and on March 11, "i have until 3/18" / "drop dead date for me." On March 22, 2024: "i need a date as BB is up my ass amongst other stuff and instead of sending them money, i am sending it to YOU!," followed by a proposal that Steiner "take it over, its 3.5mm principal balance with iska due" and "tell BB you taking over the loan." On March 27, 2024, Nussbaum listed what he owed: "RENT 15MM 17MM 39.5MM Lights Silber Refis BB." Nussbaum had told Steiner what Blueberry required, treated Blueberry's escrow as a debt he owed rather than money he held, and sent it to Steiner anyway.

51. Steiner paid Nussbaum in kind as well as in points. On May 13, 2022, before the "wire hit," Nussbaum sent Steiner links to Rolex and Patek Philippe watches — "this one better," "but sure, send me a patek," "i dont want yours, i want a new one" — and, when it did, "wire hit, ty, now buy a watch for me," then "papers and a box!" On July 7, 2022, a Miami car dealer named Serge wrote to Nussbaum, "Mendy is like family and he asked me for things and I do them without question," and on July 10, 2022, "Was wondering where to bring the McLaren," then that Steiner had "asked to give yiu the other one too"; Nussbaum answered, "Love him!," and gave his Golden Beach, Florida address. On December 8, 2022, Serge wrote, "Mendy asked for Escalade"; on December 4, 2024, "Bentley convertible good?," to which Nussbaum answered, "YES :)." On January 8, 2024, Nussbaum asked Steiner, "i would take 20k mezuman for the thurs party, can you deliver before then?"; Steiner answered, "Yes." On January 10, 2024: "someone just called me for

50k, want to provide?" / "Cash?" / "yes." On March 14, 2024, Nussbaum wrote, "we need to do LLC and as discussed, i am taking 10% so lmk who owning 90%." On March 21, 2024, ninety-four seconds after pasting the confirmation of the $450,000.00 wire to Real Green described above, Nussbaum wrote, "BTW, make sure we have new watches for pesach, Jeff or otherwise, this on u!" On March 25, 2024, he asked Steiner to pay NLLLP's own rent: "Got April rent bill pls send 10k asap to 1542." Thus, Nussbaum was a lender to Steiner, paid in points, watches, cars, and cash, using money that belonged to the people whose escrow he held.

52. By late 2024, the scheme was desperate and on the verge of collapse. On November 1, 2024, Nussbaum texted Steiner: "U think I want to come to you and ask you for my money? I don't... It's not enjoyable knowing that at any second something can happen that changes your life forever." On December 4, 2024: "And tomorrow we need 29 more," then "Need 61 tomorrow." On December 5: "I'm out of time." On December 12: "This is emergency!!!!" On December 23 and 24, 2024, as the trust account fell toward zero, $10,077,731.86 left it in three wires — $7,532,161.86, $800,000.00, and $1,745,570.00 — for a newly opened NLLLP trust account at Customers Bank, ending 9086. Within the following week that new account wired $10,700,000.00 to Aven Realty in four wires: $700,000.00 on December 24, $1,500,000.00 on December 27, and $1,000,000.00 and $7,500,000.00 on December 30, 2024. On December 13, 2024, eleven days before the account emptied, it had wired $500,000.00 with the notation "Steiner."

53. On January 7, 2025, three days before Blueberry's demand, Nussbaum wrote to Steiner: "come up with 60 plus large tomorrow am and we live to see another day," and, "i have a plan to get 20mm plus tomorrow, if you can make sure BB wires, and i know you cant, but you know what i mean, we in the game." He framed the alternative as a public-relations problem: "i know you trying, but if it happens, we will be back in everyones good graces, maybe not sod, but

i can explain it away and maybe make up with him, but its tomorrow am or bust." He told Steiner to raise the money without involving Nussbaum's own creditors — "Figure out a way to get this done tomorrow without me going to my ppl. Cause I can't. And you know that" — and, that night, to borrow against his assets to refill the escrow: "YES, take a big loan against your assets, wipe our all escrow," and "pay 2 points a month as its a second, but secured." Asked for an organizational chart and surveys, Nussbaum proposed inventing one: "you want to just create llc?," "have them as holding it?," and "tell sam."

54. On January 8, 2025, Nussbaum wrote: "We need bb. This am." Steiner asked, "How is the da office is the heat good there." That afternoon Nussbaum admitted his position in writing: "Mendy - i dont have access, i am wiped out, my ppl are wiped out and i cannot tell anyone anymore (for now) with confidence, that money they sending me, they will get back." He continued: "its over caused u said BB would wire and we sent out another 10mm and they not wiring," and, of another creditor, "Sod isnt doing shit as his atty was spoken to and expained that he is part and parcel part of a fraud conspiracy here." He directed a cover story for a creditor named in the messages as Sheldon Zafir — "u can tell sheldon that i am dealing with personal emergency, tell him whatever you want," and "tell him i am not reachable and for the second you get me i tell you emergency, make it up, you smart, i will not lie" — and stated the objective: "No. I want the reo asap so we can wrap this up. We solve the issue this isn't news next week." In a WhatsApp voice note to Nussbaum at 5:36 p.m., Steiner asked, "Can we get on a call and come up with an exact plan, calmly, without yelling and seeing if there's a plan for us?," and in another at 6:51 p.m., "It's over." Nussbaum's messages that night read: "Come clean. Tell them deposit on what you selling them," "We need reo asap pls," and "If there is enough there maybe we can get money for your family as well." At 10:49 p.m., Steiner wrote: "I loved u" and "And u stepped me."

Nussbaum's last messages, the morning of January 9, 2025, read: "Send it.," "ty," "u alive?," and "ur really dropping the ball here." Steiner died that day. Nussbaum told the car dealer that afternoon, "He owed a lot." That evening he asked Steiner's brother Leo: "is there anyway you can get me 10mm now to cover my trust account?," and the next day, "to be frank, this might be the difference of me turning myself in or not," and "im on the phone with my criminal counsel." That same day he forwarded Leo a question — "Are Leo and all Steiner family members giving a COJ tonight individually and on behalf of their LLCs?" — asked for "the bank statements from aven realty 1 and real green," and wrote, "if mendy's assets aren't enough to cover everyone, are you and/or anyone in the family willing to step in and assist?" Leo answered, "I don't have what to answer you differently. I told you I will work with you whatever he owes," and, "I can't talk on anyone behalf ... I'm 1 hour after" the burial. On January 12, 2025, Leo sent Nussbaum a spreadsheet captioned "Mendel Steiner PFS REO - 6.1.2024.xlsx" — the personal financial statement from August 22, 2024, five days before the date of the Escrow Agreement.

55. In or about May 2025, Nussbaum was arrested and charged by the Manhattan District Attorney's Office with grand larceny in connection with the theft of client escrow funds; a New York County grand jury has since indicted him, and that prosecution is pending.

56. On or about June 16, 2025, the Nussbaum Firms executed a General Assignment for the Benefit of Creditors to a court-appointed assignee, ABCMN LLC, which over fifty creditors have joined, and ABCMN LLC commenced *ABCMN LLC v. Real Green Management Corp. and Aven Realty 1, LLC*, Index No. 656436/2025 (Sup. Ct. N.Y. Cnty.). On January 27, 2026, Nussbaum executed a sworn affirmation under C.P.L.R. § 2106, filed January 28, 2026 as NYSCEF Doc. No. 14 in that action. In it, Nussbaum admits that from mid-2022 until mid-2025, creditors — including Blueberry — deposited in excess of $437,630,000.00 into the Nussbaum

Firms' trust accounts; that certain creditors were presented with fictitious investment opportunities involving supposed "proof of funds" transactions or purchases of real property; that phony emails, escrow agreements, and deal documentation were used and non-existent third parties invented; that new creditor money was used to return some earlier creditors' deposits; that Nussbaum personally transferred approximately $336,731,000 of the creditors' money out of the trust accounts to the accounts of Real Green and Aven Realty, entities he understood to be controlled by Steiner; that he transferred approximately $24,025,000 more directly to Steiner or to companies he was told were owned by Steiner's family; and that there was no consideration or legitimate business reason for any of those transfers, which the creditors never authorized, consented to, or knew about. He affirms that the creditors' funds passed through the Nussbaum Firms' trust accounts at Signature Bank, Flagstar Bank, and Customers Bank, and that the ABCMN complaint's description of his and Steiner's activities is true and consistent with his recollection.

**C. Where Blueberry's Money Went: The Bank Records**

57. The bank records demonstrate that Blueberry's money left the NLLLP trust account in two routes. The first is direct: wires from the account to Steiner's companies, to Steiner personally, and to Riverside closings, within a day of Blueberry's deposits. The second is structural: the account never held enough money from any other source to have paid what it paid, on the days it paid it, without using Blueberry's money to do so, and thus those transfers were of Blueberry's money. The pattern is the one Nussbaum described to Steiner: money in, money out to Steiner's companies and to other clients' closings, the same day or the next. Between February 11, 2022 and November 21, 2023, Blueberry wired $108,726,601.74 into the NLLLP trust account in forty items on thirty-five dates, and over the whole period Blueberry and its affiliates made not less than forty-six deposits into that account totaling approximately $125,200,000.00. The money

that came back to Blueberry on its earlier loans came out of the same pool — $19,036,000.00 on September 12, 2022 and $8,083,875.00 on November 17, 2022 (20221117B6B7261F001881), among others. The account was a pass-through the entire time: in February 2022 it took in $150,505,379.32 and paid out $152,964,027.66, and its month-end balance swung from $46,891,396.82 at the end of January 2023 to $18,375,224.66 a month later and to $26,205,106.02 at the end of June 2023.

58. On December 8, 2022, Blueberry wired $1,600,000.00 into NLLLP's trust account (Fed. Ref. No. 20221208B6B7261F00179412080849FT01). The same day, the account wired $1,600,000.00 to Real Green at JPMorgan Chase, account ending 1819 (20221208B6B7261F003960). Four days later, on December 12, 2022, it wired $800,000.00 more to Real Green under the notation "Michael Steiner" (20221212B6B7261F005672); it had wired $1,300,000.00 to Real Green under the notation "Steiner" on December 2 (20221202B6B7261F004044). Blueberry's $10,000,000.00 deposit of December 5, 2022 (20221205B6B7261F00513312051356FT01) was followed within two days by $5,314,603.98 to Meister Abstract Corp. and $3,347,900.00 to Nord Group LLC, and by a $1,379,396.02 return to Blueberry on December 7. The account's lowest balance that month, $8,532,011.97 on December 28, was below what Blueberry alone had deposited in it that month. On December 29, 2022, Mindick sent Nussbaum a settlement statement for Riverside file RANY-49167, and on December 30, 2022, the account wired $10,175,000.00 to Riverside at Signature Bank on that file (20221230B6B7261F002110).

59. On July 5, 2023, Blueberry wired $8,500,000.00 into the account (20230705B6B7261F00124407050851FT03), after which the account closed that day at $8,596,007.47. The same day, the account wired $8,500,000.00 — the identical amount — under

the notation "Silber" (20230705B6B7261F002044). Six days later, on July 11, it wired $2,500,000.00 to Real Green under the notation "Steiner" (20230711B6B7261F004160).

60. On July 17, 2023, Blueberry wired $8,000,000.00 into the account (20230717B6B7261F00116307171046FT03). That day, the account wired $1,000,000.00 to Opal Holdings LLC, Prager's company. The next day, July 18, 2023, it wired $3,000,000.00 to Real Green under the notation "Steiner" (20230718B6B7261F003852); $3,500,000.00 to Riverside Abstract at Flagstar Bank (20230718B6B7261F003430); $5,080,156.00 to Fidelity National Title Insurance Company under the notation "RALA-50002 ag/yg" (20230718B6B7261F003100); and $350,000.00 to Meister Abstract Corp. Those July 18 wires alone total $11,930,156.00 — more than Blueberry had deposited the day before. On July 26, 2023, the account wired $5,200,000.00 more to Real Green (20230726B6B7261F003873).

61. On August 24, 2023, a Blueberry affiliate wired $7,500,000.00 into the account (20230824B6B7261F00134208241140FT03), after which the account, which had closed the prior day at $10,760,279.22, closed that day at $20,795,365.80. That day, the account wired $507,693.80 to Riverside referencing File RANY-51165. The next day, August 25, it wired $2,500,000.00 to Real Green under the notation "Steiner" (20230825B6B7261F002394) and $2,423,543.34 to Mazal in Macon LLC under the notation "Mendel Fischer." On August 28 it wired $500,000.00 to Opal Holdings; on August 29, $5,500,000.00 to Real Green under the notation "steiner" (20230829B6B7261F001828) and $1,500,000.00 to Riverside at Flagstar Bank; and on August 30, Riverside wired the identical $1,500,000.00 back into the account under the notation "RALS MOSHE SCHICK RIVERSIDE ABSTRACT LLC" — a same-amount, next-day round trip between the escrow and Riverside. The account closed August 2023 at $4,388,180.51, having fallen to $3,506,519.06 on August 9.

62. On September 11, 2023, Blueberry wired $900,000.00 into the account (20230911B6B7261F00205809111400FT03). Two days later, the account wired $1,450,000.00 to Riverside on File RAIN-50011 (20230913B6B7261F001930). On September 20, 2023, nine days after Blueberry's deposit, the entire account held only $859,895.74.

63. Between those deposits and the Escrow Agreement, the account's month-end and low balances were as follows: it closed December 2023 at $534,500.08, having held $22,887,232.68 the day before — $22,352,732.60 left it on December 29, 2023, the day Nussbaum wrote to Steiner, "you owe me 10.5mm just on escrow right now"; it fell to $2,184,378.53 on January 8, 2024; it rose to $29,324,890.24 on February 14, 2024 and fell to $3,368,701.96 six days later; it closed March 2024 at $4,356,399.76; it fell to $1,757,090.32 on June 17, 2024; and it closed July 2024 at $5,581,748.40. In November 2023, a Blueberry representative told Nussbaum that Blueberry had "38 million sitting by you in escrow for Steiner," and Nussbaum did not deny it. That non-denial came in the weeks after the account had wired $2,796,667.17 on October 26, 2023 and $1,493,931.75 on November 6, 2023 for two Prager closings. At no point in that period did the account hold $38 million.

64. Blueberry's 2024 advances followed the same path through the MJN & Associates account at Capital One, account ending 2089, which held $5,000.00 until Blueberry's first deposit. On June 24, 2024, the day Blueberry's $2,500,000.00 deposit posted, the account wired $2,000,000.00 to Aven Realty. On June 25, 2024, the day Blueberry's $493,000.00 deposit posted there, the NLLLP trust account wired $493,000.00 to Aven Realty under the notation "steiner" (20240625B6B7261F002987). On July 10, 2024, two days after Blueberry's $4,960,000.00 deposit, the Capital One account wired $4,950,000.00 to the NLLLP trust account, which the same day wired $2,700,000.00 to Aven Realty (20240710B6B7261F002334) and $6,060,000.00 to a

third party, and the next day wired $4,000,000.00 to Steiner (20240711B6B7261F003621). On July 19, 2024, two days after Blueberry's $3,000,000.00 in deposits, the Capital One account wired $3,300,000.00 to the NLLLP trust account, which that day wired $15,225,000.00 and $9,000,500.00 to two other recipients and, on July 22, $250,000.00 to Aven Realty 1. On July 24, 2024, the Capital One account wired $900,000.00 to the NLLLP trust account, which wired $600,000.00, $777,000.00, and $500,000.00 to Aven Realty 1 on July 24, 25, and 26. Blueberry's $1,000,000.00 deposit of October 9, 2024 sat in the Capital One account until November 20, 2024, when it was wired to the NLLLP trust account, which wired $1,000,000.00 to Aven Realty the next day (20241121B6B7261F003057). On June 28, 2024, the NLLLP trust account had wired $5,221,000.00 to Blueberry (20240628B6B7261F004957) under the notation "MJN." By December 9, 2024, the Capital One account held $4,736.00.

65. Blueberry's money was misappropriated for closings with Riverside on which Blueberry was not the lender, on the day it arrived. The account both took in a Blueberry deposit and paid out to a Riverside closing in a single day on fourteen occasions. On eleven of those fourteen days, the payment to Riverside exceeded every dollar in the account from any source other than Blueberry.

66. For example, three of those days are referenced, and on each NLLLP acted as the purchaser's counsel. On April 7, 2022, Blueberry wired in $997,000.00 and $3,120,000.00, and the account wired $44,397.44 to Riverside on File RANY-47664 — a Brooklyn condominium bought by Nussbaum's client Mendel Fischer. On April 12, 2022, Blueberry wired in $5,000,000.00 (20220412B6B7261F00572304121613FT03), and the account wired $500,000.00 to Riverside on File RAMD-47008A (20220412B6B7261F007220), the deposit for a $115,000,000.00 Baltimore portfolio purchase financed by Cap Fund Inc.; NLLLP took a $100,000.00 fee, Lazarus was on the

closing chain, and the account wired a further $14,044,678.02 to Riverside on June 14, 2022 (20220614B6B7261F002703). On November 29, 2022, Blueberry wired in $6,000,000.00 (20221129B6B7261F00402511291258FT03), and the account wired $8,500,000.00 to Riverside Title LLC, Riverside's Houston affiliate, on File RATX-47052 (20221129B6B7261F003554) — a $40,500,000.00 membership-interest purchase in Lake Jackson, Texas financed by Lument Capital, on which NLLLP took an $80,000.00 fee, on which Riverside had prepared a $42,500,000.00 statement the day before, and on which Lazarus wrote to the lender's counsel that afternoon, "We have received purchaser's funds."

67. Blueberry was not the lender on those three transactions, and it was repaid on the loans its 2022 deposits funded; they are pleaded iu order to show how the misappropriation functioned. The same practice also consumed the deposits Blueberry never got back. Four wires to Riverside followed Blueberry's deposits within days: $10,175,000.00 on File RANY-49167 on December 30, 2022; $3,500,000.00 on July 18, 2023, the day after the $8,000,000.00 deposit; $507,693.80 on File RANY-51165 on August 24, 2023, the day of the Blueberry affiliate's $7,500,000.00 deposit; and $1,450,000.00 on File RAIN-50011 on September 13, 2023, two days after the $900,000.00 deposit.

68. Blueberry's money also was sent to Riverside on loans Blueberry itself was making — and on those files Riverside prepared two prices for the same property and only showed Blueberry the higher one, as set forth in Section D below. Three wires from the NLLLP trust account to Riverside identify Blueberry on their face: $15,650,388.89 and $4,444.44 on March 8, 2022 on the Macon file, and $3,007,715.20 on April 14, 2022 on the Baton Rouge file (20220414B6B7261F004867), the last funded that day by a $2,670,538.29 Blueberry deposit

(20220414B6B7261F00395604141255FT03). A fourth, $22,509,166.67 on September 10, 2021 on the Gary, Indiana file, matches to the penny the settlement statement with Blueberry as lender.

69. Under New York law, one whose money is commingled in a trust account may trace it under the lowest-intermediate-balance rule: the claimant's interest in the account survives as long as the balance does not fall below the claimant's traceable contribution, and disbursements from the account while that interest exists are disbursements of the claimant's money to the extent the remaining balance is insufficient to satisfy it. Applying that rule to the deposits set forth above, every Real Green, Aven Realty, Steiner, and Riverside wire described in this Section and in Section B that left the account while Blueberry's contribution exceeded the account's remaining balance carried Blueberry's money. In the alternative, where a fiduciary has so commingled and dissipated trust funds that strict tracing is impossible, the burden of distinguishing its own money from the beneficiary's falls on the fiduciary, and the beneficiary may recover from the commingled fund and its proceeds without regard to the lowest intermediate balance.

**D. Riverside: The Closing Machine**

70. Riverside was the other half of the mechanism. Money that left the NLLLP trust account did not stay in Steiner's and Prager's hands as cash; it was funneled into closed real estate transactions, and Riverside was the settlement agent that closed them. Riverside prepared the settlement statements, controlled when escrow broke and funds released, issued the title insurance, and paid Nussbaum an undisclosed share of what it earned for doing so. The fees, referral payments, and assignment proceeds the participants took from those closings came from the spread between what a property was worth and what a lender was induced to lend against it, and Blueberry's money financed that spread more than once.

71. At all relevant times, Blueberry believed it was doing what a commercial lender ordinarily does: funding an arm's-length purchase of real property by a creditworthy borrower, based on the property's true value, on terms disclosed in a settlement statement it could rely on. But the transactions highlighted were not as they appeared to Blueberry. The process, which the participants called a "flip," began with an ordinary contract. A first buyer — an entity controlled by or aligned with the scheme's participants rather than a genuine arm's-length purchaser — signed a contract to buy a property at or near its market value. That contract was the version the seller, and later a title underwriter, would be shown; it was not the version shown to the lender to induce it to lend. Before that contract closed, the first buyer assigned its rights to a second buyer at an inflated price, and the inflated price was the only number disclosed to the lender whose financing on which the closing depended. Because the resale followed the true-price contract within hours or days, the lender was given no market event, improvement, or arm's-length negotiation to justify the markup, had the lender known about the increase. All it had was the paperwork the Riverside and Nussbaum Defendants prepared to make the transaction look regular: an assignment agreement, a settlement statement at the assignment price naming the lender, a transfer-tax form generated for the recorded price, and, where a deed could not carry the flip, a deed structure agreed in advance with Riverside's counsel so that the recorded instrument showed only the lower price.

72. But the lender's version also had to look funded. The Nussbaum Firms manufactured that appearance on demand: proof-of-funds letters issued by NLLLP's office manager on request, deposits parked overnight in Riverside's account and wired back the next morning, a $3,000,000.00 letter that Riverside's Chief Financial Officer scripted in one instance for Steiner, and "soft" deposits that Riverside put up itself while telling the seller's attorney the buyer was funded.

73. Once the inflated price was on paper and the funding appeared real, Riverside closed at the inflated number, collected a title premium calculated on that number, issued its policy against it, and disbursed the spread — the difference between the true price and the price the lender funded — to the people who had engineered it, on the standing formulas set out in Section K below. Two settlement statements survived for what was in actuality one closing, and only Riverside, the flipper's counsel, and the escrow attorney ever held both.

74. None of this could function with one participant alone. Riverside supplied what a flip cannot exist without: a closing agent willing to accept and disburse the funds, issue the policy, and produce a file that looked regular on its face. Lowinger supplied the documents — the assignments, the paired statements, the transfer-tax forms, the deed structures — that reduced the inflated price to a form a lender could rely on. Nussbaum supplied, and then betrayed, the one thing a lender like Blueberry actually had: an escrow relationship built on trust, into which lender capital was deposited for a stated purpose and out of which, on Nussbaum's signature alone, it was released into the closings Riverside and Lowinger had prepared. Riverside's settlement statements could not fund until Nussbaum released escrowed money for them; Nussbaum's releases had no cover without the closing documents Lowinger prepared and the title insurance Riverside issued against them. Each piece of the scheme was necessary; none was sufficient alone.

75. The examples that follow are drawn from Riverside's files and NLLLP's account statements. For each, set forth are how the two prices were arrived at, who at Riverside and NLLLP built them, and how the file connects to Blueberry — because Blueberry was the named lender, or because Blueberry's deposit funded the closing. The pattern recurred across years and dozens of closings; the closings set out here demonstrate it with great specificity — named participants, exact dates, Fed. Ref. Nos., and the participants' own contemporaneous words.

76. The mechanism called the "flip" was where a property was placed under contract at its true price by a first buyer and then sold at an inflated, financed price without full disclosure to the participants. Before the original contract closed, the first buyer assigned its rights to a second buyer at a higher price, and the lender financing the second buyer was shown only the higher price. Riverside prepared two settlement statements for the same closing: one for the seller at the true price, one for the lender at the inflated price. Nussbaum described the purpose in a September 16, 2015 email to a title agent: "we will need two closing statements, one for seller and assignor and another for assignor, assignee and the lender. We don't want the seller knowing of the assignment price nor the lender of the underlying purchase price." Riverside's blank settlement-statement template carries pre-printed fields for "Flipper" and "Flipper Counsel," and FLIPPER-captioned statements, signature pages, and invoices appear across Riverside files in New York, New Jersey, Ohio, Georgia, Michigan, Virginia, and Louisiana, as set forth in Section J below. On the 111 East 38th Street closing, Riverside File RANY-48736, Riverside's staff circulated an "EXECUTED Buyer Settlement Statement" at 11:29 a.m. on September 13, 2022 and a separately captioned "Assignment Settlement Statement" for the same file twenty minutes later. In another exchange, Nussbaum wrote: "Client will not divulge, but I have gotten loans on the assignment, based on assignment price so long as appraisal justified same." Each statement went to the party who would not object to it — the lower price to the seller, who would object if he had known of the markup; the higher price to the lender, whose money the markup was designed to reach but who would not have funded had it known of the markup.

77. Lowinger created much of the legal paperwork and described it as routine. In an email to Riverside's Benjamin Schonbrun on December 27, 2021, on Riverside File RANY-45063, Lowinger wrote: "my client is flipping this deal to Fay's client per the attached agreement of

assignment. We will need to two separate settlement statements." Two days later, on the same chain, he asked Riverside's staff to "generate signature pages to TP584 for the flip" and sent "signature pages for the TP 584 for the assignment" — a transfer-tax form generated for the assignment price so that the recorded instrument would reflect only the underlying contract price. The purchase-side and flip-side settlement statements for that file, covering 88 and 90 Tompkins Avenue, Brooklyn, New York, show a $350,000.00 spread between the two prices. Earlier that month, on Riverside File RANJ-45148, the closing of 3 University Plaza in Hackensack, New Jersey, Riverside had prepared a Buy/Sell statement at $40,000,000.00 and a flip statement at $53,000,000.00 — a $13,000,000.00 spread that never appeared on the deed, because counsel for the borrower entities instructed that "the deed must be from 3 University Plaza Partnership LLC to 3 Up Drive LLC (as to 35%) and Hackensack JYJ LLC (as to 65%), as tenants in common or lender will NOT close." Lowinger had briefed Riverside's National Counsel on that structure: in an email of December 13, 2021 copying Lazarus, Lowinger wrote, "I briefed Aryeh on this. We are all on same page." The morning after the closing, December 16, 2021, Lowinger asked Riverside for the "fully executed and compiled settlement statements. Buy/Sell and flip," and Mindick answered, "Attached. I don't have a signed flipper."

78. In a WhatsApp voice note to Nussbaum on May 3, 2023, explaining a Connecticut closing being handled by another title company, Lowinger said: "I just told them that we need to do two statements ... We need a statement for our lender with a higher price ... So I'm waiting for a second statement." Concealment from the lender was one half of the mechanism; concealment from the public record, so that no later examiner of the recorded chain of title would see the spread, was the other, and the transfer-tax signature pages and the deed structure served that half.

79. The inflated closing also had to look funded. On January 14, 2021, $790,000.00 was wired into a Nussbaum Firm's trust account and then was wired onward to the title company the same day for credit to the buying entity; the "loan" behind it was papered afterward, in one version revised so that no interest was payable at all. On November 13 and November 24, 2020, Prager signed instruments acknowledging receipt "from Mark Nussbaum, as nominee" of $1,000,000.00 on each occasion, styled as a "Shtar Iska," so that a thirty-six percent return could be booked as shared profit rather than loan interest. Riverside supplied the same appearance from its side of the table — fronting "soft" deposits, telling sellers' attorneys that unfunded buyers were funded, and scripting an overnight $3,000,000.00 deposit so that Steiner could show a lender a letter that he had the money — as set forth in Section E below. Each of those existed to show a third party money that was not there, papered so that its true character never surfaced. Between them, false funding confirmations, manufactured proof-of-funds loans, concealment of the source of closing funds, and the paired settlement statements gave every institution in the chain, from the seller's counsel to the lender extending the mortgage, a controlled, false picture of the transaction.

80. Nussbaum knew the rule his firm was breaking on Blueberry's closings. On August 31, 2022, when a counterparty on a Steiner deal wrote to him, "Mark u are my Lawer to," Nussbaum answered: "Not representing you on this deal. Am I? If yes, I can't do this deal. I can't rep both." On four of Blueberry's own loans, his firm appeared on both sides — as Blueberry's lender's counsel and as counsel to the purchaser or the flipper — and the price at which Riverside closed was not the price Blueberry was shown. On three of them, Riverside prepared two statements at differing prices. On each, two prices existed for one property within days of each other, and Blueberry was named on the paper that carried the higher one, with NLLLP on both sides of the file and Riverside's officers on the closing chain.

81. For the acquisition of a seventeen-parcel portfolio in Gary, Indiana, Riverside prepared a settlement statement, File RAIN-43016, naming Blueberry as Lender, Emerald Empire Inc. as assignor, Gary Residents Member LLC as assignee, and NLLLP as counsel for both the assignee and the lender. It recites an Assignment Price of $35,183,992.00, a new loan of $25,000,000.00, lender fees of $2,490,833.33, and a Net Wire to Title of $22,509,166.67. On the same day, for the same seventeen-parcel portfolio, Riverside prepared a second settlement statement, File RAIN-43016B, with the same assignor, a different assignee, and a different lender, reciting an Assignment Price of $13,500,000.00 — $21,683,992.00 less than the price shown to Blueberry. The term sheet for the transaction names Joel Werzberger and Mendel Steiner as guarantors. The NLLLP trust account's statement records an outgoing wire of exactly $22,509,166.67 on September 10, 2021, captioned "RAIN-43016 - Riverside Abstract," to Riverside's Signature Bank account ending 3926. Blueberry's Gary loan was later repaid; it is pleaded because it shows Riverside building two prices for one portfolio on one day and naming Blueberry as the lender on the higher one, with Blueberry's counsel on both sides of the transaction.

82. The Gary, Indiana file is emblematic of the fraud. The two statements bear the same date, the same assignor, and the same seventeen parcels; what changed between them is the assignee, the lender, and the price. The bank records corroborate the Blueberry-facing price to the penny: the $22,509,166.67 that left the NLLLP trust account on September 10, 2021 is the Net Wire to Title recited on the statement naming Blueberry, sent on the closing date that statement bears, so the price Blueberry's loan funded was the higher one. NLLLP appeared as Blueberry's lender's counsel on RAIN-43016 was, on the same file number, counsel to the assignee whose inflated purchase Blueberry's loan was financing — the conflict Nussbaum himself described, in the August 31, 2022 message quoted above, as a deal he could not do. The Steiner named as

guarantor on the term sheet is the same Steiner who personally guaranteed Blueberry's $60,000,000.00 Note and whose companies were the Obligors on it, as set forth in Section A above.

83. On October 13, 2021, Blueberry affiliates wired $13,271,550.00 (Fed. Ref. No. 20211013B6B7261F00589010131709FT03) and $3,000,000.00 (20211013B6B7261F00587710131706FT03) into the NLLLP trust account. The next day, October 14, 2021, the account wired $15,026,284.38 (20211014B6B7261F003386) and $16,271,550.00 (20211014B6B7261F003693) to Riverside's account ending 3926, each marked "Knoll Ridge," the second matching the affiliates' deposits. Riverside closed the file that day. Its settlement statement for 11510 Kirkwood Drive a/k/a 11415 Knollridge Lane, Indianapolis, names YYKK Enterprise LLC as seller, Knoll Ridge Apts 1 LLC as purchaser, NLLLP as counsel for both purchaser and lender, and Blueberry as Lender, at a contract price of $27,375,000.00 and a Net Wire to Title of $16,271,550.00, with $13,332.00 and $25,000.00 in "Legal Fees" to NLLLP. Two days before that closing, on October 11, 2021, Lowinger stated in an email that the purchase price of the property's Parcel 1 was $15,705,000.00. Blueberry's appraisal, ordered for the transaction it was shown, returned an As-Is value of $27,400,000.00. Blueberry was never shown Riverside's settlement statement and was never told of the $15,705,000.00 price. On October 14, 2021, Mindick texted Nussbaum, "I funded the Legal's. Waiting on final close to semd flips," and, earlier that morning, "Mendy still reviewing" and "He's almost final." On October 15, 2021, $15,100,000.00 came back into the NLLLP trust account from "IOLA-Steven Weinreb" (20211015B6B7261F00560710151643FT03), the seller's counsel named on Riverside's statement — a round trip through Riverside's closing and back to the escrow within forty-eight hours.

84. Knoll Ridge is the most completely documented of the four closings described herein, because every step survives on paper or on a bank statement. The two wires of October 14,

2021 went out on Nussbaum's and Lowinger's direction, and the second of them carried the affiliates' combined deposit of $16,271,550.00 into Riverside's account; Riverside's statement then recites that same figure as the Net Wire to Title. The same statement shows NLLLP collecting "Legal Fees" of $13,332 and $25,000 from the closing while describing itself, on the same page, as counsel for the Lender, Blueberry. The record also shows how the price reached $27,375,000.00. Lowinger's October 11, 2021 email put Parcel 1 at $15,705,000.00 while the file was at a different title company; by the time Riverside closed it, on October 14, 2021, the contract price on Riverside's own statement had risen by $11,670,000.00, in the space of three days and a change of title company. Blueberry's own pre-closing diligence could not catch that substitution, because it was aimed at the number Riverside intended to show it: the appraisal Blueberry ordered, dated October 12, 2021, the day after Lowinger's email, returned an As-Is value of $27,400,000.00, matching Riverside's $27,375,000.00 contract price almost to the dollar. Mindick, administering the closing in real time, reported "Mendy still reviewing" and "He's almost final," which places Steiner inside the operational loop of the closing as the affiliates' money moved through it. The $15,100,000.00 that came back on October 15, 2021 from the seller's counsel completed a cycle in which Blueberry-affiliated money passed from the affiliates, through the NLLLP escrow, through Riverside's closing, and back to the escrow from the seller's own lawyer, within forty-eight hours. Nussbaum and Lowinger directed the outgoing wires; Riverside, through Mindick's administration, closed the file and disbursed the funds; and Blueberry — named on the document Riverside used to do it — never saw that document, was never told the property had carried a different price three days earlier, and never authorized a closing on the terms Riverside papered.

85. On Blueberry's $16,000,000.00 loan on 4215 Chambers Road a/k/a 1000 Crystal Lake Circle, Macon, Georgia, with a closing date of March 7, 2022 and funded on March 8, 2022,

Riverside produced three settlement statements: a Seller statement reflecting the sale by New Gen 235 LLC to Empire Chai LLC at a Contract Price of $12,400,000, with a $25,000 legal fee to NLLLP; an Assignment statement naming Blueberry as Lender and reflecting the assignment from Empire Chai LLC to Mazal in Macon LLC at an Assignment Price of $17,500,000.00 against Blueberry's New Loan Amount of $16,000,000.00; and a third statement captioned "FLIPPER" in Riverside's own filename and header, identifying Empire Chai as the "Flipper" and stating an Original Contract Price of $12,400,000.00, a Flip Contract Price of $17,500,000.00, and Flip Gross Proceeds of $5,100,000.00. Blueberry's loan exceeded the property's arm's-length contract price by $3,600,000.00. The routing of the spread was scripted in advance. In a WhatsApp voice note to Steiner on February 1, 2022, Nussbaum said that "Sam can't tell" the title company where to send the assignor's proceeds informally, but that "what Sam Lowinger could do is send me an email to say, on behalf of assignor, the proceeds should go to XYZ entity"; Steiner replied by voice note, "Send a ... email with the wiring." On March 8, 2022, on an email thread captioned "WIRE: Blueberry to Mazal in Macon- RAGA-43043," Lowinger wrote to Riverside's staff, "All Assignor proceeds should be sent to the attached. Please confirm receipt," and, hours earlier, "Please add our legal fee as follows: 25,000 from Assignor - this should go on the Seller statement. 7500 from Assignee - this should go on assignment statement." Riverside's staff accountant answered, "I'm asking for lender counsel approval," then "Yes. Wires are out." No Blueberry representative was on that thread, and Blueberry was not aware of it. The bank records match the documents: on December 20, 2021, the NLLLP trust account wired $650,000.00 under the memo "RAGA-43043," the down payment the Seller statement shows held by Riverside; on March 8, 2022, it wired $15,650,388.89 and $4,444.44 to Riverside under the instruction "Blueberry to Mazal in Macon" — together $15,654,833.33, the Assignment statement's own "net wire to title" — and

received $5,024,100.00 under the memo "RAGA-43043 ASSIGNOR PROCEEDS RIVERSIDE ABSTRACT LLC," the flipper's net proceeds, with fee wires of $25,000 and $7,500 matching Lowinger's instruction. Blueberry was never shown the Seller statement or the FLIPPER statement. This loan was repaid in full by a $16,000,000.00 wire on July 3, 2023 (20230703B6B7261F002744) and is not counted in Blueberry's damages; it is pleaded because it shows how the scheme operated, on Steiner's scripted instruction and Lowinger's execution.

86. Macon, Georgia featured a $16,000,000.00 loan from Blueberry. As on every closing in this Section, two prices existed for the same property: New Gen 235 LLC, the seller, sold at the property's genuine price to Empire Chai LLC, the first buyer; Empire Chai immediately “assigned” its purchase rights to Mazal in Macon LLC at the marked-up price; and Blueberry, unknowingly financing the assignment rather than the underlying sale, was shown only the higher of the two. Riverside's three statements are the three views of that one closing: the Seller statement is the true price, shown to the seller; the Assignment statement is the inflated price, shown to Blueberry; and the FLIPPER statement is Riverside's internal record of the spread.

87. The February 1, 2022 exchange fixes who scripted the routing and who carried it out. Nussbaum rejected any informal redirection of the assignor's proceeds and prescribed the form the instruction had to take — an email from Lowinger, "on behalf of assignor" — and Steiner told him to send it. Five weeks later, Lowinger sent exactly that email under a subject line carrying Blueberry's name. The people on that thread were Nussbaum, Lowinger, an associate of the Nussbaum Firms, Riverside's accounting and closing staff, and the borrower side; the one party whose money was moving was not among them. The "lender counsel approval" Riverside's staff accountant was asking for was from NLLLP, the firm that had just told Riverside where the assignor's proceeds should go. Lowinger's fee instruction that morning shows the same firm

dividing its fee across the paired statements: $25,000.00 on the Seller statement, which Blueberry was not shown, and $7,500.00 on the Assignment statement, which named Blueberry as Lender.

88. Blueberry's loan towards 5617 Prescott Road, Baton Rouge, Louisiana closed on April 13, 2022. Riverside again prepared three statements for it. The Seller statement shows the owner selling the Prescott and Brookstown properties for $3,200,000.00. The statement captioned RALA-47000-B, which names Blueberry as Lender, shows Prescott Road assigned from TBZ Trading to Rol Prescott Partners LLC at $4,575,000.00, against Blueberry's loan of $3,202,500.00 and a Net Wire to Title of $3,007,715.20. A third statement, “RALA-47000-A,” shows the companion property at 3942 West Brookstown Drive assigned to the same buyer at $1,425,000.00 with a different lender. The two assignment prices total $6,000,000.00, although there was a $3,200,000.00 contract for both properties.

89. NLLLP was on both sides of this deal. It was counsel to the flipper, TBZ Trading, which the deposit escrow agreement calls "TBZ Equities" and directs notices to "c/o Nussbaum Lowinger LLP"; Mindick signed that agreement for Riverside as "Escrow Agent ... Name: Azi Mindick, Title: CFO." On the same loan, NLLLP was "counsel to the Mortgagee" — Blueberry. Its fee was split across the two statements, $5,000.00 on one and $7,500.00 on the other.

90. The money moved as follows. On March 4, 2022, Abbott sent the wiring instructions from her Riverside email under the caption "Wiring Instructions - RALA-47000." On April 14, 2022, Blueberry wired $2,670,538.29 into the NLLLP trust account (20220414B6B7261F00395604141255FT03), and that day the account wired $3,007,715.20 to Riverside's account ending 3926 under the instruction "Blueberry- FW: Purchase Agreement RALA-47000" (20220414B6B7261F004867), and $2,030,000.00 under "Oshry/RALA-47000" (20220414B6B7261F004461). On April 19, Riverside wired $2,792,500.00 back to the NLLLP

trust account under the notation "RALA-47000" (20220419B6B7261F00270204191054FT03). That is the flipper's spread — $7,500.00 short of the $2,800,000.00 difference between the assignment prices and the seller's contract price — returned to the flipper's counsel. On April 18 and 19, the account also received $12,500.00, the two NLLLP fee lines, and $151,973.70 under the same notation.

91. On December 30, 2022, NLLLP issued a payoff letter for Blueberry's Prescott mortgage in the amount of $3,281,908.33. That sum reached the NLLLP account on January 6, 2023 (20230106B6B7261F00181301060928FT01). The statements show no wire of that amount to Blueberry.

92. Baton Rouge, Louisiana, shows the same scheme. Riverside built the two prices by dividing one $3,200,000.00 contract into two assignments — $4,575,000.00 for Prescott Road, on the statement naming Blueberry, and $1,425,000.00 for Brookstown, on the statement naming a different lender — so that neither lender's statement showed the $3,200,000.00 the seller was paid for both properties together. Notably, Blueberry's $3,202,500.00 loan on Prescott Road alone exceeded the seller's price for both. Mindick signed the deposit escrow agreement for Riverside as its Chief Financial Officer; Abbott sent the wiring instructions under the file's caption; and NLLLP, the flipper's counsel on that agreement, described itself as Blueberry's counsel on the same loan. Blueberry's $2,670,538.29 went into the NLLLP trust account on April 14, 2022, and the account wired Riverside $3,007,715.20 that day — the Net Wire to Title on the statement naming Blueberry — under an instruction carrying Blueberry's name. Five days later, Riverside wired all but $7,500.00 of the $2,800,000.00 spread to the trust account of the flipper's own counsel, and, on April 18 and 19, the two NLLLP fees. The spread Blueberry's loan had created did not stay with any buyer; it returned, within the week, to the firm that was acting as Blueberry's counsel.

93. On April 7, 2022, the NLLLP trust account wired $8,390,000.00 to TS Agency LLC under the instruction "555 East 242nd Street AND 118-120 Pearl- TSL-13304-BX-Blueberry" (20220407B6B7261F007176). On March 28, 2022, when the buyer's representative wrote to the seller's counsel that the purchase was "closing this all cash next week" and that "Mark will be representing a partner that will be funding this deal," Nussbaum forwarded the thread with the note, "Looping in my associate who will be handling the file for our client (Blueberry)." On the wire email of April 7, 2022, captioned with Blueberry's name and noting a "$10,000 legal fee being held back for us," Nussbaum replied: "I need to be made whole first PLEASE!" This transaction does not show the two-statement device; it shows the attorney, in writing, putting his own payment ahead of the client whose money he was moving. The address is the same 555 East 242nd Street named in Section A above among the earlier loans on which NLLLP acted for Blueberry; the wire pleaded here is a separate, specifically dated disbursement. On March 28, 2022, Nussbaum identified Blueberry, in writing, as the firm's client on the file, and on April 7, 2022, on an email with Blueberry's name, he demanded that he be paid ahead of the client to whom he owed a fiduciary duty. That is the betrayal the two-price closings served.

94. Demonstrating the structural side, Riverside also received Blueberry's money on the July and August 2023 closings described in Section C above — $3,500,000.00 on July 18, 2023, the day after Blueberry's $8,000,000.00 deposit, and the $1,500,000.00 round trip of August 29–30, 2023 — on files on which Blueberry was not the lender.

95. Those wires show the mechanism functioning not by a wire that carries Blueberry's name to its destination, but by arithmetic. On July 18, 2023, one business day after Blueberry's $8,000,000.00 deposit, the NLLLP trust account wired $3,500,000.00 to Riverside and, under the notation "RALA-50002 ag/yg," $5,080,156.00 to Fidelity National Title Insurance Company.

Those two title-company wires totaled $8,580,156.00 — $580,156.00 more than Blueberry had deposited the day before. The account could not have made that pair of payments without the deposit Blueberry had made the prior business day. The August wires leave less room for explanation, because the money did not merely leave the account; it came back. Five days after the Blueberry affiliate's $7,500,000.00 deposit of August 24, 2023, the account wired $1,500,000.00 to Riverside, and the next day Riverside wired the identical $1,500,000.00 back. A same-amount, next-day round trip is the same cycling of money through Riverside's hands that the Knoll Ridge wires of October 2021 and the Baton Rouge return wire of April 2022 document, recurring in 2023. The wires out of the NLLLP trust account are Nussbaum's, on the control of that account described in Section B above; the July 17–18, 2023 leg is separately pleaded as part of Predicate Act 6 in Section L below.

96. The last link runs past Riverside to where the money ended. On June 24, 2024, the day the first $2,500,000.00 of Blueberry's 2024 advances posted to the MJN & Associates account at Capital One, $2,000,000.00 left that account for Aven Realty — one of the entities Nussbaum has since admitted he used to move approximately $336,731,000 of client money to Steiner, as set forth in Sections B and C above.

**E. The Riverside Officers**

97. Nussbaum treated Riverside's closings as a personal profit center, and Riverside's officers dealt with him on that footing. On October 20, 2021, he sent Greenwald a list of Riverside file numbers — RATX-43063, RS-44176, RS-44152, RATN-43017, and RAOH-43047 — described as "some open files of mine." On December 10, 2021, he wrote to Greenwald, of a client identified in the thread as "fischer, mendel," "anything from Mendel Fischer is mine." On June 3, 2022, he wrote to Mindick, "rala-47009 assignor proceeds MUST come to me, please confirm,"

and on September 12, 2022, "4.7mm should come back to me." He named the charities to which Riverside was to send his share — Pomona Jewish Community, Chabad of Pomona, Ohr Shlomo Chasidic Center, Congregation Shterenzer Gemach, and, as late as 2023, Rofeh Cholim Cancer Society, in the name "Mark Nussbaum RCCS Hockey."

98. Greenwald, Riverside's CEO and then Chairman, ran the business relationship with Nussbaum and was paid from the escrow directly. He controlled the instrumentality on the other end of the NLLLP account: the title/closing operation that took escrow money and turned it into closed transactions at undisclosed prices. He did so personally, for the benefit of the enterprise, and with knowledge of what the transactions were. On May 2, 2022, the NLLLP trust account wired $550,000.00 to the Signature Bank account of the "Law Offices of Shaul C. Greenwald" — an account bearing Greenwald's own name, not Riverside's — under the notation "Prager."

99. Greenwald described his arrangement with Nussbaum in writing. On October 26, 2021, Greenwald asked Nussbaum, "How can we work together on a loan for a client"; Nussbaum answered, "Send me the deal and I give you a piece"; Greenwald asked, "We will charge 2 and split?"; and Nussbaum answered, "I pay for the money," and "We can split what I make." Thus, Greenwald would send Nussbaum a client who needed money, Nussbaum would give him "a piece," and the two would "split" what Nussbaum made — a profit-sharing arrangement between Riverside and the attorney, not an arm's-length referral relationship. On March 8, 2022 — the day Blueberry's Macon loan proceeds went out to Riverside on File RAGA-43043 — Greenwald sent Nussbaum a series of WhatsApp voice notes about who would get credit for that file. At 3:11 p.m., he said: "Mark, I love you dearly. I never ask you for a commission when I send people to you to get money for a day or two. But even if I would, I just think it would be right that you don't take deals that are deals that I'm in ... I have a guy who's my client who brought me a deal and then they

flip it to your client. That's fine ... 43043 ... When it's your deal, I promise you I'll pay you. But if it's not your deal, then don't come to me with that deal." At 4:41 p.m., he explained how a flip file could be re-labeled so that Nussbaum received referral credit: "if you have a deal that's a flip, and it's on Riverside, and you want credit ... you tell them that you want it to be under, that it has to change from Riverside to affiliated title, which is one of my companies, or I'll give you five other names. And if you get it under that name, and the guy says that he's not controlling it anymore, and you're controlling it, then for sure it's yours." Greenwald was describing keeping a stable of substitute title-company names so that a file can be made to show a different controlling party than the one who actually brought it. At 4:44 p.m., responding to an email from Lowinger, he said: "Sam sent an email. I don't think it's fair that he — when you're in the middle of a flip, you know how things work ... And I do work with you guys because I play the games along with you guys. It's fine. We all want to be in this game ... But I don't like being threatened by anyone. So I think you should tell Sam not to threaten me in the future." Greenwald's reference to Lowinger by name, and his description of playing "the games along with you guys," is his own statement that Riverside, Nussbaum, and Lowinger were playing the same game together.

100. Riverside, at Greenwald’s direction, paid Nussbaum in a disguised manner, through charities, so that they would not appear as payments to Nussbaum. On September 14, 2021, Nussbaum texted Greenwald, "RATN 43017 is me, pls confirm," and "lmk when its ready so i can give some charity"; Greenwald asked, "What charity and I'll send"; Nussbaum answered, "same as before / Pomona Jewish Community 84-2502482"; Greenwald wrote, "I don't think it closed yet. 5500," then "I'll send it now"; and Nussbaum added, "just let me know when it goes out so i can ensure they credit my account." That is the charitable-conduit device Zagelbaum built and taught, described below, directed by Greenwald personally: the payment went out in a charity's

name, and Nussbaum asked to be told when it went so that he could make sure the charity would "credit my account." It was sent in the same month Blueberry's Gary loan closed. On November 29, 2021, asked to send a Tulsa, Oklahoma file's referral payment "to chabad ... Of Pomona," Greenwald wrote, "This is confirmed. Small deal as we don't keep much in OK but hadassah will handle ... We literally keep 40% over there," then "Sending 2k." On December 10, 2021, Nussbaum asked Greenwald, "do i need to keep track or you guys do? i need you to and tell me you have for me and ask where to send pls. possible?," and "so then dont i have some more shekels due to me?"; Greenwald answered, "We keep track," and "Yes. We will handle shortly." Riverside kept the ledger of what Nussbaum was owed. That day Greenwald asked, "I forget our deal on 1031"; Nussbaum answered, "1 point a month I think," and Greenwald replied, "I believe I said I will split the fee," adding that Riverside's own yield on parked funds was "at .45." Whatever the rate, the exchange shows Riverside and NLLLP treating the yield on client funds parked in escrow as something to be divided between them. On September 30, 2021, Greenwald sent Nussbaum confirmation of a $1,505,057.43 wire from Riverside's Signature Bank account to "NUSSBAUM LOWINGER LLP," and Nussbaum answered, "I got it. Short 600k or so." Nussbaum's answer confirms that he expected a larger sum from Greenwald and that the $1,505,057.43 wire fell short of it. On May 27, 2022, Nussbaum told Greenwald to "put these on my cheshbon"[3] — a running account — to "knock down some fees," and, "just remember he gives me title." Riverside adjusted what it charged Nussbaum's clients according to the volume of title business Nussbaum steered its way, and Greenwald kept the running tally rather than settling closing by closing. A February 2022 assignment document shows Greenwald personally holding a 9.50% membership interest in Jericho Plaza Members LLC in his own name while Nussbaum held an identical interest in the

[3] "Cheshbon" is a Hebrew word meaning "calculation." It can also mean "account" or "tab."

same entity through a nominee. On January 22, 2025, twelve days after Blueberry's demand, Nussbaum wrote to Greenwald that "a joint riverside contribution would be greatly appreciated." Those messages are not the record of an enterprise keeping a running account between participants — "We keep track," "cheshbon," "Short 600k or so" — on terms not put on a settlement statement.

101. At Greenwald's direction, Riverside vouched for money that was not there. On October 30, 2019, Nussbaum asked him, "client has a $15mm deal, needs $100k soft deposit, can you put it up and do title?," and on November 11, 2021, "i have a title order for you, but need you to put up soft deposit of $200k, works?" Those were requests that Riverside show a third party a deposit as if it had posted even though the buyer had not deposited the requisite funds — the same soft-deposit mechanism the Fischer exchange that follows spells out.

102. On April 20, 2023, on a $38 million purchase by a buyer named Fischer, Nussbaum asked Greenwald to have Riverside "put deposit up," explained it would be "soft for 15 days, then he will replace," and wrote, "please have Azi tell seller atty that you are funded"; Greenwald asked, "Is it soft and for how long," answered, "Sure.," then "Lol. We will do so but there is a bit of a process. I'll arrange," and, "I assume he isn't flipping the deal," to which Nussbaum answered, "no, he buying this." That instruction told Riverside to tell the seller's attorney that the buyer was funded even though he was not, and Greenwald agreed without hesitation, asking only whether the buyer was flipping the deal. Tellingly, he treated arranging a false funding confirmation through his CFO as routine business, not as an extraordinary favor. On October 6, 2021, reviewing a closing's disbursements that included a $250,000 line to Bordeaux Capital, Greenwald described it as "an old debt that [he] just realized was never paid"; Nussbaum answered, "its his dads, not his," and "yalla, remove and lets close," and Greenwald confirmed it "was done." A six-figure line

unconnected to anything the closing required was thus added to a settlement statement as an "old debt" and struck on a text instruction, with Riverside confirming the change.

103. Greenwald caused Blueberry's loss because he was the executive who personally controlled whether, and on what terms, Riverside would accept funds from NLLLP and turn it into a closed transaction. His arrangement with Nussbaum formed the basis of the enterprise. Riverside closed the Gary, Knoll Ridge, Macon, and Baton Rouge files using Blueberry's and its affiliates' money at prices Blueberry was never shown, on paper Riverside prepared, because Riverside, under Greenwald, was a closing agent that played "the games along with" the lawyer holding Blueberry's escrow rather than an independent one. And on the days Blueberry's deposits arrived, the same arrangement pulled them into other clients' Riverside closings before Blueberry's own loan ever drew on them. Greenwald arranged the appearance of funding on closings that lacked it, received $550,000.00 from the escrow into an account in his own name, and personally kept the stable of affiliated title names under which a file could be re-labeled so that Nussbaum would be paid on it. Blueberry's money moved through Riverside's hands because Greenwald had built, and personally profited from, an arrangement that made Riverside willing to close on those terms.

104. Zagelbaum, Riverside's founder and President, set the rate at which Riverside paid Nussbaum and built the concealment of it. Over nearly a decade, he personally built, operated, and taught the mechanisms by which that arrangement was kept from the lenders whose closings funded it. The arrangement dates to at least February 2, 2016, when Nussbaum texted Zagelbaum, after closing two files including Riverside File RANJ-20910, "Close 2 deals today... Lmk after these deals clear and keys cheshbon up," and Zagelbaum answered, "Hadassahs checking." That is, Riverside's Controller, Abbott, was already checking Nussbaum's running tally, as set out below in the discussion of Abbott. On March 14, 2016, Nussbaum told Zagelbaum a referral check

Riverside had issued could not be deposited because it did not name a limited liability company — "Last check didn't have LLC. Bank giving us crazy issues and even shut down account[.] Easiest way is to cancel old check and issue me new one" — and Zagelbaum answered, "Np. I'll let hadassah know."

105. By March 2016, Riverside's referral payments to Nussbaum were already being routed through a limited liability company rather than paid to Nussbaum or his firm by name — the same logic that, fifteen months later, directed a larger payment to an entity in his wife's name, as set out below. On July 13, 2016, negotiating his cut on two Connecticut closings ("He's my client. My files though"), Nussbaum wrote, "I need no coordination fee on this file so that they paid 1250 essentially in each one and I need my % on each premium. Pls advise ASAP. Closing now," describing his cut as a "Referral fee and coordination fee"; Zagelbaum wrote that Riverside's margin was "getting hit from both sides," that "ill discuss with shaul[.] I bleiev shaul wants to charge 1k here. My opinion is leave it. No reason u or I should get squeezed," and, "I always want u to be happy." Zagelbaum did not simply approve the fee himself; he took the pricing question to Greenwald rather than resolve it against Nussbaum, told Nussbaum, "Best bet is for you to leave it to them to work out," and, when it was done, "I didn't want it to be ur problem. silly ovber a few bucks" — consulting Riverside's other principal for the specific purpose of keeping Nussbaum insulated from any dispute over the very fee the two men were negotiating. Over the following month, Nussbaum asked for his accounting five times, and Zagelbaum answered, "Hadassah working on it," "Trying to fig out what's who's," and, on August 26, 2016, "No. I'm sorry. I keep forgetting. Monday. Promise." Each time, Zagelbaum acknowledged the debt rather than disputing it — a fee acknowledged as owed, repeatedly promised, and never disputed on the merits.

106. On June 15, 2017, Nussbaum described overriding a lender's own choice of title company so that Zagelbaum would get the business: "I saved it when lender insisted on their title. I told them f no and then took half of the loan policy for you/me as well while keeping he full owner policy." That is an early, concrete instance of Nussbaum overriding a lender's own title selection and personally splitting the resulting premium with Zagelbaum. On June 21, 2017, Zagelbaum asked to "Send me wiring info again pls" for a referral payment, Nussbaum gave the account of "Rscl holdings LLC" — an entity whose May 6, 2016 operating agreement lists Nussbaum's wife, Rena Nussbaum, as its sole member — rather than his own name or his firm's, and followed up, "Sent funds to rscl?"; Zagelbaum answered, "Thought it went out a while ago. I'll check first thing tomorrow. Sorry." Whatever became of that particular transfer, Nussbaum's choice of destination — an account bearing neither his name nor his firm's — reflects the same concealment logic that elsewhere routed payments through a charitable donor-advised fund: a destination chosen because it would not read, to anyone who saw it, as a payment to Nussbaum. By 2016 and 2017, then, Riverside was paying the attorney who steered closings to Riverside a percentage of each premium, characterized by the recipient as a "Referral fee and coordination fee," paying it to an entity in the name of the attorney's wife rather than to the attorney or his firm, and not disclosing it.

107. Riverside knew the arrangement was improper and kept it going. On January 15, 2020, Nussbaum told him, "ur deposit scheme is too well known, i got a buyer and seller will not let riverside hold deposit as seller is also a client"; Zagelbaum answered, "Can hold at underwriter," and, told "they know that too!," "But regardless the seller is being a douche. Bc the money is actually there." Zagelbaum answered an outside party's objection with a workaround rather than a compliance concern, and then dismissed it; a third party had recognized the arrangement as a

conflict seven weeks before Zagelbaum and Nussbaum negotiated the 1031 rate that follows. On March 4, 2020, Nussbaum asked, "what is our 1031 deal?," and Zagelbaum answered, "Half point if I recall correctly." On March 9, 2020, Nussbaum wrote, "i mean for you to send me a half a point! i want to cover purim!," and Zagelbaum answered, "Of course. when it's done. That's a while from now," and explained the rate in a WhatsApp voice note the same day: "The point is a half a point for as long as it sits. So, it's a half point on what's earned. It sits for six months, whatever it earns, it's a half point. A half point is annualized... If it sits for a day, there's nothing earned. It's a half point basically a day annualized." Thus, Riverside agreed to pay the escrow attorney a share of the yield on client money "for as long as it sits" in escrow.

108. Zagelbaum thus explained why the arrangement mattered financially: escrow deposits, simply sitting in the account, were revenue to be divided, and the split was one that was not disclosed to any party to the closing. On June 7, 2021, Zagelbaum wrote, "Will send 5k to you. Wanna give me charity and ein? And will see from fidelity," and "give me their Ein. And will have it sent directly. You jist hve to make them aware it's coming"; on July 6, 2021, after Zagelbaum reported "12.8 is what we made," Nussbaum asked, "ahhh so my portion was $5k?," and Zagelbaum answered, "That's our total Income. Obv not sending the entire amount." The payment was routed through a Fidelity Investments Charitable Gift Fund donor-advised account, so that a negotiated referral payment would appear, on paper, as a charitable grant, and Riverside kept the balance of what it earned on client deposits for itself while cutting Nussbaum in on a fixed share. On November 10, 2021, discussing a prospective client who did not want his title decision disclosed, Zagelbaum directly instructed that the arrangement was to be kept from the client, "not a big deal if you make the connection. He doesn't have to know our deal." On Riverside File RANY-37888, Nussbaum asked Zagelbaum, "Is it possible for you guys to prepare deed and acris

and if my seller's come through in the am we close?," and told him, "That's ME"; Riverside prepared the recordable filings. "That's ME" identified Nussbaum himself, not any disclosed client, as the transaction's actual principal.

109. Zagelbaum built the charitable conduit and taught it to others. In a recorded voice note on April 9, 2018, after a payment to Chabad of Pomona failed, he said: "It's not a hard process to get added to the Fidelity or JCF website... you should tell Chabad to get themselves signed up to Fidelity Fund and the JCF, Jewish Communal Fund... It actually makes donations a lot easier for a lot of people." That is Riverside instructing a recipient charity to register with donor-advised-fund platforms so that Riverside's payments to it could move as grants. On July 19, 2018, he said: "I don't think they remembered with this one... I wrote a little check... I really did I just gave a round check it wasn't even based on a number." Zagelbaum acknowledged that at least one such payment was not a calculated donation at all but a "round check" unconnected to any number.

110. On August 27, 2020, Nussbaum asked, "was check sent to aish kodesh?," and Zagelbaum answered, "I assume so. But I'll check again"; on September 3, 2020, Nussbaum identified "443 Hancock RANY-33081B" as the file generating that payment, and Zagelbaum confirmed the amount, "3500"; and on September 14, 2020, after Nussbaum reported "Aish didn't get checks from riverside," Zagelbaum was asked to "confirm amounts and dates sent." That sequence shows a third conduit, using Riverside's own checks rather than a donor-advised fund, with Zagelbaum personally tracking, and falling short of tracking, whether payments tied to an identified file had actually gone out. When a charity designated in the June 2021 Fidelity exchange had not been paid a month later, Zagelbaum wrote that he had "just followed up woth Hadassah." The arrangement was still running in 2024. On February 15, 2024, Zagelbaum sent Nussbaum two voice notes. In the first he asked, "It was a quarter point, right? That's what we spoke about? It's

been a long time. Remind me. But I'll reach out." In the second he said: "I know you probably hear a lot in the news, but Barak Hashem, we're moving forward ... if anybody calls you trying to pull you around, just tell them politely, no." Nussbaum answered, "The hawks are circling," and "Whatever it is is fine with me. Pls let Hadasah know." That exchange took place one week before the Federal National Mortgage Association's ban on Riverside described in Section G below became public. The rate had moved from a half point in 2020 to a quarter point in 2024, but the arrangement itself was still being discussed in the same year the Escrow Agreement was signed, and Zagelbaum's instruction to tell anyone "trying to pull you around" politely "no" was given with the news already circulating.

111. Zagelbaum caused Blueberry's loss because he built, set the rate for, and personally operated for nearly a decade the incentive structure that made Riverside willing to serve as a compensated closing agent for Nussbaum's referrals rather than an independent title company transacting at arm's length — the company he led as President throughout the period Blueberry's transactions closed. Zagelbaum set the price at which Riverside would close whatever Nussbaum sent it and be paid on the float of whatever Nussbaum parked; taught the charitable-conduit mechanism by which that price could be paid without leaving a line on any settlement statement; wrote that the client "doesn't have to know our deal"; and when the news broke, told Nussbaum to tell anyone who asked "no." Blueberry was the kind of client that instruction was designed to keep in the dark: a lender that could never have known, from anything Riverside or NLLLP showed it, that its closing agent and its escrow attorney had spent years building and concealing a relationship.

112. Mindick, Riverside's Chief Financial Officer, personally controlled when Riverside broke escrow and funded, and administered the closings that took Blueberry's money. On September 3–10, 2021, on Blueberry's Gary file, Mindick told Nussbaum, "You need

29,824,641.46 to close." On October 14, 2021, on Blueberry's Knoll Ridge file, he texted Nussbaum, "Mendy still reviewing," "He's almost final," and "I funded the Legal's. Waiting on final close to semd flips." Mindick's own words place him, in real time, administering Riverside's disbursement of the Knoll Ridge legal fees and waiting to distribute the flip proceeds, on the day $31,297,834.38 moved out of the account into which $16,271,550.00 of Blueberry funds had arrived the day before, as set forth in Section D above; "Mendy still reviewing" placed Steiner inside the operational loop of that closing as it happened. In the same March 8–9, 2022 exchange in which Blueberry's Macon wires went out, he told Nussbaum, "I sent you for Georgia." On Blueberry's Baton Rouge file, he signed the deposit escrow agreement for Riverside as "Escrow Agent ... Name: Azi Mindick, Title: CFO." On July 24, 2020, he instructed Nussbaum, "Pls confirm to Manny that we can break escrow and fund"; on December 29, 2022, "its not clear to fund and lender hasnt funded yet"; and on May 31, 2023, after reporting that "Fleischman office asked that we hold off now…," "exactly!! we are funding now." The first of those messages is Mindick deciding when escrow broke; the second is Mindick alone controlling whether a closing could proceed at all; and the third confirms that Riverside disbursed funds after Mindick himself reported that an outside attorney's office had asked for a pause. On December 29, 2022, he sent Nussbaum the settlement statement for Riverside File RANY-49167 and, the next day, confirmed the resulting $10,175,000.00 wire out of the NLLLP trust account by texting its full Fed. Ref. No.: "NUSSBAUM LOWINGER LLP 20221230B6B7261F002110 10,175,000.00 RANY-49167 SIGNATURE BANK." That is a $10,175,000.00 wire Mindick personally documented from settlement statement through wire confirmation. He handled the overage personally. On February 3, 2020, he wrote, "You just got another 49k and change from overage. I need kleinman to send the diff. I'll call him now"; on November 18, 2020, under the subject line "Overage," Mindick

directed Nussbaum to "send your wiring for overage" on an identified closing. That is Riverside soliciting the wiring instructions needed to move a closing's excess proceeds onward, rather than disbursing the excess on the settlement statement. On December 16, 2020, he told Nussbaum a counterparty was "short to pay you back"; Nussbaum answered, "Ok but that won't stop closing," and Mindick confirmed the next afternoon, "Closed sending wires now." Mindick flagged the shortfall and confirmed the next afternoon that Riverside had funded the closing anyway — the shortfall-and-fund mechanism described throughout this Section, operated in real time.

113. Riverside, through Mindick, knew during the time that it received Blueberry's funds, acted as settlement agent for Blueberry, and issued Blueberry policies of title insurance, that Nussbaum's escrow was one commingled pool. On February 1, 2022, when Nussbaum wrote, "to me, where the funds came from!," Mindick asked, "Thought you have separate accounts….." and Nussbaum answered, "nope." In the same exchange Nussbaum told him, "Puretz wired you more money for me" — Aron Puretz being the participant in Prager's network who later pleaded guilty in the federal mortgage-fraud conspiracy described in Section G below. As confirmed by the bank records, Mindick kept funding Nussbaum's closings from that account for the next three years. On March 8, 2022, Mindick texted Nussbaum the figure "6,522,112.39" and, thirteen minutes later, wiring instructions for Riverside File RAAL-43023; the NLLLP trust account wired $6,522,112.39 to Riverside that day (20220308B6B7261F006191), and $6,240,000.00 came back the next day. When Nussbaum wrote, "im short! where is the balance?," Mindick answered, on March 9, 2022, "We send flippers proceeds not amount you sent in……" In that sentence, Riverside explained the mechanism to the attorney: what came back from a Riverside closing was not the money the escrow had sent in, but the flipper's proceeds on the marked-up price. What a lender sent in and what Riverside paid out on the same closing were, by design, two different

numbers. Mindick's working vocabulary, repeated across more than two and a half years and many files, names that mechanism without euphemism. In a WhatsApp voice note on November 12, 2021, Mindick said: "If you're now Flipper's attorney, then it's going to have to go to Flipper's attorney or they're going to have to direct it. It goes to you." On December 5, 2022, he wrote, "What's with Flipper's proceeds? My lender's following up with that," "the flipper is getting money and that's how my guy's getting his money back," and "just $7.95 has to go back to Jasmec, and the rest is for you." On June 17, 2021: "we didn't get the flippers proceeds yet when we do I know that 6.5 has to go to you not 6.6." On April 20, 2023: "On this Mendel Fischl deal, I'm going to fund before we get dox." That is funding before documents, stated as a plan rather than an accident, although the same constitutes clear evidence of a breach of fiduciary duty. In a voice note on December 16, 2021, Mindick said, "mark i get it that we had money had to go from one file to another file to the third file and all that... they should have a flow of what happened so if they can get to working on that... i can just confirm it up," and in another on December 17, 2021, "Yeah, that file was a mess... the whole overage is a mess... If you want it today, I'm happy to send it to you." Those are Riverside's acknowledgements that money on Nussbaum's files had moved "from one file to another file to the third file" and that he was nonetheless prepared to send the "overage."

114. Riverside, through Mindick, manufactured the appearance of funds, including for Steiner. On September 25, 2020, he asked Nussbaum, "Do you have fed ref for the 10mm to zlotowitz?," and "Can you pls rush it. Needs to turn two more times within the hour....". That is a $10,000,000.00 sum Mindick himself directed to recirculate multiple times within a single hour. On December 30, 2020, Nussbaum asked, "If I send you 900k for raoh 39003 it's stay by you till Monday a d then back to me?," and Mindick answered, "Ok"; on January 4, 2021, Nussbaum noted

he had "got other wires from riverside in the interim! :)". That is a second instance of the same parking mechanism, as agreed by Mindick.

115. On January 12, 2021, Mindick texted Nussbaum, "You will be getting 3mm on behalf of steiner. Pls confirm you will send it back tomorrow morning"; when Nussbaum answered, "I know nothing about this. But sure. How am involved? This with Fleischmann?," Mindick asked, "Didn't steiner call you," and then explained in a WhatsApp voice note: "Basically, Steiner needs a letter that he has $3 million, so Chaim Zlatowicz, who represents our lender, was going to send it to you, and you were going to write a letter that you earned a receipt of $3 million on behalf of Mendy Steiner... I need your confirmation that tomorrow morning the money will go right back to Chaim." The next day he asked, "Are you back today to handle the 3mm letter and wire?," and wrote, "Lender asking if we have funds," followed immediately by "Did you send the 180k back to us?" Riverside's Chief Financial Officer scripted, for Steiner, a proof-of-funds letter backed by money that was to "go right back" the next morning, and named the lender's representative it was meant to deceive.

116. On September 15, 2021, on a file he called "Ketchum," Mindick wrote, "you may want to have assignor process go to an entity….. lender may ask for all outgoing wires," and, when Nussbaum proposed "lets send somewhere else," answered, "Agreed. Let me know." That is a proposal to redirect and reroute assignor proceeds through an intermediary entity because the lender might ask to see every outgoing wire.

117. On April 8, 2020, Nussbaum asked Mindick, "how much you sending me outside of legal fee?," and Mindick answered, "Send me wiring ASAP for 5mm." Mindick answered with an instruction, not a number. On the same date and again on March 2, 2021, Mindick confirmed to Nussbaum the Riverside account for Prager-designated money: "Account ending 3926" — the

account to which the NLLLP escrow wired $2,000,000.00 under the notation "Prager" on February 11, 2022. A CFO does not personally confirm wire routing twice, eleven months apart, for an ordinary customer's file; he does so for an illicit channel the enterprise built and maintains, and it was the same account ending 3926 that received the Knoll Ridge wires on October 14, 2021.

118. Mindick also stood on the other side of Riverside's closings. On January 31, 2022, he signed a Bordeaux Capital LLC payoff statement reciting a $9,000,000.00 loan, a $516,000.00 fee, and a $9,516,000.00 total payoff as Bordeaux's "Authorized Signatory," while he controlled Riverside's disbursements, as set forth in Section H below. He controlled Riverside's escrow releases on the lending side of transactions Riverside's own escrow funded. On the Hopewell file, Riverside File RANJ-38285, Mindick personally prepared and sent to lender's counsel a settlement statement embedding Nussbaum's fee — "Attached is the revised settlement statement which includes the legal fee to Mark Nussbaum" — on a file whose seller-facing statement stated a different price from its lender-facing one. When an outside party tried to verify what Mindick was telling it, his response was evasion rather than transparency. When a lender's outside counsel asked him on March 30, 2020 to verify a deposit account and accrued interest, he answered only that Riverside "continue[s] to hold $1.5mm in escrow at Signature Bank," reserved Riverside's "rights and defenses as a stakeholder only," and asked to respond verbally rather than in writing. There is no verification of the deposit account or confirmation of the accrued interest in that file.

119. Mindick directly caused Blueberry’s loss. Riverside received Blueberry's money only because Mindick personally authorized its release from escrow and personally built the channel — Riverside's account ending 3926 — into which the money was paid. The Gary closing took $22,509,166.67 of Blueberry's loan in the week Mindick told Nussbaum what the file needed to close; the Knoll Ridge closing took $31,297,834.38 of Blueberry-affiliated money on October

14, 2021, because Mindick funded it and said so in writing that day; the Macon closing ran Blueberry's own loan through the same arithmetic on March 8, 2022, from the same escrow, through the same officer; and the $10,175,000.00 that left the escrow for Riverside on December 30, 2022, while Blueberry's December deposits exceeded everything else in it, went out on a settlement statement Mindick sent and on a wire Mindick confirmed. Every dollar of Blueberry's money that reached a Riverside closing passed through the escrow-release gate he controlled, on files he administered, from an account he knew was one commingled pool, for a borrower for whom he had personally manufactured the appearance of funds.

120. Lazarus, Riverside's National Counsel, was on the closing chains of Blueberry's files and of the files funded from Blueberry's escrow money. Lazarus personally managed the structure by which loan funds were received and disbursed, and he communicated directly with Nussbaum about the disbursement of "excess" funds beyond what a closing required — the handling of overage being a hallmark of the inflated transactions. He was among the Riverside staff on the September 2021 Gary closing chain. On December 13, 2021, Lowinger copied him on the email confirming that the deed structure on Riverside File RANJ-45148 — the $40 million/$53 million file — had been agreed by the enterprise: "I briefed Aryeh on this. We are all on same page." On November 29, 2022, on Riverside File RATX-47052, funded with $8,500,000.00 from the NLLLP trust account the same day Blueberry's $6,000,000.00 deposit arrived, Lazarus wrote to the lender's counsel, "We have received purchaser's funds," on a file for which Riverside had prepared a $42,500,000.00 statement the day before and a $40,500,000.00 statement the day of closing. Lazarus's confirmation to the lender's counsel that the purchaser's funds were in hand was the representation on which that closing proceeded, and the funds it confirmed were Blueberry's deposited funds. He was on the closing chain of Riverside File RAMD-47008A, the $115 million

Baltimore purchase funded from the escrow. On January 26, 2022, he asked Nussbaum for "loan info on Steiner Florida Dixie file" — Blueberry's Hollywood, Florida loan.

121. Lazarus personally handled the routing of "excess" proceeds. That excess is the spread a two-price closing produces — the difference between what the lender funded and what the seller was paid — and Lazarus treated its disbursement as a routine question of which account should receive it because he was expert at it.

122. On December 24, 2019, Nussbaum asked Lazarus, "how fast till you disburse the excess?," and he answered, "Ask azi. He handles the $." On Riverside File RASC-36017 he wrote, "Please provide the account number that was provided for seller excess funds." In December 2021, on the Berger file, Nussbaum asked, "why am i not being wired today on berger?" Lazarus answered, "Haven't reconciled yet. The statements were a hodge posted cluster. How much should be coming back to you?," accepted Nussbaum's "over $5mm for sure," and wrote, "Azi working on your flow of funds and overage. Call him tomorrow." Lazarus asked Nussbaum to name his own number, took the answer without verifying it, and handed the money to Mindick.

123. Lazarus also controlled when lenders' money was released, working directly with Mindick. On Riverside File RANJ-39946, he circulated the assignment statement, asked whether it was "ok to circulate to lender," and then told lender's counsel, "We have received all funds. Please confirm we are authorized to proceed with closing and break of escrow." On September 15, 2021, he wrote, "We funded. I Don't have the refs. Azi will need to send those."

124. Lenders looked to Lazarus personally to hold their money until their conditions were met. On a FinWise-originated loan to Owls Nest SC Management LLC, the lender's counsel wrote to Lazarus by name: "The wire has been sent. It should not be released by Riverside, until a copy of the Deed, transfer documents for membership purchase, signed settlement sheet and pro

forma policies" have been received. And on the $343 million Wacker Drive closing, Riverside File RAIL-43060, Lazarus was on the final loan-document distribution with Lowinger, Nussbaum, and Prager, circulated by Mindick to officers of the credit union that financed it. His role ran from the smallest “excess”-funds routing to the largest transaction referenced.

125. As late as January 2, 2025, Lazarus identified the red flag and let it go. He asked Nussbaum, "Arms length deal? Call me if you can"; when Nussbaum answered yes, Lazarus wrote, "13.5 in 2022. 3.5 in 2025?"; Nussbaum answered, "Let me get info as to why," then "That was a packaged deal"; and Lazarus replied, "Ok. Appreciate it." There, Riverside flagged a valuation that had fallen from $13.5 million to $3.5 million in under 3 years and accepted a three-word answer, eight days before Blueberry demanded its money. Lazarus’ words show him positioned to catch exactly this kind of problem — screening a transaction for its arm's-length character and identifying a valuation collapse consistent with the inflate-and-divert mechanism described throughout this Complaint — and choosing not to press it past a single unverified assurance.

126. Lazarus caused Blueberry's loss because Riverside's legal function enabled and ran the fraudulent closings. As Riverside's in-house attorney whose position carried the responsibility to catch exactly this kind of diversion, Lazarus not only did not pump the brakes or halt the scheme; rather, he operated the disbursement machinery, deciding how funds from lenders flowed, when escrow broke, and how the "excess" beyond a closing's requirements moved once Mindick released it. He confirmed receipt of purchaser's funds that had come from Blueberry's deposit the same day, authorized funding, and routed the overage, file after file, on files he had been briefed carried two prices; lenders' counsel addressed their funding conditions to him by name. Blueberry's money could reach a Riverside closing only because Lazarus directed Riverside's legal department not to

stop it and instead to enable it. When he finally asked the right question — "Arms length deal?" — eight days before Blueberry's demand, he accepted a three-word answer and let it go.

127. Abbott, Riverside's Controller, moved the money and maintained the books. She was the officer responsible for the wiring instructions by which funds entered Riverside's escrow, the disbursements by which they left it, and the books that recorded both. On March 4, 2022, she sent the wiring instructions for Blueberry's Baton Rouge file, on which $3,007,715.20 of Blueberry's money moved from the NLLLP trust account to Riverside six weeks later, as set forth *supra*. Abbott also was on the September 2021 Gary closing chain. On March 4, 2020, Abbott forwarded Bordeaux's wiring instructions to Nussbaum for a $2.05 million transaction, and on March 10, 2021, when Greenwald asked her to "send wiring info as to where funds should go" for the Kleinman payment described in Section H below, she attached wiring instructions for Bordeaux's Signature Bank account.

128. Abbott administered Nussbaum's cut. Riverside's staff were "checking" Nussbaum's tally in February 2016, reissuing his check in March and April 2016 — "Do u know of Hadassah issued new check yet?," Nussbaum asked three weeks after Zagelbaum said he would "let hadassah know" — and "working on" his accounting in July 2016, and each time Zagelbaum named Abbott as the person doing it. In July 2021, when a charity had not been paid, he had "just followed up woth Hadassah." Abbott was the Riverside official who made sure a payment actually went out. Abbott was thus performing the same function in 2016 that she performed in 2022 and 2024, years before a dollar of Blueberry's money reached the NLLLP trust account — a standing position in Riverside's dealings with Nussbaum, not a task handed to her *ad hoc*.

129. On July 20, 2022, Abbott reported to Nussbaum, "You have a balance of 4K last time and new balance is 5800 for Tn-47007 and TN 47008. Most of the files above were paid and

a few didn't close yet," and "I have a running spreadsheet." Nussbaum directed $3,000.00, $5,000.00, and $1,800.00 to three charities that day — the $9,800.00 she had just reported — and on July 22, 2022, she confirmed, "All done." That is a Controller reporting a balance owed by file number, receiving instructions on which charities should receive it, and confirming payment within two days: the administration of a standing account, not the processing of a one-time referral.

130. On March 11, 2022, Abbott wrote of a proposed recipient, "Are they a 501c. Because not coming up in fidelity," and "Not coming up. Can they register it with fidelity," and sent Fidelity's registration link. Abbott thus administered the mechanism that made the payments look legitimate: she pursued a charity's registration in the Fidelity donor-advised system so that a referral payment could appear on paper as a grant. On February 27 and May 4, 2023, she confirmed a "10k" allocation on Riverside File RALA-50005; on May 10, 2023, a $10,000.00 payment to Harchava Charitable Fund. On March 3, 2023, when Nussbaum asked her to send $5,000.00 to Rofeh Cholim Cancer Society "In honor of Mendy & Chanie Fischer and family for Mark Nussbaum RCCS Hockey," Abbott answered, "yes nut you need to let them know cant write anything," and, after Nussbaum wrote "done," "sent" — the recipient was told that the payment could not carry the dedication naming Nussbaum. On February 15, 2024, asked whether the practice extended to a 1031 exchange file, Riverside File RS-50260, Abbott wrote, "I don't think 1031 files get handled," and "Please ask Yoel"; Nussbaum answered, "they told me they do, specifically yoel did," asked Zagelbaum that day, and, on March 7, 2024, told Abbott, "I did." Abbott's question was whether the charitable-routing practice applied to 1031 exchange files at all. It should not have.

131. Abbott caused Blueberry's loss directly because her hands moved the money. The $3,007,715.20 that left the NLLLP trust account on April 14, 2022, naming Blueberry on the wire's

face, reached Riverside because Abbott personally transmitted the wiring instructions. And the ledger and charitable-conduit machinery she separately maintained — the running spreadsheet of what Riverside owed Nussbaum — was the mechanism by which Riverside paid the attorney for the business that consumed the escrow, without disclosure to Blueberry. Both roles were hers, and both operated on the same commingled account that held, and then lost, Blueberry's money.

132. The foregoing officers' roles were not separate, individualized operational failures that happened to intersect on Blueberry's transactions. They were complementary parts of one working mechanism, the Riverside portion of the enterprise that made the participants millions of dollars of fraudulent profits. Nussbaum and Lowinger supplied the trust account and reassurances that gave Blueberry the appearance of safekeeping. Zagelbaum supplied the rate and the concealment architecture. Greenwald supplied the authority to accept Nussbaum's money into Riverside's closings and disburse it at whatever price the file required. Mindick, Lazarus, and Abbott held every gate for money had to pass through: the release, the legal sign-off, and the wire desk. Each is shown operating a piece of the mechanism while it was happening. Blueberry's $58,772,945.00 did not disappear through negligence distributed across an impersonal enterprise; it disappeared because the identified individuals built and ran the mechanism that took it.

133. Prager, not a Defendant, is described here because his flips consumed the largest share of the commingled escrow and because he described the arrangement with Riverside directly. The wires and communications bearing his name are the clearest documentary proof that the same commingled account, the same captive title agent, and the same two-price method used against Blueberry were being used on a far larger scale.

134. Riverside opened a dedicated series of file numbers for Prager's transactions; Mindick confirmed, twice, the Riverside account into which his money was to move; and

Greenwald received $550,000.00 from the escrow under his name. Prager insisted on Riverside as closing agent — "We need riverside its a deal breaker" — and in August 2022 wrote to Nussbaum that "riverside still needs to send me funds" and that he needed to "sit down with shaul." Prager pushed to use Riverside because he was a partner in the enterprise, just as Steiner was on the Nussbaum side. Discussing the 111 East 38th Street closing in September 2022, Nussbaum wrote to Prager, "It's you and kat and riverside," and "Right. All 'our' team." That is Prager, a counterparty on the deal, and Riverside's closing agent, described as members of a single “team,” the enterprise.

135. The scale of Prager's receipt of funds from the account that held Blueberry's money is documented and, standing alone, exceeds Blueberry's entire loss. The NLLLP trust account's statements reflect not less than $111,411,383.00 in outgoing wires designated for Prager during the period Blueberry's funds were on deposit, against not less than $51,311,551.00 returning from Prager-affiliated sources — a net outflow of at least $60,099,832.00, larger than the Escrow Amount, drawn from the same unsegregated pool.

**F. Lowinger**

136. Lowinger was the draftsman. The assignment agreements, the paired settlement statements, the transfer tax forms, the deed structures, the payoff letters, and the instructions telling Riverside where the spread should go were the work of a lawyer, and on file after file that lawyer was Samuel Lowinger. Nussbaum supplied the money and the escrow. Riverside supplied the closing table and the policy. Lowinger supplied the paper that made a two-price closing look like one transaction, and without that paper no lender could have been induced to fund and no recorded instrument could have carried the fiction.

137. Lowinger was NLLLP's other named partner and one of the two attorneys authorized to sign on the trust account that held Blueberry's money. He also owed Blueberry duties

as its attorney: NLLLP appeared as counsel for the Lender on Riverside's settlement statements for the Gary and Knoll Ridge closings, described itself as "counsel to the Mortgagee" on the Baton Rouge loan, and gave Riverside disbursement instructions on the Macon loan, and Lowinger personally worked those files. Lowinger personally engineered the pricing and paperwork devices that made the underlying transactions possible, coached the concealment of those devices from lenders, and, after Blueberry's money was gone, gave Blueberry a false account as to why.

138. Lowinger knew the price Riverside was closing at on Blueberry's Knoll Ridge loan and did not tell his client. On October 11, 2021, while the Knoll Ridge file was still at a different title company, Lowinger stated in an email that the purchase price of the property's Parcel 1 was $15,705,000.00. Riverside closed the file three days later, against $16,271,550.00 of Blueberry-affiliated money, on a settlement statement reciting $27,375,000.00 and naming NLLLP as lender's counsel. On the Knoll Ridge closing chain that week, Lowinger instructed Riverside that "Soundview Equities LLC is Seller on all flip statements." Lowinger thus knew that the price on the statement naming his firm as lender's counsel was not the price he had stated three days earlier, and NLLLP was counsel of record on both sides of that file.

139. On Blueberry's Macon loan, on March 8, 2022, Lowinger sent Riverside the instruction that "All Assignor proceeds should be sent to the attached" and the instruction dividing NLLLP's fee between the Seller statement and the assignment statement, on a thread Blueberry's name that no Blueberry representative was on, as set forth in Section D above. That instruction executed, to the letter, the script Nussbaum had dictated to Steiner by voice note five weeks earlier, set forth in Section D above: Lowinger could not tell the title company informally where the assignor's proceeds should go, but he could "send me an email to say, on behalf of assignor, the proceeds should go to XYZ entity." Riverside's staff confirmed the wires were out.

140. On the Baton Rouge loan, Lowinger represented the flipper, whose $2,792,500.00 spread came back into the firm's trust account. On that file, then, the firm served as counsel to Blueberry the mortgagee and represented the flipper whose spread Blueberry's loan funded, and received that spread into the account that held Blueberry's money.

141. Lowinger asked for the second statement before anyone asked him for it. On File RANY-45063, in a December 27, 2021 email to Riverside, he wrote: "my client is flipping this deal to Fay's client per the attached agreement of assignment. We will need to two separate settlement statements." Two days later, Lowinger asked Riverside's staff to "generate signature pages to TP584 for the flip" and sent "signature pages for the TP 584 for the assignment" — a New York transfer-tax form prepared so that the public instrument would show only the underlying contract price and not the assignment price the lender funded.

142. Where the deed itself could not be made to carry the fiction, Lowinger built the structure that could. On File RANJ-45148, the December 2021 closing of 3 University Plaza in Hackensack, New Jersey, Riverside prepared a Buy/Sell statement at $40 million and a flip statement at $53 million. The $13 million spread did not appear on the deed, because borrower’s counsel instructed that "the deed must be from 3 University Plaza Partnership LLC to 3 Up Drive LLC (as to 35%) and Hackensack JYJ LLC (as to 65%), as tenants in common or lender will NOT close." Lowinger had briefed Riverside on that structure in advance: in an email of December 13, 2021, copying Lazarus, he wrote, "I briefed Aryeh on this. We are all on same page." The morning after the closing, he asked Riverside for the "fully executed and compiled settlement statements. Buy/Sell and flip," and Mindick answered, "Attached. I don't have a signed flipper."

143. The two-price deception was Lowinger’s ordinary practice. On February 14, 2020, he wrote that he "took 4500 from buyer and 2500 from flipper for yesterday legal." That is one

legal fee divided across the two statements a single closing produced, with the larger share on the statement Blueberry was not shown. On May 19, 2020, Lowinger described a transaction to be handled "as a regular flip contract." On September 22, 2022, he wrote that he had "back to back to back markups in process." That is his description of inflating the prices on multiple files as a typical practice. In an April 20, 2023 voice note, he proposed: "If it's about you, I can build more into the legal fee. He'll probably appreciate that more. So tell me what your thoughts are, and can we do two and then two out?" That device folded a party's compensation into the stated legal-fee line of the closing rather than into the loan's points — the same instinct for keeping compensation off the number a lender would see, applied to a different line item. His December 2021 emails on Files RANY-45063 and RANJ-45148 and his May 3, 2023 voice note, set forth in Section D above, describe the same practice. On those two files, at spreads of $350,000 and $13 million, Lowinger, unprompted, told Riverside that two separate settlement statements would be needed and coordinated the paperwork and deed structure that kept the true spread off the recorded instrument. In an exchange with Nussbaum on File RANY-45063, when Nussbaum wrote that "there is only a 5k dep to Waldman," Lowinger responded that the signed assignment reflected a $190,000 deposit credit and asked whether to change the settlement statement to the lower figure anyway. Lowinger's preparation of that settlement statement shows that he knew, at the time, its numbers did not match the parties' signed agreement, and that the gap was resolved off the written record.

144. The paper Lowinger produced induced the lenders. On Knoll Ridge, the appraisal Blueberry commissioned returned an As-Is value of $27.4 million — within $25,000 of the $27,375,000 price Riverside's statement recited, but $11,670,000 above the price Lowinger had stated in writing three days earlier. An appraiser values a property against the transaction he is shown. Where the transaction he is shown is an assignment at a price built by counsel three days

before closing, the appraisal that follows measures the built price, not the market. Blueberry's own diligence was fooled by the only version of the transaction Blueberry was permitted to see.

145. Lowinger coached concealment from lenders. On February 13, 2021, he told a party what to say to a lender: "Tell them you are not involved with tenant docs and tenant org docs are non negotiable." On April 3, 2022, discussing a lender's diligence: "if they ask Nord for receipts, we fucked." On a pair of files he asked Greenwald, "Shall I say nothing or say Segal?" That is Blueberry's counsel asking Riverside whether a party's identity should be disclosed or withheld. On March 8, 2022, he wrote to Greenwald that it was not his job "to chase down mystery figures and an angry client who has no inkling re fees added," and, "You've told me that clients 'know,' but I have numerous files and stories that do not match that narrative." That is Lowinger's rejection, in writing, of the premise that Riverside's clients understood what was being added to their closings; it shows that Lowinger understood the fee structure was being concealed, and it was written on the same day Blueberry's Macon loan proceeds moved through Riverside. In an internal voice note, an unidentified speaker told him: "I need those docs on Prager ASAP. When you're done with the docs, sorry, Sam, you got to look through them and make sure they're golden because the docs are backdated... They're going to get scrutinized by Shia's partners, and I need them to be good and clean." Lowinger's knowledge of falsification is thus confirmed: he was told that a specific set of closing documents on Prager's transactions had been backdated and needed to be made to look "clean" before outside scrutiny. On October 20, 2021, discussing the Wacker Drive transaction, he wrote to Nussbaum, "Can you ask Shaya whats with Canal and Wacker?," and, seventy-one seconds later, "wacker is the deal we are holding deposit on." Those are Lowinger's words confirming he was contemporaneously aware that his firm was holding the deposit on the transaction on which Riverside's settlement statements reflected a million-dollar spread.

146. On or about March 7, 2024, Lowinger forwarded Nussbaum the news report of the Fannie Mae ban on Riverside and asked for his thoughts. The report described the federal criminal convictions and Riverside's resulting ban in a separate mortgage-fraud conspiracy; NLLLP's partners were discussing the criminal exposure attaching to the same structure through which Blueberry's money moved, without informing Blueberry. On August 22, 2024, five days before the Escrow Agreement was signed, he asked a party to "send over Mendel Steiner's PFS, and proof of income from income yielding properties." Lowinger requested Steiner's personal financial statement because he was helping to arrange financing for him right before the Escrow Agreement.

147. Lowinger knew, before writing his client Blueberry, that NLLLP could not pay what it owed. On January 7, 2025, as creditors began calling him about wires Nussbaum had not sent, Lowinger wrote to Nussbaum: "Why is Jacob sod calling me about a wire he sent you?," "What the frick is going on," "Just respond to him with a WhatsApp at the very least. I'm telling you, you think you know him, etc., but you are playing with fire," "And now zalman schochet on my ass," and "Why can't you wire today? What is happening?" On January 8, 2025: "you are hanging me out to dry here," "mass panic," and "You are ignoring everyone. Dont bullshit me." Nothing in that exchange describes an account illegally accessed. It describes the firm failing to send wires it owed, and Lowinger's contemporaneous alarm at it in real time. Nussbaum had told Steiner the night before to have Lowinger set up the fabricated holding structure: "tell sam." Six days later, on January 14, 2025, Lowinger told Blueberry that NLLLP's trust account "may have been illegally accessed and substantially depleted as a result of irregular transactions," that he had contacted the bank, that the account was frozen, and that NLLLP was therefore unable to return any funds. That statement was false, and Lowinger had no basis to make it: the account had not been illegally accessed; it had been emptied by his own partner, into Steiner's companies, over a

long period of time under Lowinger's watch. The statement delayed Blueberry's discovery of where its money had gone, during the days in which money was still moving on Nussbaum's instructions. It was made by Lowinger personally, to a client he owed a duty to inform truthfully.

148. Lowinger caused Blueberry's loss by building the instruments through which it was taken. He was not a bystander, nor merely a partner in the firm that held the money. He was one of its two architects on the escrow side, with signing authority over the NLLLP account, and he was Blueberry's lawyer on the closings. On Blueberry's four files, he stated a price and let a higher one close, divided his firm's fee across the two statements so that the larger share was concealed from Blueberry, directed where the assignor's proceeds would go, and acted for the flipper on the loan where he told the borrower he was counsel to the lender. On other files, he told Riverside two statements would be needed, generated transfer-tax pages so the recorded instrument would not show the spread, directed Riverside on a deed structure that hid a $13 million markup, and described "back to back to back markups in process" as ordinary work. The assignment agreements, the paired statements, the transfer-tax forms, and the deed structures were crucial to the enterprise. And when Blueberry finally asked for its money, Lowinger responded with a knowing lie rather than the truth, delaying Blueberry's ability to learn what had happened.

**G. BR Title Agency LLC — Alter Ego and Mere Continuation of Riverside**

149. In February 2024, Riverside lost the ability to close federally backed mortgages. Boruch Drillman pleaded guilty on December 13, 2023, in the United States District Court for the District of New Jersey, No. 3:23-cr-01053, to conspiracy to commit wire fraud affecting a financial institution. According to Department of Justice press releases, the scheme involved acquiring property in Troy, Michigan for a true price of $42.7 million and then presenting to the lender a second closing at approximately $70 million — the two-price scheme described herein — through

a title company that contemporaneous reporting identified as Riverside. Consequently, Fannie Mae barred Riverside from a mortgage loan closing in any capacity; its Deputy General Counsel's memo stated, "Until further notice, we will not accept delivery of any mortgage loan closed using Madison or Riverside in any capacity," and tied that action to the conduct described in the press release. Lowinger forwarded the news report to Nussbaum on or about March 7, 2024, but Zagelbaum had already stated “we're moving forward.” The ban cut off a core part of Riverside's business and supplied an immediate motive for continuing that business under a different name.

150. BR Title is the vehicle through which Riverside's business continued. BR Title was formed on March 19, 2018; its registered agent and sole principal of record with the New Jersey Division of Revenue is Greenwald; its registered business address is 3839 Flatlands Avenue, Suite 207, Brooklyn, New York — a different suite in Riverside’s building. Its personnel are Riverside's: Bayla Hersh appears as a Riverside employee at BHersh@rsabstract.com in a January 2021 Riverside email and, by February 2023, as "Supervising Coordinator" at BR Title at BHersh@brtitlegroup.com. Its files are Riverside's: on a February 23, 2023 closing of three parcels with File Nos. BRNY-47158 and BRNY-47159, on which NLLLP served as seller's counsel, BR Title served as title company and collected the title fees while the settlement statement carried a deposit line: "Down Payment - Held By Riverside." In December 2024, BR Title endorsed nearly $12.8 million in construction-loan advances on a matter captioned "Wercberger, Wolf" (File No. BRNY-53140), whose file reflects mid-transaction handoff from Riverside's file numbering to BR Title's — and issued a title report (File No. BRNY-53197) addressed to NLLLP. Each December 2024 document features letterhead with the 3839 Flatlands Avenue address. In a telephone conversation with Plaintiff's representative, an individual who identified herself as Elky Braunstein, a manager at BR Title, stated that BR Title's staff substantially overlaps with

Riverside's former staff and that Greenwald continues to oversee BR Title's operations; asked directly whether BR Title is Riverside, she answered, "it depends who's asking."

151. The connection did not end with the 2023 closing. The two December 2024 matters both arose after the Fannie Mae ban and under BR Title's file numbering. The Riverside-numbered title report inside File No. BRNY-53140 marks a matter that began under Riverside and was completed, with nearly $12.8 million in advances endorsed, under BR Title; and the title report on File No. BRNY-53197 went to the same referring firm who formed the enterprise with Riverside.

152. Thus, upon information and belief, BR Title is dominated and controlled by Riverside's principals, operates Riverside's title/closing business from Riverside's premises with Riverside's staff and files, and is Riverside's alter ego and, in the alternative, its mere continuation, such that it is liable coextensively with Riverside for the claims pleaded against Riverside below. BR Title has continued to operate Riverside's business, under Riverside's management, with Riverside's personnel, and on Riverside's files, immediately following Riverside's loss of its federally backed closing business. BR Title thus was a party to the RICO Conspiracy.

**H. Bordeaux Capital LLC**

153. Bordeaux is a lender that sat on the receiving side of closings Riverside processed while Riverside's CFO signed for it. On a Bordeaux payoff statement dated January 31, 2022, reciting a $9 million loan, a $516,000 fee, and a total payoff of $9.516 million due within days, Mindick signed as Bordeaux's "Authorized Signatory." At the same time, Mindick controlled Riverside's timing and authorization of disbursements. Riverside's back office handled Bordeaux's money: on March 4, 2020, Abbott forwarded Bordeaux's wiring instructions to Nussbaum for a $2.05 million transaction, and on October 6, 2021, a Riverside settlement statement carried a $250,000 line to Bordeaux Capital that Greenwald described as "an old debt" and that Nussbaum

had removed with the words "its his dads, not his, yalla, remove and lets close." Mindick did not sign the payoff statement as an accommodation to a client's business: the same officer who decided when Riverside released lenders' funds was the private lender on the other side of it. Facilitating payments to Bordeaux was a routine function of Riverside's back office.

154. A legitimate real estate closing with lenders who fund and title insurance underwriters who write policies depends on the independence of the parties to it: the closing agent is supposed to be neutral, the escrow holder a disinterested stakeholder, and the lender an arm's-length party assessing its risk. Bordeaux broke those basic rules. Mindick, as the Riverside officer with authority over the release of escrowed funds, was at the same time the authorized signatory of a private lender whose loans Riverside's closings paid off and whose wiring instructions Riverside's Controller circulated. Blueberry, an arms'-length lender, could not have known from what Riverside showed it that the closing agent had an interest in the other lender.

155. Bordeaux received money from the Nussbaum Firms' accounts on a sustained basis. On March 10, 2021, Nussbaum wrote to Abraham Kleinman: "To clarify, $508,579.52 of monies received today on your behalf shall be paid to Jeff Seidenfeld, David Metzger and Shaul Greenwald. Please confirm." Greenwald emailed Abbott to "send wiring info as to where funds should go," and Abbott attached wiring instructions for Bordeaux's Signature Bank account ending 5956. Seidenfeld's accounting on the same thread read, "Madison title…gets $25,517 / Riverside gets $195,697.86 / Seidenfeld gets $195,697.86… / Metzger gets $91,666.67," and on March 11, 2021, exactly $195,697.86 left the NLLLP account ending 1964 (20210311B6B7261F004490) to Bordeaux, with memo "kleinman." On March 10, 2021, Mindick wrote to Nussbaum, "From kleinman deal pls confirm 500k and change is going to Bordeaux to pay back Seidenfeld," and Nussbaum answered that "it is going to shaul, jeff and david ... per my client's email instructions

that Shaul has a copy of." Bordeaux received the wire. Separately, Bordeaux wired $500,000 into the NLLLP account on June 20, 2018, and the account wired $100,000 to Bordeaux on each of April 14, May 6, June 17, and September 1, 2022, each at the request of an individual named Barry Farkas in a one-line email reading "Please wire 100,000" or "Please wire $100,000"; six earlier Farkas emails between June 30, 2020 and February 2, 2021 similarly directed a further $553,000 to Bordeaux. Bordeaux's received at least $1,148,697.86 from the Nussbaum Firms' accounts.

156. The Kleinman thread shows the chain from instruction to wire. Nussbaum's client named Greenwald as one of three payees; Greenwald, rather than supplying his own wiring information, asked Riverside's Controller to supply it, and she supplied Bordeaux's; Seidenfeld's accounting assigned equal $195,697.86 shares to "Riverside" and to himself; and Riverside's CFO followed the money, asking Nussbaum to confirm that "500k and change is going to Bordeaux to pay back Seidenfeld." The $195,697.86 that left the account on March 11, 2021 matches those shares and was received by the company for which Riverside was authorized to sign.

157. Those transfers show a multi-year, two-way relationship between Bordeaux and the trust account that held Blueberry's funds. The June 20, 2018 wire shows Bordeaux placing its money in that escrow years before the Kleinman wire; the six Farkas emails of 2020 and 2021 show money being directed out of the escrow to Bordeaux on a standing template nearly two years before the four 2022 wires; and the 2022 wires show the same practice continuing on the same one-line instruction. This was a close relationship of co-conspirators.

158. Bordeaux is named as a Defendant herein for two reasons. First, for its own receipts: the four $100,000 wires of 2022 left the NLLLP escrow during the period Blueberry's 2022 deposits were commingled in it, and Bordeaux, a lender for which Riverside signed, was not a good-faith transferee for value. Second, as Riverside's alter-ego: upon information and belief

Bordeaux is owned by Greenwald, its signatory authority was held by Mindick, its wiring instructions were circulated by Abbott and other Riverside staff, and there is no indication that it maintains staff, books, or capital of its own — facts on which Blueberry alleges Riverside used Bordeaux's appearance as a separate entity to extract lending fees and interest from the same escrow apparatus that took Blueberry's money.

159. Bordeaux was a mere alter-ego and extension thoroughly dominated and controlled by Riverside. Bordeaux was, upon information and belief, owned by Greenwald, who directed the use of Bordeaux as an artifice to extract fees and interest. Mindick held Bordeaux's signatory authority while exercising Riverside's authority over the release of escrowed funds at the closings that paid off Bordeaux's loans, with Riverside on both sides of the transaction. Riverside's back-office personnel administered Bordeaux's affairs. The fees and interest so extracted were ones a disclosed, arm's-length lending relationship would not have generated, and no settlement statement Blueberry ever saw disclosed them. Bordeaux is liable, coextensively with Riverside, for the claims pleaded against the Riverside Defendants, in addition to its own liability for the receipts.

**I. Miller, Eisenreich, and Treff**

160. Miller has worked at Riverside for approximately thirteen years and signs as its "Chief Counsel." On Riverside closings, her confirmation that a file was clear was the precondition to funding. On July 21, 2022, on File RANY-48647, a $38 million purchase of 260 Viola Road, Monsey, New York, on which NLLLP was buyer's counsel and the buyer's $15,092,187.56 came from the NLLLP trust account (20220721B6B7261F005783), Riverside's closer wrote to the closing group — which included Nussbaum, Lowinger, Treff, Abraham Lowy, and Farkas — "Adding Karla. We can't fund until she confirms that we're clear on the seller's end," and then, "Karla, Please confirm that we're clear to close." Miller answered, "We are clear to close," and

Riverside's staff wrote, five minutes later, "Wires have been released. We are closed." The sequence shows the function Miller performed: nothing moved until she said the file was clear, and $15,092,187.56 out of the NLLLP escrow moved within minutes once she did. Miller's dealings with Nussbaum are long-standing: a settlement statement for a November 10, 2014 closing at 222 Palmetto Street, Brooklyn identifies her as Riverside's "Chief Counsel" on a transaction on which Nussbaum, then at Altman Schochet LLP, represented the purchaser; in May 2020, she corresponded directly with Nussbaum on the loan policy and escrow agreement on File RANY-39581, on which she is the designated notice addressee for the escrow agent; and in March 2021, she handled entity-formation and title requirements on File RAEX-43000.

161. Taken together, those records show a sustained professional relationship between Miller and Nussbaum spanning at least 2014 through 2022, not the passing institutional contact of a title company: the 2014 settlement statement places her seniority at Riverside, and her direct contact with Nussbaum years before the conduct at issue; the May 2020 correspondence shows her dealing with Nussbaum directly, not merely with Riverside as an institution; and the July 2022 closing shows her personal clearance releasing the buyer's funds out of the NLLLP escrow on a $38 million file. Miller is not named in the fraud Count pleaded against the Firm Defendants below, but she is named as the officer whose clearance released funds.

162. Eisenreich and Treff operate a private lending business together. On December 12, 2024, a real-estate finance broker, Eli Mermelstein, seeking a loan for Steiner, asked Nussbaum, "Do you know Avery Eisenreich," wrote that "Joe Treff does his lending business" and "I have done multiple deals with him." Nussbaum answered that he knew "both" men. Upon information and belief, based on representations by individuals with knowledge of Riverside's affairs, Eisenreich and Treff each hold a direct or indirect ownership interest in Riverside and have funded

Riverside closings. Treff and his law partner Abraham Lowy were on the closing distribution for the RANY-48647 closing. Eisenreich is the principal whose lending business it is, and Treff operates that business and makes its credit decisions. Their presence on the RANY-48647 distribution places Treff and his law partner inside a Riverside closing funded out of the NLLLP escrow, on the same thread with Nussbaum, Lowinger, and Miller.

163. Treff's law firm's trust account transacted with the NLLLP trust account while Blueberry's money was on deposit. Treff & Lowy PLLC maintained an attorney trust account at Signature Bank. The NLLLP account's statements record nine wires between the two: incoming to NLLLP, $268,000.00 on August 25, 2021; $1,824,090.02 on August 30, 2021 under the notation "193 GREENPOINT"; $600,000.00 on November 14, 2022; and $181,682.23 on February 8, 2024; outgoing from NLLLP to Treff & Lowy, $776,000.00 on August 23, 2021; $924,000.00 on August 25, 2021; $600,000.00 on March 10, 2022 under the notation "Miami Flagler/Eisenberg"; $846,805.60 on May 24, 2023; and $1,256,000.00 on June 10, 2024, the last to a second Treff & Lowy trust account at Dime Community Bank. Treff & Lowy received $4,402,805.60 and sent $2,873,772.25 — $1,529,033.35 more out of the escrow than it paid in. Five of the nine wires fall within the period Blueberry's funds were on deposit. Separately, on December 27, 2022, Treff & Lowy received a $5,000,000.00 wire from the Real Green account ending 1819 — the account to which Nussbaum has admitted diverting client escrow funds — from a statement that the same month shows wires captioned "Ref: Steiner" to Olivvi LLC, to D.S. Lending, and to Steiner's wife. A related Nussbaum-controlled trust account shows Treff & Lowy wire activity as early as 2018, and a second shows a $1,150,000.00 wire from NLLLP on December 24, 2021.

164. Those wires show a relationship, not a handful of isolated payments. The routing-number overlap places Treff & Lowy's escrow at the same institution, Signature Bank, at which

the NLLLP escrow, Riverside's own accounts, and Bordeaux's account all sat, and the nine wires between the two escrows ran in six- and seven-figure amounts on a recurring cadence from August 2021 through June 2024. Treff & Lowy's position across them is not that of a lender still waiting to be made whole: a lender who closes out a multi-year relationship with an trust account $1,529,033.35 ahead has been repaid his principal and then some. That net-positive position corroborates what the Mermelstein exchange shows Treff to be — a private lender who "does his lending business" and decides which loans to fund — and Treff is pleaded not as an unwitting conduit through which money merely passed, but as someone who made money from the closings that money funded. Nor was the relationship confined to a single account or a single window in time: the 2018 activity in a Nussbaum-controlled account places it in the escrow apparatus years before Blueberry's funds arrived, and the relationship did not pause while Blueberry's money was on deposit, the last wire going to a separate banking relationship at Dime Community Bank two weeks before Blueberry's June 24, 2024 deposit.

165. The $5,000,000.00 wire of December 27, 2022 stands apart from the nine NLLLP-account wires. Section B above identifies the account as Real Green's and sets out Nussbaum's admission that client escrow funds were diverted to it; the same account had received wires from NLLLP on December 2, 8, and 12, 2022, within days of Blueberry's December 2022 deposits, as set forth in Section C above. The largest payment to Treff's firm cited here therefore came from the account into which Nussbaum admitted diverting client escrow funds, in the same month that account was receiving the NLLLP escrow's wires and sending wires captioned with the name of Steiner — the same Steiner who personally guaranteed Blueberry's $60 million loan.

166. Eisenreich is named only in Counts VIII and IX below because his capital funded, and he shared in the fees generated by, the same closing apparatus that processed the commingled

escrow holding Blueberry's deposits. Treff is named in Counts II, V, VIII, and IX below due to receipts from that escrow and the $5 million Real Green wire. Neither man's inclusion in this Complaint depends on his represented ownership interest in Riverside standing alone.

**J. Pattern Evidence: The Same Scheme on Other Transactions**

167. The dual-price device run against Blueberry was Riverside's and NLLLP's standing way of doing business. It appears on Riverside's settlement-statement template, which carries pre-printed fields for "Flipper" and "Flipper Counsel," and on FLIPPER-captioned statements, signature pages, and invoices across at least nine Riverside files in seven states, including RAOH-43034 (Ohio), RANY-44212, RANY-45613, and RANY-17884 (New York), RANJ-45148 (New Jersey), RAGA-43043 (Georgia), RAMI-36017 (Michigan), Louisiana, and Virginia; Riverside's paired-file numbering recurs on wiring instructions captioned "RAIL-43025B." The participants used the word themselves: in a March 22, 2019 iMessage, Benjamin Fish reported, "Flipper said they received TOE from seller"; in a November 12, 2021 voice note, Mindick spoke of "Flipper's attorney"; in an October 11, 2021 voice note, a participant explained that Riverside's multiple-statement structure "is going to need to have an assignor," which "can be your SoundView entity."

168. The FLIPPER statement for File RAVA-39003, a July 24, 2020 closing on twenty-four properties in Richmond, Virginia, names the Flipper as Jackson Point Holding LLC and the Flipper's counsel as Nussbaum, and recites an "Original Contract Price" of $20,300,000.00, a "Flip Contract Price" of $27,500,000.00, and "Flip Gross Proceeds" of $7,200,000.00.

169. On File RANY-44212, a $29,250,000-to-$61,000,000 flip of Rochester and Syracuse, New York properties closing October 6, 2021, Mindick wrote, "will send final SS now. Please confirm we can attach your signature page and fund," on a draft statement that had carved $250,000.00 out of the inflated proceeds for Bordeaux until Nussbaum had the line removed. The

same flipper returned four months later on File RAMI-36017, a February 17, 2022 Michigan closing with an $8,927,900 assignment spread and NLLLP as assignor's counsel.

170. On File RAOH-43034, an August 12, 2021 Monroe, Ohio closing, NLLLP acted as Flipper's Counsel on a $23,375,000 Original Contract Price re-papered as a $28,960,000 Flip Contract Price for a $25,000 legal fee.

171. On a June 3, 2022 Baton Rouge, Louisiana closing of a 674-unit portfolio, Riverside's flipper-side statement re-papered a $37 million contract price as a $52 million Flip Contract Price and then applied a $14 million "Vacancy Credit" that clawed back most of the $15 million spread before any cash moved.

172. On File RATX-47052, the Lake Jackson, Texas membership-interest purchase funded from the NLLLP escrow on November 29, 2022 and financed by Lument Capital, Riverside prepared a $42.5 million draft statement on November 28 and a $40.5 million executed statement on November 29.

173. On the 111 East 38th Street file, RANY-48736, Riverside created a Seller statement at $10.3 million, a Buyer statement with an $8 million loan, an assignment statement at $4.7 million, and a further assignment statement at $15 million — the latter being the sum of the seller price and the first assignment.

174. On the February 2, 2022 closing of a $343 million transaction on 35 W. Wacker Drive, Chicago, financed by a $220 million loan from UNIFY Financial Credit Union, the file was papered as RAIL-43060A and RAIL-43060B and distributed $1,355,000 to Riverside, $125,000 to Nussbaum, and $1,100,000 to the mortgage broker.

175. On the flip of 818 Quincy Street, Brooklyn, a single property was documented at $995,000 (NLLLP as purchaser's counsel), $1,225,000 (a parallel contract to a different buyer),

and $1,280,000 (an assignment), under an assignment agreement providing that "Until closing of title, Assignee shall not contact or relay information to Seller or Seller's attorney."

176. On the Hopewell file, RANJ-38285, Mindick sent a settlement statement to counsel at $60 million in April 2020, and there was a second statement for the same closing at $95 million.

177. In April 2023, on the Park at Crestview property in Austin, Texas, there was a purchase for just over $40 million and an assignment at $54 million. Riverside disbursed a $138,685 "Broker Fee" to Fortune Capital Group and $50,000 in "legal fees" to NLLLP on a loan of over $42 million from Lument Real Estate Capital LLC.

178. On December 21, 2023, Nussbaum asked Prager, "on LA, can the settlement statement have the assignment price (seller will not see it)?"; Prager answered, "OK let's do it."

179. Thus, the enterprise carried out its scheme on numerous transactions, not merely the ones in which Blueberry was involved. The foregoing are examples, not a comprehensive list.

**K. The Enterprise's Method, Scale, and Duration**

180. The participants divided the proceeds on a standing formula. On Riverside's closings, the title premium was split 80/20 between Riverside and the underwriter, and of Riverside's share, approximately one-third was paid back, through Greenwald, to whoever had directed the title work to Riverside — a referral payment never disclosed.

181. The referral payments ran through at least nine charities, including Pomona Jewish Community (EIN 84-2502482), Ohr Shlomo Chasidic Center (EIN 84-4530416), Harchava Charitable Fund (EIN 88-4006313), Bais Menachem North Miami Beach (EIN 65-0588673), Congregation Shterenzer Gemech (EIN 82-3663065), Aish Kodesh (EIN 13-3689362), Chabad of Pomona, Tomche Shabbas of Monsey, and Rofeh Cholim Cancer Society.

182. On Riverside's largest closings, the same undisclosed spread appeared as oversized broker and consulting fees: on a Paramus, New Jersey property (Files RANJ-45396 and RANJ-50902) supporting a $78 million loan, the records reflect a $585,000 mortgage broker fee, a $20,000 consulting fee to an entity identified as “Credit Unity,” and a $390,000 broker fee to an entity identified as AANDAR.

183. A different formula governed the 1031-exchange and other funds Nussbaum parked at Riverside: a share of the yield "for as long as it sits" — "a half a point on what's earned," in Zagelbaum's words, later "a quarter point" — which, as Greenwald said, was to "split the fee."

184. In order to carry out the aims of the enterprise, the appearance of buyer liquidity was manufactured to a script. NLLLP issued proof-of-funds letters on request; Riverside fronted deposits and confirmed unfunded buyers as funded; and cash outside the banking system sometimes filled gaps — on August 1, 2019, Prager asked Nussbaum, "Should I deposit cash in your bank account?"; on August 12, 2021, Nussbaum proposed, "Let's do cash back for a good amount and wire the balance"; and on September 4, 2022, discussing a transaction called "willow," Nussbaum wrote, "We can fund the cash on Tuesday and then he will accept the bank money and send back to still a purchase for the bank later."

185. Riverside was not misled by appraisals into doing flips with higher prices; it papered both prices itself, and the appraisals name the lender as their sole intended user and disclaim reliance by others — the appraisal for the Willow Oaks property, effective September 8, 2022, names lender A&S Capital, LLC and states that it "is not intended for any other use or user."

186. The scheme ran from at least 2016 through January 2025. The referral payments are documented from February 2016 (Zagelbaum: "Hadassahs checking") through February 2024 (Zagelbaum: "It was a quarter point, right?") and were still being invoked on January 22, 2025,

twelve days after Blueberry's demand, when Nussbaum asked Greenwald for "a joint riverside contribution." The two-price closings were common from April 2020 (Hopewell) through April 2023 (Park at Crestview), and the FLIPPER field remains on Riverside's template. The NLLLP trust account sent 163 wires to Riverside-named beneficiaries between March 2021 and January 2025, totaling approximately $467,300,000. Upon information and belief, based on the files identified in this Section and in Sections D and J above, on Riverside's template, and on that wire volume, the transactions specifically pleaded are representative of dozens (not less than fifty) closings of the same character carried out by the enterprise between 2018 and 2024. Riverside remains a going concern, BR Title issued title reports to NLLLP in December 2024, and the referral practice was being extended to 1031 files in March 2024, with Abbott administering it.

**L. Predicate Acts of Racketeering Activity**

187. The acts of wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. §§ 1956 and 1957) described herein constitute a pattern of racketeering activity. Each is pleaded with the Defendant who committed it, the date, the wire/communication, and the reason undertaken.

188. **Predicate Act 1 — Gary, Indiana (September 10, 2021).** Riverside, through Mindick, Lazarus, and Abbott, prepared and transmitted by interstate email two assignment settlement statements for the same portfolio, Files RAIN-43016 and RAIN-43016B, one naming Blueberry as Lender at an Assignment Price of $35,183,992.00 and the other at $13,500,000.00, and NLLLP, as counsel to both the assignee and Blueberry, caused $22,509,166.67 to be transmitted by interstate wire from the NLLLP trust account to Riverside against the higher statement. Mindick wrote on that chain, "You need 29,824,641.46 to close." The object was to obtain Blueberry's $25,000,000.00 loan against a price of $21,683,992.00 above the actual price.

189. **Predicate Act 2 — Knoll Ridge (October 11–15, 2021).** On October 11, 2021, Lowinger transmitted by interstate email a statement that the Parcel 1 purchase price was $15,705,000.00; on the closing chain that week he instructed Riverside that "Soundview Equities LLC is Seller on all flip statements." On October 14, 2021, Nussbaum and Lowinger caused $15,026,284.38 and $16,271,550.00 to be transmitted by interstate wire from the NLLLP trust account to Riverside, and Mindick administered the closing and disbursement ("I funded the Legal's. Waiting on final close to semd flips"; "Mendy still reviewing"), against a settlement statement naming Blueberry as Lender at $27,375,000.00; on October 15, 2021, $15,100,000.00 returned by interstate wire from the seller's counsel. This act involved Blueberry-affiliate funds and is pleaded for the pattern of conduct.

190. **Predicate Act 3 — Macon (December 20, 2021–March 9, 2022).** On March 8, 2022, Lowinger transmitted by interstate email the instructions "All Assignor proceeds should be sent to the attached" and "Please add our legal fee as follows: 25,000 from Assignor - this should go on the Seller statement. 7500 from Assignee - this should go on assignment statement," and Riverside's staff transmitted by interstate email the confirmations "I'm asking for lender counsel approval" and "Yes. Wires are out"; the NLLLP trust account transmitted by interstate wire $15,650,388.89 and $4,444.44 to Riverside and received $5,024,100.00 in "ASSIGNOR PROCEEDS" from Riverside; Greenwald, by voice notes transmitted that day, described the file as one his client had brought and "flip[ped] ... to your client"; and Mindick, in the same exchange, wrote, "I sent you for Georgia." The object was to obtain Blueberry's $16,000,000.00 loan against an Assignment Price of $17,500,000.00 for a property selling for $12,400,000.00.

191. **Predicate Act 4 — Baton Rouge (March 4–April 19, 2022).** On March 4, 2022, Abbott transmitted by interstate email the wiring instructions on File RALA-47000; Mindick

executed the file's deposit escrow agreement for Riverside; Riverside transmitted statements naming Blueberry as Lender at an Assignment Price of $4,575,000.00 on a property under contract, with its companion parcel, at $3,200,000.00; on April 14, 2022, the NLLLP trust account transmitted by interstate wire $3,007,715.20 to Riverside under the instruction "Blueberry- FW: Purchase Agreement RALA-47000"; and on April 19, 2022, Riverside transmitted by interstate wire $2,792,500.00 — the spread — back to the NLLLP trust account. The object was to obtain Blueberry's $3,202,500.00 loan against an inflated price and to capture the spread.

192. **Predicate Act 5 — 555 East 242nd Street (April 7, 2022).** Nussbaum, as a partner of NLLLP and the principal of MJN & Associates acting in the course of the firms' escrow business, caused $8,390,000.00 to be transmitted by interstate wire from the NLLLP trust account under an instruction naming Blueberry, and transmitted by interstate email, on the same file, "I need to be made whole first PLEASE!"

193. **Predicate Act 6 — the July and August 2023 deposits (July 5–August 30, 2023).** Nussbaum, having reported escrow balances to Blueberry through the Blueberry Nussbaum Escrow WhatsApp group, caused Blueberry to transmit by interstate wire $8,500,000.00 on July 5, 2023, $8,000,000.00 on July 17, 2023, and, through its affiliate, $7,500,000.00 on August 24, 2023, into the NLLLP trust account, and then caused the account to transmit by interstate wire, within one business day of each deposit, $8,500,000.00 to a third party under the notation "Silber," $3,000,000.00 and $2,500,000.00 to Real Green, $3,500,000.00 to Riverside, and $5,080,156.00 to another title company, as set forth in Section C above.

194. **Predicate Act 7 — the 2024 diversion wires (February 1–December 30, 2024).** Nussbaum, caused the NLLLP trust account and the MJN & Associates Capital One account to transmit by interstate wire, while Blueberry's loan proceeds were required to be held in those

accounts, the wires to Real Green, Aven Realty, Steiner, and others set forth by date and Fed. Ref. No. in Sections B and C above — including $2,000,000.00 to Aven Realty on June 24, 2024, the day Blueberry's $2,500,000.00 deposit posted; $4,000,000.00 to Steiner on July 11, 2024, three days after Blueberry's $4,960,000.00 deposit; $350,000.00 to Steiner on September 30, 2024, after the Escrow Agreement; $500,000.00 to D.S. Lending on December 13, 2024; and $10,077,731.86 to the Customers Bank successor account on December 23–24, 2024, followed by $10,700,000.00 to Aven Realty by December 30, 2024.

195. **Predicate Act 8 — the Escrow Agreement (August 27, 2024).** NLLLP, by Nussbaum in New York, executed and transmitted by interstate electronic mail to Blueberry in New Jersey an Escrow Agreement reciting that "$58,772,945 is being held in escrow by Escrow Agent," when the account in which that sum was to be held had not exceeded $16,537,183.95 that month, in order to induce Blueberry to consolidate and extend its loan and to refrain from demanding its money.

196. **Predicate Act 9 — the referral payments (June 7, 2021–March 7, 2024).** Riverside, Greenwald, Zagelbaum, and Abbott transmitted by interstate wire and electronic communication the payments and the messages arranging them set forth *supra*, including Greenwald's September 14, 2021 confirmation of the $5,500 Pomona Jewish Community payment and November 29, 2021 confirmation of the $2,000 Chabad of Pomona payment; Zagelbaum's June 7, 2021 "Wanna give me charity and ein? And will see from fidelity" and July 6, 2021 "That's our total Income. Obv not sending the entire amount"; Abbott's July 20 and 22, 2022 ledger messages and $9,800.00 in payments; Abbott's March 3, 2023 transmission of the $5,000 Rofeh Cholim Cancer Society payment with the instruction that the recipient "cant write anything"; and Zagelbaum's February 15, 2024 "It was a quarter point, right?" — each in furtherance of a scheme

to pay the attorney acting as Blueberry's counsel and escrow agent an undisclosed share of Riverside's fees and float on the closings Blueberry funded, depriving Blueberry of that attorney's honest services and of the arm's-length closing agent to which it was entitled.

197. **Predicate Act 10 — the same device on other lenders (2020–2023).** Riverside, by Mindick, transmitted by interstate email, on October 6, 2021, "will send final SS now. Please confirm we can attach your signature page and fund," on File RANY-44212, a $29,25 million to $61 million flip; NLLLP acted as Flipper Counsel on File RAVA-39003 (July 24, 2020) and RAOH-43034 (August 12, 2021); Riverside, through Lazarus, transmitted by interstate email on November 29, 2022, "We have received purchaser's funds," on File RATX-47052, on which Riverside had transmitted a $42.5 million statement one day and a $40.5 million statement the next day to the lender; and in April 2023, Riverside transmitted by interstate wire the $138,685.00 "Broker Fee" and $50,000.00 "legal fees" out of the Park at Crestview closing.

198. **Predicate Act 11 — concealment (November 13, 2023–January 14, 2025).** NLLLP, by Nussbaum in the Blueberry Nussbaum Escrow WhatsApp group on November 13, 2023, answered Blueberry's statement that it had "38 million sitting by you in escrow for Steiner" by proposing alternative accounts rather than disclosing that the account held a fraction of that sum, and accepted Blueberry's confirmation of the balance on January 31, 2024, when the account held $2,428,821.47. NLLLP, by Lowinger on January 14, 2025, transmitted by interstate email to Blueberry the false claim that the trust account "may have been illegally accessed and substantially depleted as a result of irregular transactions." Each communication was designed to, and did, delay Blueberry's discovery of the diversion of funds and attempt to recover funds.

199. **Money laundering.** The following transactions in the proceeds of the wire fraud pleaded above, each exceeding $10,000, were conducted by the Defendant named with knowledge

that the property was criminally derived, in violation of 18 U.S.C. § 1957: the $550,000 wire from the NLLLP trust account to Greenwald's law firm account on May 2, 2022; the $2,792,500 wire from Riverside to the NLLLP trust account on April 19, 2022 — the flipper's spread on the Baton Rouge closing pleaded as Predicate Act 4 — sent by Riverside and received by NLLLP as the flipper's counsel; the $5,024,100 "ASSIGNOR PROCEEDS" wire from Riverside to the NLLLP trust account on March 8, 2022, the spread on the Macon closing pleaded as Predicate Act 3, sent by Riverside and received by NLLLP; and, by the Nussbaum Firms, in the proceeds of Predicate Acts 5 through 8, the $12 million wire to Steiner on February 27, 2024, the $450,000 wire to Real Green on March 21, 2024, and the $10.7 million in wires to Aven Realty between December 24 and December 30, 2024. In addition, Riverside, Greenwald, Zagelbaum, and Abbott conducted the referral payments pleaded as Predicate Act 9 through a donor-advised charitable fund and through entities other than Nussbaum or his firm knowing that the transactions were designed to conceal the nature, source, and ownership of the payments, in violation of 18 U.S.C. § 1956(a).

## AGGREGATE DAMAGES

200. Blueberry lost the Escrow Amount: the $58,772,945 that NLLLP acknowledged in the Escrow Agreement it was holding for Blueberry’s benefit, that the notes required to remain in NLLLP's trust account absent Blueberry's written consent, and that was never returned. That sum is the consolidated balance of Blueberry's advances to the Obligors, together with interest and fees capitalized under the notes as consolidated, as of August 2024. It is the principal sum every Count and the Prayer for Relief in this Complaint seek to recover, as pleaded below.

201. The deposits from which that balance was funded, and the wires by which it left the Nussbaum Firms' accounts, are set forth *supra*. The $8 million Blueberry deposit of July 17, 2023 and the $7.5 million Blueberry affiliate deposit of August 24, 2023 are pleaded as advances into

the escrow; to the extent either is not included within the Escrow Amount, Blueberry reserves the right to seek it by amendment. The $3,281,908.33 Baton Rouge payoff that reached NLLLP's trust account on January 6, 2023 is pleaded in Section D above and is not included in the sum sought unless and until Blueberry confirms it was not received.

202. Blueberry has suffered substantial monetary damages as a direct and proximate result of the conduct alleged in this Complaint, including the loss of the Escrow Amount, the interest the Note and Escrow Agreement provide on it, the costs of investigating where its money went and of this action, and the loss of the use of its money since January 2025. Blueberry is entitled to prejudgment interest on each sum from the earliest ascertainable date the cause of action existed, at the statutory rate of nine percent (9%) under C.P.L.R. §§ 5001 and 5004 and to post-judgment interest as allowed by law.

203. In addition to that principal sum, Blueberry is entitled to the interest the Note and Escrow Agreement provide, including default interest from the Obligors' default; to prejudgment interest as allowed by law; to punitive damages; and to treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c) on Counts X and XI. Punitive damages are warranted because the conduct alleged was not an isolated private wrong but part of the widespread scheme by which the parties deceived hundreds of contracting parties and Nussbaum diverted $336,731,000 from dozens of victims, carried out through fabricated escrow representations, multi-price settlement statements, and false assurances. Those deceived included, but were not limited to, federal, state, and local governmental authorities; institutional and non-institutional lenders and investors; sellers; buyers; title insurance companies; and charitable organizations.

**PLAINTIFF'S VULNERABLE POSITION AND LACK OF KNOWLEDGE**

204. Blueberry is a commercial lender. It lent money to the Obligors on documented terms: promissory notes, a personal guaranty, confessions of judgment, and a requirement that the loan proceeds remain in NLLLP's attorney trust account until released with Blueberry's written consent or returned to Blueberry. Blueberry relied on NLLLP to hold that money as required and on NLLLP's reports of the balance it claimed it held. Blueberry did not control or have any visibility into the attorney trust accounts and was never shown the seller-side settlement statements Riverside prepared on its loans. It received no part of any flip spread, referral payment, or float, and no part of the money misappropriated and diverted to Steiner's companies. Had Blueberry known that its escrow was being lent to Steiner at "a point a week," or that Riverside was closing its loans against an inflated price, it would not have advanced or left a dollar with NLLLP.

205. Blueberry did not know, and had no reason or way to know, that two settlement statements were being prepared for its closings, that the prices shown to it had been built by assignment hours before closing, that proof of funds was being manufactured, that its escrow agent was being paid by its settlement agent, or that its escrow was being disbursed on loan to the borrower's principal (never to be returned). Those instruments and that conduct were actively concealed from Blueberry.

206. Blueberry was shown and relied on legal documents that appeared, and were made to appear, regular and unremarkable on their face. It did not prepare, review, approve, or participate in creating any settlement statement, proof-of-funds wire, receipt letter, or closing document used to carry out the scheme. Those documents were created and controlled by the enterprise.

207. Once Blueberry wired its money into the NLLLP trust account, it had no authority or ability to control the movement of that money. The authority to hold, transfer, and disburse it rested with the Firm Defendants, as the attorneys who controlled the account, and with Riverside

as the settlement agent. It was they, not Blueberry, who moved Blueberry's money out of the account within days of its arrival, cycled it through Riverside's closings and Steiner's companies, and diverted it to recipients and purposes Blueberry did not authorize. Blueberry's only interest at all times was the return of its principal and the interest it had been promised. Had it known of the scheme, it would not have deposited, advanced, or left even a single dollar with NLLLP.

208. The taking of Blueberry's escrow is a wrong independent of any characterization of the underlying real estate transactions. The conversion of client-escrowed funds from an attorney trust account is an unthinkable crime, and one in which Blueberry also took no part. Blueberry is a client that was betrayed by its own attorneys and fiduciaries.

209. Blueberry's conduct as it relates to each Defendant was lawful and in good faith.

210. Blueberry engaged in no inequitable conduct connected to the subject of this action.

211. Blueberry did not injure any Defendant, each of which was enriched by the enterprise as described herein.

212. The Nussbaum Firms were Blueberry's counsel who engaged in multiple conflicts of interest on the closings described above. As it turns out and unbeknownst to Blueberry, they were acting adversely to Blueberry, at the exact times Blueberry was relying upon them to provide legal advice and counsel, to safeguard its entrusted funds, and to act in an upright manner.

213. The betrayal by Blueberry’s escrow and closing/settlement agents was shocking to Blueberry, and it has taken significant time to achieve an understanding of the scope and magnitude of the enterprise whose activities were actively concealed from Blueberry.

## **CAUSES OF ACTION**

### **COUNT I — FRAUD**

*(Against Lowinger and the Nussbaum Firms)*

214. Plaintiff repeats and realleges paragraphs 1 through 213 of this Complaint as if fully set forth herein.

215. NLLLP made numerous misrepresentations to Blueberry, including, but not limited to, the following:

a. On August 27, 2024, NLLLP, by Nussbaum, executed and delivered to Blueberry the Escrow Agreement reciting that "$58,772,945 is being held in escrow by Escrow Agent," when in actuality none of that amount was held and the account in which that sum was to be held had not equaled one-third of that amount at any point that month.

b. In the notes consolidated on January 1, 2024 and in August 2024, which Nussbaum notarized, NLLLP's trust account was designated as the account in which Blueberry's loan proceeds would be held and from which no transfer would be made without Blueberry's written consent, when, in actuality, the proceeds were not held there and would not be held there.

c. NLLLP accepted Blueberry's money on those terms and said nothing when, as Nussbaum has admitted, its practice since mid-2022 had been to sweep new deposits to Steiner's companies and to repay earlier depositors with later ones — an omission by a fiduciary bound to disclose.

d. Through the Blueberry Nussbaum Escrow WhatsApp group, NLLLP reported balances and confirmed receipts, did not correct Blueberry's November 13, 2023 statement that $38,000,000.00 was "sitting by you in escrow," and accepted Blueberry's January 31, 2024 confirmation of the balance, when the Nussbaum Firms did not hold those funds.

216. Each was made by Nussbaum as a partner of NLLLP in the ordinary course of the firm's business and is NLLLP's own under New York law.

217. NLLLP knew each was false: its partner was, at the same time, telling Steiner that Blueberry's money was "escrow money," that "even when BB money comes in, its not released," and, in May 2022, "Don't tell blueberry I have money for you when I don't!!" MJN & Associates is liable on the same facts as the owner of the Capital One account Nussbaum opened, into which Blueberry's 2024 advances were wired and from which $2 million went to Aven Realty.

218. Lowinger is liable for similar, complementary conduct he exhibited. He drafted or directed the instruments by which the two-price closings were papered: the assignment agreements, the paired settlement statements, the transfer-tax forms prepared so the recorded instrument would conceal the assignment price, and the deed structures agreed in advance with Riverside's counsel, as set forth in Section F above. As counsel on Blueberry's Knoll Ridge loan, Lowinger knew on October 11, 2021 that the property's Parcel 1 price was $15,705,000, directed the "flip statements" on the closing chain, and let Riverside close the file against Blueberry-affiliated money at $27,375,000 three days later, all without telling his client — a concealment by an attorney with a duty to disclose to the client whose loan he was closing.

219. As one of the two attorneys authorized to sign on and responsible for the trust account, Lowinger owed Blueberry a duty to disclose that the account did not hold what NLLLP represented.

220. On January 14, 2025, Lowinger told Blueberry that the trust account "may have been illegally accessed and substantially depleted as a result of irregular transactions," that the account was frozen, and that NLLLP was therefore unable to return any funds — a statement of present fact he knew to be false, having spent January 7 and 8, 2025 writing to Nussbaum, "Why

can't you wire today? What is happening?," "you are hanging me out to dry here," and "Dont bullshit me," with no report of any intrusion or other form of illegal access.

221. Blueberry relied on those knowing misrepresentations. It advanced the tranches consolidated into the Note, consolidated and extended the loan in January and August 2024, advanced $12,193,000 more in 2024 into the Capital One account Nussbaum opened for the loan, and refrained from demanding the Escrow Amount until January 2025, because NLLLP — a law firm acting as counsel and escrow agent, on whose account Blueberry had been repaid on eight prior loans — told it the money was there.

222. Blueberry’s reliance was reasonable in that the Nussbaum Firms were its counsel, and especially given that the Nussbaum Firms had closed eight other, successful loans.

223. Lowinger's January 14, 2025 statement delayed Blueberry's discovery of where its money had gone during the weeks in which the Steiner accounts and the Customers Bank successor account still held funds Blueberry could have sought to restrain.

224. As a direct and proximate result of the foregoing, Blueberry has been damaged in an amount to be determined at trial but that is not less than $58,772,945.

**COUNT II — AIDING AND ABETTING FRAUD**

*(Against the Riverside Defendants, BR Title, Miller, Treff, and, in the Alternative, Bordeaux)*

225. Plaintiff repeats and realleges paragraphs 1 through 224 of this Complaint as if fully set forth herein.

226. The facts pleaded herein establish numerous instances of fraud.

227. Each Defendant against whom this Count is pleaded had actual knowledge of that fraud and gave it substantial assistance. That knowledge is shown by each Defendant's contemporaneous communications.

228. Riverside prepared the two-price statements on Blueberry's Gary, Macon, and Baton Rouge loans, naming Blueberry as Lender on the higher price and NLLLP as counsel on both sides of each file; closed Knoll Ridge at a price its own lender's counsel had put $11,670,000.00 lower three days earlier; and received Blueberry's escrow on closings for which Blueberry was not the lender on the days Blueberry's deposits arrived, including the December 30, 2022, July 18, 2023, August 24, 2023, and September 13, 2023 wires. Its assistance was the closings themselves: it prepared the statements, confirmed the funds, broke escrow, disbursed the money, and issued the policies that caused Blueberry's money to be put beyond its reach.

229. Greenwald knew because he set the terms: "We will charge 2 and split?"; "We keep track"; "I play the games along with you guys." On the day Blueberry's Macon proceeds went to Riverside, he described it as a flip of his client's deal "to your client." He arranged for Riverside to tell a seller's attorney that an unfunded buyer was funded, added and struck a self-dealing payment to Bordeaux on a settlement statement, kept a stable of affiliated title names under which a file could be re-labeled, and received $550,000 from the escrow into an account in his own name. His assistance was to supply and conceal the payments that kept Riverside a willing counterparty, and to lend Riverside's name and policies to closings whose prices he knew were built.

230. Zagelbaum knew because he set the rate — "a half a point for as long as it sits" on money parked in escrow — and arranged its concealment, routing payments through charities and other companies, telling Nussbaum the client "doesn't have to know our deal," acknowledging that Nussbaum's "deposit scheme is too well known," and, when the news broke, instructing that anyone who asked be told "no." His role was to keep Riverside paid and silent, for nearly a decade, on the terms that made it Nussbaum's captive agent and partner rather than independent.

231. Mindick knew because he asked and was told: "Thought you have separate accounts….." / "nope." He described Nussbaum's escrow as the account to which a flipper's proceeds go, told Nussbaum "We send flippers proceeds not amount you sent in," scripted the $3 million proof-of-funds letter for Steiner, and proposed routing assignor proceeds "to an entity" because a "lender may ask for all outgoing wires." His assistance was the escrow-release gate itself: he administered the Gary, Knoll Ridge, Macon, and Baton Rouge closings, sent the settlement statement and confirmed the $10,175,000 wire that left the escrow for Riverside on December 30, 2022, and kept funding from the account he knew was one pool.

232. Lazarus knew because Lowinger briefed him, including on the deed structure of a file that carried a $13 million spread; because he routed the "excess" that two-price closings produce, file after file, and told Nussbaum to "Work with azi on overage"; and because he confirmed receipt of "purchaser's funds" on RATX-47052 drawn the same day from Blueberry's deposit, on a file with statements at two prices. His assistance was Riverside's legal sign-off — the confirmations of funds and authorizations to close that counsel addressed to him by name.

233. Abbott knew because she kept the books on the arrangement: the running spreadsheet of what Riverside owed Nussbaum by file number, the charity registrations, the instruction that a recipient "cant write anything" naming Nussbaum, and the 1031 files that "get handled." Her assistance was operational: she transmitted the wiring instructions on Blueberry's Baton Rouge file, was on the Gary closing chain, and administered the payments that kept the escrow attorney steering closings to Riverside.

234. BR Title is treated as coextensive with Riverside on the alter-ego theory pleaded in Section G above, and independently provided title and closing services to NLLLP on the BRNY-

47158/47159 closing and in December 2024. Bordeaux, in the alternative, is treated as coextensive with Riverside on the alter-ego theory pleaded in Section H above.

235. Miller provided substantial assistance as the attorney whose confirmation was the precondition to funding on Riverside closings paid from the NLLLP escrow, including the July 21, 2022 closing funded with $15,092,187.56 from that account; her knowledge is pleaded from her thirteen years as Riverside's Chief Counsel, her direct dealings with Nussbaum since 2014, and her role as the notice addressee on Riverside's escrow agreements with NLLLP's clients. Treff provided substantial assistance by funding, through the lending business he operates with Eisenreich, closings Riverside processed, and by receiving, through his firm's trust account, $1,529,033.35 net from the NLLLP account and $5,000,000.00 from Real Green's account.

236. Together, the Riverside Defendants and BR Title provided the substantial assistance without which the fraud could not have been carried out: they processed the disbursements, prepared the settlement statements that reduced the inflated transactions to writing, and structured the closings that gave Nussbaum's diversions the appearance of ordinary real estate transactions — the same FLIPPER-captioned practice documented across seven states in Section J above, on the standing formulas documented in Section K above.

237. As a direct and proximate result, Blueberry has been damaged in a principal amount to be determined at trial but that is not less than $58,772,945.00.

## COUNT III — BREACH OF FIDUCIARY DUTY

*(Against Lowinger, NLLLP, and MJN & Associates)*

238. Plaintiff repeats and realleges paragraphs 1 through 237 of this Complaint as if fully set forth herein.

239. NLLLP, as escrowee under the Escrow Agreement and holding Blueberry's loan proceeds in its trust account, owed Blueberry the duties of an escrow agent and fiduciary: to hold

the funds as required, to disburse them only as authorized, to be loyal to Blueberry in its administration of them, and to disclose the truth about them. Lowinger owed Blueberry those duties as one of the two signors on that account and as its counsel on the Knoll Ridge, Gary, and Baton Rouge closings, on which his firm simultaneously represented the purchaser or the flipper, and as the NLLLP partner who gave Riverside its disbursement instructions on the Macon closing. MJN & Associates owed the same duties as the holder of the Capital One account that received Blueberry's 2024 advances.

240. Each breached those duties. NLLLP swept Blueberry's deposits to Steiner's companies and to other clients' closings within days of receipt, repeatedly represented in writing that it held $58,772,945.00 it did not hold, and took undisclosed referral payments and a share of the float on the closings Blueberry funded. MJN & Associates sent $2 million of Blueberry's first 2024 advance to Aven Realty the day it arrived. Lowinger closed Blueberry's Knoll Ridge loan knowing the true price and withholding it, gave Riverside the instructions dividing (and thus hiding from Blueberry) his firm's fee across the two statements on Blueberry's Macon loan and represented the flipper on Blueberry's Baton Rouge loan while his firm was Blueberry's counsel. Also, after demand, Lowinger falsely told Blueberry the account had been illegally accessed.

241. As a direct and proximate result, Blueberry has been damaged in a principal amount to be determined at trial but that is not less than $58,772,945.00.

**COUNT IV — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

*(Against the Riverside Defendants and BR Title; and, in the Alternative, Bordeaux)*

242. Plaintiff repeats and realleges paragraphs 1 through 241 of this Complaint as if fully set forth herein.

243. The conduct pleaded above constituted a breach of fiduciary duties owed to Blueberry.

244. The Riverside Defendants knew that they were transacting with an attorney trust account holding client money and that NLLLP was Blueberry's fiduciary on the files they closed. Riverside's settlement statements on Gary and Knoll Ridge name NLLLP as counsel for the Lender, Blueberry, and Riverside's staff on Macon sought "lender counsel approval" from Lowinger. Mindick asked whether Nussbaum kept "separate accounts" and was told "nope," and described Nussbaum's escrow as the account to which a flipper's proceeds go. Zagelbaum agreed to pay Nussbaum on client money "for as long as it sits" in escrow. Greenwald agreed to split the yield on 1031 funds Nussbaum parked. Lazarus was briefed on the deed structure of a two-price file and confirmed receipt of purchaser's funds drawn from the escrow the day a Blueberry deposit arrived. Abbott kept the ledger of what the enterprise owed and administered the payments.

245. With that knowledge, each provided the substantial assistance described above, enabling NLLLP's breaches. BR Title and, in the alternative, Bordeaux are liable coextensively with Riverside on the theories pleaded in Sections G and H above.

246. As a direct and proximate result, Blueberry has been damaged in the principal amount to be determined at trial but that is not less than $58,772,945.

**COUNT V — CONVERSION**

*(Against the Firm Defendants, the Riverside Defendants, BR Title, and Treff)*

247. Plaintiff repeats and realleges paragraphs 1 through 246 of this Complaint as if fully set forth herein.

248. Blueberry had a possessory right to its loan proceeds in the NLLLP and MJN & Associates accounts, which the notes and Escrow Agreement required to be held for it and to be released either to it or upon its consent to another.

249. Blueberry’s deposits are identified by Fed. Ref. No. in Sections A and C above, and under the lowest-intermediate-balance rule the wires described there carried Blueberry's money.

250. NLLLP, through Nussbaum, exercised unauthorized dominion over it by wiring it to Real Green, Aven Realty, Steiner, and others, through the wires out of the NLLLP trust account and the Customers Bank successor account; MJN & Associates by wiring $2 million of Blueberry's first 2024 advance to Aven Realty the day it arrived; and Lowinger, as a signatory on the account, by withholding Blueberry's money while it was being dissipated.

251. Riverside exercised unauthorized dominion over Blueberry's money, and its traceable proceeds, by receiving and disbursing the wires identified in Sections C and D above, including those of December 30, 2022, July 18, 2023, August 24, 2023, and September 13, 2023; Mindick and Lazarus by authorizing the release and funding of those closings; Greenwald by receiving $550,000 into his own account; Zagelbaum and Abbott by directing and administering the payments to the escrow attorney out of Riverside's receipts; and BR Title as Riverside's alter ego and continuation — each with knowledge that it was an attorney trust account transacting in clients' money as one commingled pool.

252. Treff exercised unauthorized dominion over traceable proceeds through his firm's receipts described in Section I above.

253. As a direct and proximate result, Blueberry has been damaged in the principal amount to be determined at trial but that is not less than $58,772,945.

**COUNT VI — CIVIL CONSPIRACY**

*(Against the Firm Defendants, the Riverside Defendants, and BR Title; and, in the Alternative, Bordeaux)*

254. Plaintiff repeats and realleges paragraphs 1 through 253 of this Complaint as if fully set forth herein.

255. There was a corrupt agreement between the Nussbaum side and the Riverside side, and it is shown by conduct spanning years: Zagelbaum's agreement to pay Nussbaum "a half a

point for as long as it sits" on escrowed money and to keep the arrangement from clients; Greenwald's agreement to split fees and float with Nussbaum, his description of playing "the games along with you guys," and his arrangement of false funding confirmations; Mindick's standing agreement to run Steiner's round-trip deposits and to keep funding Nussbaum's closings from an account they knew was not segregated; Abbott's maintenance of the ledger that tracked the enterprise's operations; Lazarus's participation in the deed structuring and his routing of the overage; and, on the Nussbaum side, the legal documents accompanying two-price statements, the fee splits, and the diversion of the escrow's money to Riverside's closings.

256. Each Defendant named committed or knowingly permitted and took steps to enable an overt act in furtherance — the closings, the disbursements, the payments, and the concealment described above — and participated to its financial benefit. BR Title and, in the alternative, Bordeaux are named on the theories pleaded in Sections G and H above.

257. As a direct and proximate result, Blueberry has been damaged in the principal amount to be calculated at trial but that is not less than $58,772,945, without duplication of the recovery sought under Counts I and III.

**COUNT VII — NEGLIGENCE AND, IN THE ALTERNATIVE, GROSS NEGLIGENCE**

*(Pleaded in the Alternative; Against Miller and Lazarus)*

258. Plaintiff repeats and realleges paragraphs 1 through 257 of this Complaint as if fully set forth herein.

259. This Count is pleaded in the alternative to the knowing-participation theories pleaded against Miller in Count II and against Lazarus in Counts II, IV, and VI.

260. Miller, as Riverside's Chief Counsel, was the attorney whose personal confirmation that a file was "clear to close" was the precondition to Riverside's funding closings paid from NLLLP's attorney trust account.

261. A closing attorney who performs that gatekeeping function on closings funded from a trust account holding lenders' money undertakes a duty of reasonable care to the depositors, whose reliance on that function is direct and foreseeable.

262. A reasonably prudent attorney acting in that role, with thirteen years at Riverside and direct dealings with Nussbaum since 2014, would have inquired why Riverside was closing files funded from a single attorney trust account at prices that differed from statement to statement, and would not have cleared them.

263. Lazarus, as National Counsel, personally confirmed receipt of funds, authorized funding, and routed the "excess" that two-price closings produce, on files he had been briefed carried two prices, and on January 2, 2025 identified a valuation that had fallen from $13.5 million to $3.5 million and accepted a three-word answer — a departure from reasonable care on that occasion alone, eight days before Blueberry's demand.

264. On the same facts, credited as showing routine, unremarked handling of an irregularity of that scale, each acted with gross negligence.

265. As a direct and proximate result, Blueberry has been damaged in a principal amount to be determined at trial but that is not less than $58,772,945.00, recoverable under this Count only in the alternative to, and not in addition to, any recovery against Miller under Count II or against Lazarus under Counts II, IV, or VI.

**COUNT VIII — UNJUST ENRICHMENT**

*(Against All Defendants Except the Obligors)*

266. Plaintiff repeats and realleges paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267. As to NLLLP, this Count is pleaded in the alternative to Count XV.

268. Each Defendant was enriched at Blueberry's expense.

269. NLLLP and MJN & Associates: the retained Escrow Amount, the legal fees carried on Riverside's statements on Blueberry's loans ($13,332 and $25,000 on Knoll Ridge; $25,000 and $7,500 on Macon; $5,000 and $7,500 on Baton Rouge), the $2,792,500 Baton Rouge spread received as the flipper's counsel, and the referral payments and float received from Riverside.

270. Lowinger: his share of those sums as NLLLP's partner.

271. Riverside: the title premiums and closing fees on the Gary, Knoll Ridge, Macon, and Baton Rouge closings and on the closings funded from Blueberry's deposits, and the retained share of the split it paid Nussbaum.

272. Greenwald: the $550,000.00 wired to his law office on May 2, 2022, and his share of Riverside's proceeds.

273. Zagelbaum, Mindick, Lazarus, and Abbott: the compensation and distributions each received from Riverside's proceeds of those closings.

274. Miller: the compensation attributable to the closings she cleared.

275. BR Title: Riverside's enrichment, coextensively, on the theory pleaded in Section G above.

276. Bordeaux: its $1,148,697.86 in receipts from the Nussbaum Firms' trust accounts, including $400,000 from the NLLLP escrow in 2022, or, in the alternative, Riverside's enrichment on the alter-ego theory pleaded in Section H above.

277. Eisenreich: the funding fees and proceeds described in Section I above, in an amount to be determined.

278. Treff: $1,529,033.35, the net amount his firm's trust account received from the NLLLP escrow, and the $5 million received from Real Green.

279. Equity and good conscience require each to make restitution.

280. Blueberry has been damaged in a principal amount that is to be determined at trial but that is not less than $58,772,945.00 as to the Firm Defendants, the Riverside Defendants, and BR Title, and not less than the sums stated as to each other Defendant.

**COUNT IX — CONSTRUCTIVE TRUST AND EQUITABLE LIEN**

*(Against the Riverside Defendants, BR Title, Bordeaux, Eisenreich, and Treff)*

281. Plaintiff repeats and realleges paragraphs 1 through 280 of this Complaint as if fully set forth herein.

282. NLLLP stood in a fiduciary relationship with Blueberry as its counsel.

283. NLLLP stood in a fiduciary relationship with Blueberry under the Escrow Agreement

284. NLLLP promised to hold Blueberry's money as a trustee and escrow agent.

285. Blueberry transferred its funds, which were the loan proceeds, in reliance on those promises and assurances.

286. Various Defendants were enriched by the receipt of Blueberry's funds.

287. Riverside's Signature Bank account ending 3926 and its other trust accounts received funds from Blueberry's escrow.

288. Greenwald's law office account at Signature Bank received funds from Blueberry's escrow.

289. Bordeaux's Signature Bank account ending 5956 received funds from Blueberry's escrow.

290. Eisenreich and Treff received the proceeds of the transfer of Blueberry's escrowed funds to Treff & Lowy PLLC's trust accounts at Signature Bank and Dime Community Bank and the proceeds of the closings Eisenreich funded.

291. Equity and good conscience require that the funds be returned to Blueberry.

292. Blueberry has no adequate remedy at law as to those specific funds and their proceeds.

293. A constructive trust, and in the alternative an equitable lien, should be imposed on them for Blueberry's benefit.

**COUNT X — VIOLATION OF 18 U.S.C. § 1962(b), (c)**

*(Against the Firm Defendants, the Riverside Defendants, and BR Title)*

294. Plaintiff repeats and realleges paragraphs 1 through 293 of this Complaint as if fully set forth herein.

295. Nussbaum, Lowinger, the Nussbaum Firms, Riverside, BR Title, Greenwald, Zagelbaum, Mindick, Lazarus, and Abbott, along with non-parties Steiner and Prager, constituted an association-in-fact enterprise (the "Enterprise") engaged in and affecting interstate commerce.

296. The Enterprise's common purpose was to generate and divide undisclosed proceeds from real estate closings — flip spreads, referral payments, the float on escrowed money, other undisclosed charges and fees — by concealing true prices from lenders and sellers and true sources of funds from lenders and escrow depositors — including by keeping the trust account's money moving into Riverside closings regardless of whose money it was.

297. The Enterprise's members' relationships were fixed and recurring: the Nussbaum Firms supplied the trust account that funded the closings and the lender-side counsel role that concealed the prices; Riverside and its officers supplied the two-price statements, the releases of funds, the appearance of a neutral settlement agent, and the title insurance; Steiner and Prager supplied the buyers, the flippers, and the demand for manufactured liquidity; and the participants divided the proceeds on the standing formulas set forth in Section K above.

298. The Enterprise operated continuously from at least 2016 through January 2025, across files in at least seven states.

299. The Enterprise was not a single corporation acting through its own officers; it combined two independently owned businesses — an escrow-attorney practice and a title agency — bound by a referral-and-float arrangement neither disclosed, together with the outside borrowers whose transactions the arrangement served and who in turn were supposed to feed it.

300. The predicate acts are set forth in Section L above, each with the Defendant who committed them. The acts are related — the same participants, the same mechanisms, the same account, the same victims —extending from at least July 2020 through January 2025, across many transactions and victims including Blueberry, Bethpage FCU, UNIFY FCU, Lument, and the creditors named in the Nussbaum Affirmation.

301. Each Defendant participated in the operation or management of the Enterprise. Lowinger, NLLLP, and MJN & Associates controlled the trust accounts and directed the two-price paperwork; Greenwald and Zagelbaum set the terms on which Riverside took Nussbaum's closings and paid him; Mindick decided when escrow broke and funds released and manufactured funding; Lazarus designed fraudulent structures, confirmed funds, authorized funding, and routed the overage; and Abbott moved the money and kept the ledgers for the Enterprise to function. BR Title is named coextensively with Riverside on the alter-ego theory pleaded in Section G above.

302. Blueberry was injured in its business or property by reason of the predicate acts. Its injury — the loss of the $58,772,945 Escrow Amount — flows directly from the Predicate Acts, which took the escrow it was repeatedly assured was being held and concealed the loss. The money taken was Blueberry's, from the account in which it was required to sit, and no third party stands between those acts and the loss. Blueberry was also the direct target of Predicate Acts 1, 3, and 4, which obtained its loans against inflated prices on its own files, and of Predicate Act 9, which deprived it of the honest services of its own escrowee and counsel; and the Riverside Defendants'

predicate acts were the means by which the escrow's money — including the deposits Blueberry never got back, funded into Riverside closings on the days they arrived as set forth in Section C above — became closed transactions.

303. Blueberry's injury is a domestic injury. Blueberry is a Delaware limited liability company with its principal place of business in New Jersey, the accounts from which its money was taken were in New York, and the property and closings were in the United States.

304. As a direct and proximate result, Blueberry has been damaged in a principal amount to be determined at trial but that is not less than $58,772,945.00, which should be trebled under 18 U.S.C. § 1964(c), together with costs and reasonable attorneys' fees.

**COUNT XI — VIOLATION OF 18 U.S.C. § 1962(d)**

*(RICO Conspiracy; Against the Firm Defendants, the Riverside Defendants, and BR Title)*

305. Plaintiff repeats and realleges paragraphs 1 through 304 of this Complaint as if fully set forth herein.

306. The Defendants agreed to conduct the Enterprise's affairs through the pattern described in Count X, and each knew of and agreed to facilitate that pattern, as shown by the coordinated roles and communications described herein. Each Defendant's agreement is evidenced by conduct extending over years.

307. NLLLP's, MJN & Associates', and Lowinger's agreement is shown by their supplying the escrow and the two-price paperwork on file after file, by Lowinger's "back to back to back markups," by his briefing of Lazarus on the deed structure of the $13 million spread on a file, by his May 3, 2023 "we need to do two statements ... We need a statement for our lender with a higher price," and by his August 22, 2024 request for Steiner's financial statement five days before the Escrow Agreement.

308. Riverside's agreement is shown by its officers' conduct, by the dedicated file series it kept for Nussbaum's and Prager's transactions, and by its September 30, 2021 $1,505,057.43 wire to NLLLP that Nussbaum called "Short 600k or so." Zagelbaum's agreement is a running tally with Nussbaum, negotiated and adjusted from at least February 2016 through February 2024 — "Hadassahs checking," "Half point if I recall correctly," "It was a quarter point, right?" — renewed and performed closing after closing, and by "He doesn't have to know our deal." Greenwald's is agreement in his own words: "We will charge 2 and split?," "We keep track," "I play the games along with you guys," and his arrangement of false funding confirmations on request. Mindick's is shown by the Steiner round-trips he agreed to run on request — "Pls confirm you will send it back tomorrow morning" — by "nope," and by three further years of funding from the account he knew was not segregated. Abbott's is shown by the continuous, dedicated ledger of balances owed to Nussbaum that she kept by file number — conduct with no purpose except to service an ongoing enterprise. Lazarus's is shown by his being "on the same page" on the deed structure of RANJ-45148 and by his file-after-file routing of the overage. BR Title's is Riverside's, on the theory pleaded in Section G above.

309. As a direct and proximate result, Blueberry has been damaged in a principal amount to be determined at trial but that is not less than $58,772,945.00, which should be trebled under 18 U.S.C. § 1964(c), together with costs and reasonable attorneys' fees.

**COUNT XII — FRAUDULENT TRANSFER UNDER DEBTOR AND CREDITOR LAW**

*(Against the Firm Defendants and Bordeaux)*

310. Plaintiff repeats and realleges paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311. The Nussbaum Firms operated their trust accounts as a Ponzi scheme — repaying earlier depositors with later ones — and were insolvent throughout the period at issue.

312. Their trust account held a fraction of the client money it owed, closing 2023 at $534,500.08 against a Blueberry balance alone of more than $38 million, and closing 2024 at $0.00.

313. Their liabilities to trust depositors exceeded their assets at a fair valuation throughout.

314. The transfers described above were made without reasonably equivalent value.

315. Blueberry, a creditor of the Nussbaum Firms whose money was in the transferring account, seeks avoidance of those transfers.

**COUNT XIII — ACCOUNTING**

*(Against Lowinger, NLLLP, and MJN & Associates)*

316. Plaintiff repeats and realleges paragraphs 1 through 315 of this Complaint as if fully set forth herein.

317. The Firm Defendants stood in a fiduciary relationship with Blueberry.

318. Blueberry's money was commingled in their accounts with the funds of other clients, moved through dozens of transactions across at least seven states, and was the subject of fictitious transactions designed to obscure which funds went where.

319. After Blueberry demanded its money on or about January 10, 2025, NLLLP answered with the false intrusion explanation and then that it was no longer a functional entity.

320. Blueberry seeks an accounting from the Firm Defendants of all funds received, held, or disbursed in connection with Blueberry's money

321. Blueberry further seeks an accounting of all fees, referral payments, float, and other benefits received in connection with them.

**COUNT XIV — BREACH OF PROMISSORY NOTE**

*(Against 446 Monroe LLC and 185 E. 33rd St LLC)*

322. Plaintiff repeats and realleges paragraphs 1 through 321 of this Complaint as if fully set forth herein.

323. Obligors are the makers of the Amended, Restated, and Consolidated Commercial Promissory Note executed in August 2024 in the principal amount of $60,000,000.00, which consolidated, amended, and restated the Existing Notes identified in Section A above.

324. The Note fixes interest "at Six and 50/100 percent (6.50%) per every 30 days," requires monthly payments beginning August 1, 2024 under an attached payment schedule, sets a Maturity Date of August 31, 2027, and provides for a Default Rate of twelve percent per annum above the stated rate, together with a late charge on each overdue payment.

325. The Note provides that its principal "shall be disbursed to the Nussbaum Lowinger LLP Attorney Trust account IOLA at Capital One Bank," to be held under the Escrow Agreement, and that "[t]ransfer of any amount of the Loan from the Trust account without Lender's prior written consent shall be an Event of Default."

326. In the Note, the Obligors represented, warranted, and covenanted "that there are no offsets, counterclaims or defenses with respect to [their] obligations under the Existing Notes."

327. Blueberry is the holder of the Note and of the Existing Notes it consolidated.

328. Blueberry performed by advancing the loan proceeds.

329. The Obligors failed to perform by failing to make the payments the Note required.

330. Despite due notice of the default and demand for payment, the Obligors have not paid the sums due under the Note. No part of the loan has been repaid.

331. As a direct and proximate result of the Obligors' breach, Blueberry has been damaged in the amount of the unpaid principal of the Note, together with interest at the Note rate

through the date of default, interest at the Default Rate from the date of default, the late charges the Note provides, and the costs of collection, in an amount to be determined at trial.

**COUNT XV — BREACH OF CONTRACT**

*(Against NLLLP)*

332. Plaintiff repeats and realleges paragraphs 1 through 331 of this Complaint as if fully set forth herein.

333. The Escrow Agreement is an enforceable contract between Blueberry and NLLLP.

334. In accordance therewith, NLLLP covenanted and agreed that "the entirety of the Escrow Amount shall be deposited with and held by Escrow Agent until, at the latest, 12 PM Eastern Standard Time on August 31, 2027," to be released only as the Escrow Agreement provided.

335. The Escrow Agreement further provides that upon the Obligors' failure to make a payment and the passage of ten days after notice, it would "immediately and without notice to any of the parties hereto, release to Grantee the entirety of the Escrow Amount."

336. Blueberry performed its obligations under the Escrow Agreement, including by funding the Escrow Amount.

337. The Obligors failed to pay; Blueberry gave notice; ten days passed; and on or about January 10, 2025, Blueberry demanded the Escrow Amount.

338. NLLLP did not hold it, did not release it to Blueberry upon demand, and, before and after signing the Escrow Agreement, released the funds it did hold to others without Blueberry's written consent.

339. NLLLP's exculpation under the Escrow Agreement does not reach "its bad faith or willful misconduct," and the conduct pleaded above is both.

340. As a direct and proximate result, Blueberry has been damaged in the amount of $60 million, together with interest at the Note's default rate as the Escrow Agreement provides and the reasonable attorneys' fees and costs the Escrow Agreement awards the prevailing party.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Blueberry Funding, LLC respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally as applicable, as follows:

A. On Count I (Fraud), compensatory damages against Lowinger, NLLLP, and MJN & Associates in the pleaded amount, plus punitive damages;

B. On Count II (Aiding and Abetting Fraud), compensatory damages against the Riverside Defendants, BR Title, Miller, and Treff, and, in the alternative, Bordeaux, in the pleaded amount;

C. On Count III (Breach of Fiduciary Duty), compensatory damages against Lowinger, NLLLP, and MJN & Associates in the pleaded amount;

D. On Count IV (Aiding and Abetting Breach of Fiduciary Duty), compensatory damages against the Riverside Defendants and BR Title, and, in the alternative, Bordeaux, in the pleaded amount;

E. On Count V (Conversion), compensatory damages against the Firm Defendants, the Riverside Defendants, BR Title, and Treff in the pleaded amount;

F. On Count VI (Civil Conspiracy), a determination that the Firm Defendants, the Riverside Defendants, and BR Title, and, in the alternative, Bordeaux, are jointly and severally liable, on a conspiracy theory, for the damages awarded under Counts I and III, without additional or duplicative recovery;

G. On Count VII (Negligence and, in the Alternative, Gross Negligence), compensatory damages against Miller and Lazarus in the pleaded amount;

H. On Count VIII (Unjust Enrichment), disgorgement and restitution from each Defendant in the amount by which it was enriched, as pleaded therein;

I. On Count IX (Constructive Trust and Equitable Lien), imposition of a constructive trust and an equitable lien over traceable proceeds of Plaintiff's funds held by the Riverside Defendants, BR Title, Bordeaux, Eisenreich, and Treff, including the accounts identified in that Count;

J. On Counts X and XI (18 U.S.C. §§ 1962(c) and (d)), damages against the Firm Defendants, the Riverside Defendants, and BR Title in the pleaded amount, trebled pursuant to 18 U.S.C. § 1964(c), together with the costs of this action and reasonable attorneys' fees;

K. On Count XII (Fraudulent Transfer), avoidance of the transfers and such further relief as New York Debtor and Creditor Law § 273 *et seq.* provides;

L. On Count XIII (Accounting), an order directing Lowinger, NLLLP, and MJN & Associates to render a full and accurate accounting of all funds received, held, or disbursed in connection with Plaintiff's escrowed funds and of all fees, referral payments, float, and other benefits received in connection with them;

M. On Count XIV (Breach of Promissory Note), judgment against 446 Monroe LLC and 185 E. 33rd St LLC, jointly and severally, in the amount of the unpaid principal of the $60,000,000.00 Amended, Restated, and Consolidated Commercial Promissory Note, together with interest at the Note rate, interest at the Default Rate from the date of default, the late charges the Note provides, and the costs of collection;

N. On Count XV (Breach of Contract), damages against NLLLP in the pleaded amount, together with default interest under the Note and Escrow Agreement and the attorneys' fees the Escrow Agreement awards the prevailing party;

O. Pre-judgment and post-judgment interest as allowed by law;

P. An award of costs and reasonable attorneys' fees to the extent permitted by law or contract;

Q. Leave to amend, following discovery, to add defendants, theories, or damages identified in the Factual Allegations above;

R. A declaration that Plaintiff seeks a single recovery of its actual damages and not cumulative or duplicative recovery of the same loss; that where an award under one Count would duplicate an award against the same Defendant under another Count for the same loss, Plaintiff elects the greater, inclusive of and not in addition to the lesser; that Plaintiff's aggregate recovery across all Defendants shall total its actual damages of $58,772,945.00 plus the interest, punitive damages, treble damages, costs, and fees separately prayed for; and that any amount recovered from one Defendant be applied to reduce, dollar for dollar, the amount owed by any other Defendant for the same underlying loss; and

S. Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 23, 2026
New York, New York

Respectfully submitted,

**BOCHNER PLLC**

*/s/ Jeremy M. Doberman*
Jeremy M. Doberman, Esq.
Isaac Alony, Esq.
1040 Avenue of the Americas, 15th Floor
New York, New York 10018
(646) 971-0685
jeremy@bochner.law
ialony@bochner.law

*Attorneys for Plaintiff*

**VERIFICATION OF PLAINTIFF**

I, Alan J. Miller, hereby declare:

1. I am an authorized signatory of the BLUEBERRY FUNDING LLC, the Plaintiff in the above-captioned case.
2. I verify that the foregoing Verified Amended Complaint filed on behalf of Plaintiff was authorized by Plaintiff to be filed.
3. I verify that the allegations contained therein are true and correct to the best of my knowledge, information, and belief, and as to matters that are stated therein upon information and belief, the same are believed to be true.
4. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 23rd day of October, 2026.

box SIGN 15Y52KR7-4Y886KP5

Alan J. Miller